# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | |
|---|---|
| MONROE COUNTY BOARD<br>OF COMMISSIONERS,<br>100 W. Kirkwood Avenue, Room 322<br>Bloomington, IN 47404<br><br>INDIANA FOREST ALLIANCE<br>615 N. Alabama Street, Suite A<br>Indianapolis, IN 46204<br><br>HOOSIER ENVIRONMENTAL COUNCIL<br>3951 N. Meridian Street, Suite 100<br>Indianapolis, IN 46208<br><br>FRIENDS OF LAKE MONROE<br>1275 S. Longwood Drive<br>Bloomington, IN 47401<br><br>          *Plaintiffs*,<br><br>   v.<br><br>UNITED STATES FOREST SERVICE,<br>Sidney R. Yates Federal Building<br>201 14th Street SW<br>Washington, DC 20227<br><br>MICHAEL CHAVEAS, Forest Supervisor,<br>Hoosier National Forest<br>811 Constitution Avenue<br>Bedford, IN 47421<br><br>CHRISTOPHER THORNTON, District Ranger,<br>Hoosier National Forest<br>811 Constitution Avenue<br>Bedford, IN 47421<br>          *Defendants*. | Case No._____<br><br><br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

1

1.      This case challenges the United States Forest Service's ("Forest Service's" or "Service's") Houston South Vegetation Management and Restoration Project ("Project"), which entails thousands of acres of commercial logging, road building and trail improvements, herbicide application, and prescribed burning over the next 15-20 years in the Hoosier National Forest—the only national forest in the State of Indiana. The entire Project will occur within the Lake Monroe watershed, where decades of logging and agriculture have already damaged water quality so badly that parts of the Project areas are now considered "impaired" under the Clean Water Act. The watershed ultimately drains into Lake Monroe, the largest lake in Indiana and sole source of drinking water for over 145,000 people. Many of the Project activities will be carried out on steep slopes with highly erodible soils, increasing the risk of streambank erosion and pollution of the already impaired watershed with consequent risks to drinking water, public health, safety, recreation, and the ecosystem. The Project will adversely impact Lake Monroe and its tributaries, and will irreparably harm Plaintiffs and their interests in the watershed and its environmental resources.

2.      This case marks the third time the parties have been forced to come to this Court over the same Project and, indeed, the same issue—the Forest Service's chronic unwillingness to examine Project impacts on Lake Monroe (and related issues). In the first case, this Court held that the Service's original Environmental Assessment ("EA") violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, because it failed to take the legally required "hard look" at the Project's direct, indirect, and cumulative impacts on Lake Monroe. *Monroe Cnty. Comm'rs v. U.S. Forest Serv.* ("*Monroe I*"), 595 F. Supp. 3d 713, 723-24 (S.D. Ind. 2022) (Pratt, C.J.). The Court correctly held that the Service failed to make a

"convincing" case for why the Project's impacts on Lake Monroe do not merit the kind of heightened scrutiny that NEPA demands for environmentally "significant" actions like this one. *Id.* at 724. The Court's order remanding to the Service for further analysis ultimately counseled caution, stating that the "Project should not move forward without first determining how the water quality of 120,000 people could be affected." *Id.*

3.      In the second case, decided almost exactly one year later, this Court was asked to review the Forest Service's attempted end run around the Court's order in *Monroe I*. Rather than conduct the NEPA-compliant analysis deemed necessary by the Court, or heed the Court's warning to do so before Project implementation, the Service rushed to burn thousands of acres prescribed by the Project on the basis of a Supplemental Information Report ("SIR") the Service prepared to "explain why the impacts to Lake Monroe would not be significant," i.e., why it did not need to prepare an Environmental Impact Statement ("EIS")—the rigorous analysis NEPA requires for all federal actions that will result in significant impacts on affected resources. The Court rejected that analysis again, finding the Service had failed "to take the requisite 'hard look' at the environmental consequences of the Project," including "the potential harm to the thousands of citizens that consume water from the Lake absent full compliance with NEPA." *See generally* Order Granting Plaintiffs' Motion for Preliminary Injunction, *Monroe Cnty. Comm'rs v. U.S. Forest Serv.*, 4:23-cv-00012-TWP-KMB (S.D. Ind. March 30, 2023) (Pratt, C.J.), ECF No. 58 [hereinafter *Monroe II*]. Consequently, the Court enjoined Project implementation pending "a showing sufficient to pass muster under the NEPA and the [Administrative Procedure Act ("APA"), 5 U.S.C. § 5 U.S.C. 701-706)]." *Id.* at 21.

4.      The Forest Service's decision and underlying environmental analysis challenged in this case are no different from those previously rejected by this Court. The Service's position

remains an *ipse dixit*; without referring to any new research or providing any data, it claims that so-called Best Management Practices ("BMPs") will eliminate any measurable impact on the Lake Monroe watershed by pointing to its own declaration, prepared during litigation to oppose the *Monroe II* injunction (unsuccessfully), in which the agency claimed contrary to all common sense that the Project would have no measurable impact on the Lake Monroe watershed by deploying BMPs. In other words, "just trust us."

5.      The Service's predetermination of its analysis is evident in its treatment of old-growth forests in the action area. Since its prior analyses, the Forest Service's national headquarters has crystallized a forthcoming amendment to the 2006 Hoosier National Forest Land and Resource Management Plan ("Forest Plan") meant to implement President Biden's Executive Order 14,072. Forest Plan amendments are binding and will preserve, maintain, and foster the kind of old-growth forest presently found throughout the Project area, which is especially rare and unique in the Midwest due to persistent logging, agriculture, and development of forested lands in this region. The Service claims that none of this applies here by measuring the Project areas against the definition of old-growth employed by a different Forest Service region (the Southern Region). The Forest Service's self-serving conclusion conveniently omits the fact that the majority of the Project area meets both the Hoosier Forest Plan's definition of "old-growth forest" and that of the impending Forest Plan amendment.

6.      In short, the Forest Service has again violated NEPA and the APA by refusing to prepare an EIS to take the requisite "hard look" at the Project's highly significant impacts on the Lake Monroe watershed and the Service's compliance with Executive Order 14,072, among many other important resources located in the Project area. The record justifications given by the Service are patently arbitrary and do nothing to rescue the unlawful decisionmaking that has led

4

the parties back to this Court for a third time. The Court should vacate the Service decisions implementing the Project for the reasons explained below.

## JURISDICTION

7.      This case arises under the judicial review provision of the APA, 5 U.S.C. §§ 704, 706. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

8.      Pursuant to 28 U.S.C. § 1391, venue is proper in this Court and Division because the Project challenged here will take place in Jackson and Lawrence counties, Indiana.

## PARTIES

9.      Plaintiff Monroe County Board of Commissioners is a local governing body, elected pursuant to Indiana Code 36-2-2 et seq., serving as the Executive and Legislative branches of Monroe County Government, which represents the interests of the residents of Monroe County, Indiana. The Board of Commissioners' responsibilities include advocating on behalf of Monroe County residents regarding federal projects that may impact residents' health, safety, and welfare. The Board of Commissioners submitted comments on the draft Supplemental Environmental Assessment ("SEA") for the Project and filed timely objections to the Forest Service's decision. The Board's comments and objections identified specific adverse environmental impacts from the Project, including impacts to Lake Monroe and the drinking water it provides to local residents, and repeatedly requested that the Forest Service consider specific alternatives that would better protect the environment and the interests of the citizens of Monroe County. Because of the Project's highly significant impacts to Lake Monroe, old-growth forests, and many other important and unique resources, Monroe County urged the Forest Service to prepare a rigorous EIS to take a hard look at these issues before deciding whether and how to proceed with the Project. Monroe County has been a plaintiff in both of the prior lawsuits

challenging the Project in which this Court twice remanded under NEPA the Service's flawed environmental analyses of the Project's impacts.

10.    The Service's decision to undertake the Project harms the Monroe County Board of Commissioners' interests in ensuring that all residents of Monroe County have access to clean, safe drinking water and opportunities for high-quality outdoor recreation in the Lake Monroe watershed, which encourages tourism and local economic development. The Board of Commissioners has repeatedly notified the Service of these issues in comments, objections, and a sworn declaration previously filed with this Court, all opposing the Service's decisionmaking process for this Project. The Board has also requested that the Forest Service consider alternatives to the Project that would better protect the environment and the interests of the Monroe County residents whom the Board represents and for whom the Commission advocates. The Board of Commissioners signed onto Plaintiffs' jointly submitted comments on the draft SEA and their objections during the pre-decisional administrative review process preceding this litigation. Both the comments and objections explained how serious factual and methodological errors undermined the agency's analysis of the Project's impacts to Lake Monroe, and requested that the agency prepare an EIS to fully evaluate those effects. As it has every time before, the Forest Service again denied that the Project's impacts to Lake Monroe, or to the interests of the residents of Monroe County, were significant.

11.    Plaintiff Indiana Forest Alliance ("IFA") is a non-profit organization dedicated to the long-term health and well-being of Indiana's native forests. IFA provides accurate information to the people of Indiana to involve them in efforts to protect Indiana's forests and works to ensure their opportunities for input into decisionmaking that affects forests, including decisionmaking by the Forest Service. IFA speaks out for the native animals, plants, and other

creatures who survive in Indiana's forests and cannot speak for themselves. IFA's mission is to preserve and restore Indiana's native hardwood forest ecosystem for the enjoyment of all.

12.    IFA has submitted detailed comments to the Forest Service regarding the Project at every opportunity, including on the decision challenged here, and objected to the Service's decision through the pre-decisional administrative review mandated by the Service's regulations. IFA's detailed comments on the Project explained that the Project will have highly significant adverse impacts on Lake Monroe and the surrounding concentration of public forest land that is unique in Indiana and the surrounding states of Ohio and Illinois and requested that the Forest Service fully evaluate those impacts in an EIS. Plaintiff IFA also submitted numerous scientific studies that directly undermine the Forest Service's unsubstantiated assumptions and assertions throughout the planning process that purport to demonstrate nominal or non-existent impacts to Lake Monroe.

13.    The Forest Service's decision to undertake the Project harms the aesthetic, recreational, and professional interests of IFA and its members. IFA members live and work in the area where Lake Monroe serves as the sole source of drinking water. As detailed in IFA's comments on the draft SEA, the Project will have significant adverse effects on water quality in Lake Monroe and its tributaries, which in turn harms IFA members' interests in access to clean, safe drinking water, as well as their aesthetic and scientific interests in a clean and healthy reservoir and broader forested watershed for recreation. Indeed, IFA members regularly use the Project area for hiking, birdwatching, camping, and other similar outdoor activities, and they use Lake Monroe for water-based recreational opportunities. IFA members and staff have spent considerable resources and time contracting with and working alongside biologists to conduct surveys of the Project area over the past four years. Those surveys have documented multiple

rare, threatened and endangered species of bats as well as the state endangered cerulean warbler in the Project area, and demonstrated the reliance of these species on mature and old growth forest habitat in the Project area for roosting and nesting. If implemented, the Project would prevent IFA from continuing these surveys in the future, as planned. Moreover, by contributing to the pollution of the watershed and further degrading water quality, the Project will have significant adverse impacts on the ability of IFA's members to engage in high-quality outdoor recreational opportunities in and around the watershed. Additionally, substantial logging of mature and old growth forests and major trail closures and the conversion of trails into logging roads to accommodate this Project will adversely impact IFA members' aesthetic and recreational interests in hiking, birdwatching, foraging, hunting, backpacking, camping and other activities in the Project area.

14.     Plaintiff Hoosier Environmental Council ("HEC") is a non-profit organization whose mission is to make Indiana a better place to live, breathe, work, and play. HEC works toward these goals principally through education and advocacy. For example, HEC works to educate the public about the activities of federal land managers such as the Forest Service and how those activities affect the natural resources that the citizens of Indiana (including HEC members) enjoy. Likewise, HEC engages in advocacy efforts that include advocating for federal land managers such as the Forest Service to take actions that meaningfully protect and restore the environment in Indiana.

15.     Plaintiff HEC has submitted detailed comments to the Forest Service regarding the Project at every opportunity during the decisionmaking process, including on the draft SEA, and objected to the agency's Decision Notice and Finding of No Significant Impact ("FONSI"). Plaintiff HEC's comments on the original EA noted that the Forest Service's own goals for the

8

Hoosier National Forest include protecting and restoring watershed health, and encouraged the agency to consider alternatives that would more effectively accomplish this goal, for example by siting projects outside of the watersheds of municipal drinking water supplies or by considering alternative project tools that may better protect watershed resources. HEC's comments also drew attention to specific deficiencies in the Forest Service's environmental analysis, such as its refusal to conduct a comprehensive analysis of the Project's cumulative environmental impacts.

16.     The Forest Service's decision to undertake the Project harms the aesthetic, recreational, and professional interests of HEC and its members. HEC members live and work in the area where Lake Monroe serves as the sole source of drinking water. The Project will have significant adverse effects on water quality in Lake Monroe and its tributaries, which in turn harms HEC's members' interests in access to clean, safe drinking water, as well as their aesthetic interests in a clean and healthy reservoir and broader watershed for recreation. HEC members regularly use the Project area for hiking, birdwatching, camping, and other similar outdoor activities, but the Project will have significant adverse impacts on the ability of HEC's members to engage in high- quality outdoor recreational opportunities. For example, trail closures and the conversion of trails into logging roads will adversely impact HEC members' aesthetic and recreational interests in hiking and camping in the Project area.

17.     Plaintiff Friends of Lake Monroe ("FLM") is a non-profit, science-driven organization, which serves as the only organization dedicated to protecting and enhancing Lake Monroe and its watershed, including by supporting water quality, pollution reduction, and sustainable recreation. FLM works to accomplish this mission by promoting data collection, the development and implementation of science-based policy, and collaboration between local, state, and federal government entities, businesses, and private parties. Under Section 319 of the Clean

Water Act, FLM received a grant from the state of Indiana's Department of Environmental Management and the United States Environmental Protection Agency to develop the Lake Monroe Watershed Management Plan. The two-year comprehensive effort by FLM and its experts studied problems facing the watershed, quantified their magnitude, identified their source(s), and created a strategic action plan for addressing them. FLM also worked to build a coalition of agencies, organizations, and individuals committed to implementing the Watershed Management Plan and developing initiatives focused on public engagement and education. FLM completed the Watershed Management Plan in January 2022, only two months prior to this Court's summary judgment ruling in *Monroe I*. If anything, the Watershed Management Plan highlighted the substantial challenges facing Lake Monroe and its broader watershed, and counsels in favor of taking a cautious approach to actions—such as the Project—that will foreseeably contribute new forms of sediment and other pollutants into the already degraded Lake Monroe watershed.

18.     FLM submitted detailed science-based comments to the Forest Service on the draft SEA, and objected to the Decision Notice and FONSI. FLM's comments criticized the Forest Service's misplaced reliance on the Watershed Management Plan and disputed the agency's characterizations of the Project's direct, indirect, and cumulative effects on water quality in the Lake Monroe watershed. FLM's comments also pointed to specific, serious flaws in the Forest Service's environmental analysis, and requested that the Forest Service fully evaluate the Project's significant effects on Lake Monroe and its tributaries, including through preparation of an EIS.

19.     The Forest Service's decision to undertake the Project—and to do so without even preparing an EIS to seriously evaluate the Project's effects to Lake Monroe—harms the

aesthetic, recreational, and professional interests of FLM and its members. FLM members live and work in Bloomington and counties within the Lake Monroe watershed, which will be adversely affected by the Project. FLM members thus have interests in access to clean and safe drinking water from Lake Monroe. These interests will be harmed by the Project's significant adverse impacts on water quality within the watershed. FLM members' also have aesthetic, recreational, professional, and scientific interests in the watershed and its surrounding areas. For example, FLM members use the Project area for outdoor activities, including hiking, camping, and birdwatching, as well as for professional opportunities, including studying water quality and wildlife that inhabit the watershed. The Project will have significant adverse impacts on the ability of FLM's members to engage in high-quality outdoor recreational and professional opportunities. For example, closures due to logging and burning activities will adversely impact FLM members' aesthetic and recreational interests in hiking and camping in the Project area.

20.    Plaintiffs' injuries alleged above are directly traceable to Defendants' actions challenged in this case. A court order vacating or enjoining the Forest Service's decision to undertake the Project until and unless the Forest Service conducts a new analysis that complies with NEPA would redress Plaintiffs' injuries, because such a ruling would require the Forest Service to undertake a new analysis that would objectively analyze Project impacts and alternatives, and on the basis of that new analysis may yield a decision that is more protective of the environment and of Plaintiffs' interests in the affected resources.

21.    Defendant Forest Service is a federal agency within the United States Department of Agriculture that is responsible for managing the nation's National Forests, including the Hoosier National Forest. The Forest Service is ultimately responsible for the actions challenged in this Complaint.

22.     Defendant Michael Chaveas is the Forest Supervisor for the Hoosier National Forest. As the Forest Supervisor, Mr. Chaveas is responsible for the actions challenged in this Complaint. Mr. Chaveas is sued in his official capacity.

23.     Defendant Christopher Thornton is the District Ranger for the Brownstown Ranger District and the Tell City Ranger District within the Hoosier National Forest. Mr. Thornton signed the August 14, 2024 Decision Notice for the Project and is thus responsible for the actions challenged in this complaint. Mr. Thornton is sued in his official capacity.

## STATEMENT OF FACTS

## I.     APPLICABLE LEGAL FRAMEWORK

### A.     *NEPA and its Implementing Regulations*

24.     NEPA is the nation's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019).[1] The purposes of the Act are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b), (c).

25.     The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40

---

[1] The regulations implementing NEPA have been amended twice since this case first came before the Court. Neither regulatory amendment applies to NEPA reviews begun before September 14, 2020, so Plaintiffs cite throughout to the 2019 version of the regulations the Service applied here. *See,* e.g., U.S. Forest Serv., Decision Notice and Finding of No Significant Impact for the Houston South Vegetation Management and Restoration Project Supplement at 5 (2024) (same).

C.F.R. §§ 1500-1508, which are "binding on all federal agencies." NEPA is the nation's "basic national charter for protection of the environment." *Id.* § 1500.1(a).

26.     To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)–(iii). By definition, the environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b).

27.     Each EIS must consider the underlying federal "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "all reasonable alternatives" to the proposed action. 40 C.F.R. §§ 1502.13, 1502.14. NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

28.     NEPA requires that, in evaluating the alternatives of a proposed action, agencies take a "hard look" at the effects of the proposed action as compared to all reasonable

alternatives. *See* 40 C.F.R. §§ 1502.1, 1502.16. Agencies must assess the direct, indirect, and cumulative impacts of the proposed action, including adverse environmental effects that cannot be avoided. *Id.* § 1508.25. Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative impacts are those that result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or private third parties. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

29.    Where an agency is unsure whether an EIS is required, it may prepare an EA that analyzes the impacts of the proposed action as well as its alternatives. 40 C.F.R. §§ 1501.4(c), 1508.9. Although less rigorous than an EIS, an EA must "include brief discussions" analyzing direct, indirect, and cumulative impacts of the proposed action, as well as alternatives to the action. *Id.* § 1508.9; *see also* 42 U.S.C. § 4332(E) (requiring agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources").

30.    Federal agencies must prepare an EIS for all proposed actions that are likely to result in a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The "significance" determination is based on numerous factors, including "[t]he degree to which the proposed action affects public health and safety," the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "the degree to which the effects on the

quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may adversely affect an endangered or threatened species," and "[w]hether the action threatens a violation of Federal, State, or local law." *Id.* § 1508.27(b); *see also* U.S. Forest Serv., Decision Notice and Finding of No Significant Impact for Houston South Vegetation Management and Restoration Project Supplement at 5-7 (2024) (citing the "ten factors at 40 CFR 1508.27"). An action is also significant if it "is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment" and "cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.* The presence of any one of these factors requires the preparation of an EIS.

31.    If, in the course of preparing the EA, the agency determines that an EIS is not required, it must issue a FONSI explaining the reasons why the agency has determined that its proposed action "will not have a significant impact" on the environment. 40 C.F.R. § 1508.13.

32.    Public participation in agency decisionmaking, including disclosure of information concerning an agency's proposed action, its impacts, and public input into the development of reasonable alternatives to the action, is central to NEPA's statutory and regulatory scheme, regardless of whether an agency prepares an EIS or an EA. The CEQ regulations require that federal agencies "shall to the fullest extent possible . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment," and require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. §§ 1500.2, 1506.6(a). Thus, "NEPA

procedures must [e]nsure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). In short, "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

33.    During the pendency of any NEPA review, "no action concerning the proposal shall be taken which would . . . [h]ave an adverse environmental impact," or [l]imit the choice of reasonable alternatives" unless and until the "agency issues a record of decision." 40 C.F.R. § 1506.1(a).

34.    Where the Forest Service decides to proceed with an action or project evaluated in an EA and FONSI, the agency's regulations require the responsible official to document the "rationale" for the agency's decision, including "the conclusions drawn and the decision[] made based on the supporting record," in a "decision notice" ("DN"). 36 C.F.R. § 220.7(c).

### B.    *Executive Order 14,072 and Protections for Old Growth Forests*

35.    On April 22, 2022, President Biden signed Executive Order 14,072, which acknowledges the "distinctive role that Federal forest lands play in sustaining ecological, social, and economic benefits throughout the nation." *See* Exec. Order No. 14,072, 87 Fed. Reg. 24,851 (April 27, 2022) ("Strengthening the Nation's Forests, Communities, and Local Economies."). The Order specifically focuses on "the importance of mature and old-growth forests on Federal lands for their role in contributing to nature-based climate solutions by storing large amounts of carbon and increasing biodiversity, mitigating wildfire risks, enhancing climate resilience, enabling subsistence and cultural uses, providing outdoor recreational opportunities, and promoting sustainable local economic development." *Id.* To protect these old-growth forest resources, the Order directs the Secretary of Agriculture to "define, identify, and complete an

inventory of old-growth and mature forests on Federal lands," and to analyze threats to their continued existence within one year (i.e., by April 22, 2023). *Id.*

36.    On June 20, 2022, the Secretary of Agriculture responded to Executive Order 14,072 in part by "direct[ing] the Forest Service to inventory and protect mature and old growth forests to aid in climate resilience and carbon stewardship." The Secretary also directed the Service to utilize the ensuing inventory "to protect, maintain, restore, and cultivate old-growth and mature stand characteristics within the National Forest System," especially where doing so yields "complementary opportunities" to enhance "other ecosystem" and "social values" like the protection of "source-water watersheds" and recreation opportunities.

37.    On December 20, 2023, the Secretary of Agriculture announced the Service's intent "to amend all 128 national forest land management plans to conserve and steward old-growth forest conditions and recruit future old-growth conditions in light of increasing threats due to rapidly changing climate conditions." The Service refers to this plan as the National Old Growth Amendment. According to the Service, that Amendment is meant to provide a "consistent management framework for conserving, stewarding, recruiting and monitoring old-growth forests." On June 20, 2024, the Service published a draft EIS in support of the National Old Growth Amendment. There, the Forest Service broadly defines "Old-growth forests" to mean:

> [D]ynamic systems distinguished by old trees and related structural attributes. Old-growth encompasses the later stages of stand development that typically differ from earlier stages in a variety of characteristics, which may include tree size, accumulations of large dead woody material, number of canopy layers, species composition, and ecosystem function.

This definition tracks with that in the Hoosier Forest Plan, which notes that although "old growth forests are defined in many ways," the term encompasses "[t]he (usually) late successional stage of forest development."[2]

38.    According to the Service, the Forest Plan for the Hoosier National Forest does *not* "functionally meet [the] intent of [the National Old Growth Amendment]" because the Forest Plan "does not have standards/guidelines that constrain management activities in old growth" and/or existing "standards/guidelines are not as restrictive as the proposed [National Old Growth Amendment] standard." Thus, the Hoosier National Forest "is anticipated to experience [a] noticeable change in terms of old growth plan direction" as a result of the National Old Growth Amendment.

39.    According to the Service, it plans to begin implementing the National Old Growth Amendment on or before January 1, 2025.

## II.    FACTUAL BACKGROUND

### A.    *__Hoosier National Forest__*

40.    The Hoosier National Forest, which the Forest Service describes as "Indiana's National Treasure," is the only national forest in the State of Indiana. The Forest provides habitat for numerous wildlife species, including species listed as threatened or endangered under the Endangered Species Act, as well as species recognized as rare, endangered, vulnerable, or regionally sensitive by the State of Indiana or by the Forest Service itself. The Forest provides some of the most popular opportunities in the State of Indiana for outdoor recreation such as hiking and camping.

---

[2] The National Old Growth Amendment considers this to be the operative definition of "old-growth forest" for the Hoosier National Forest. *See* National Old Growth Amendment DEIS, App'x C at 12, 16 (2024).

41.     The Hoosier National Forest was established in 1935. According to the Service's 2006 Forest Plan for the Hoosier National Forest, "[t]he driving force for establishing the Hoosier was to stabilize and restore eroding lands and protect watersheds from sediment." Widespread deforestation in Indiana around the turn of the 20th century led to extensive damage to soils, watersheds, and waterways, and the Hoosier National Forest was established in part to halt and reverse this environmental damage. The Hoosier National Forest has pursued that goal by acquiring large parcels of contiguous land and by promoting reforestation in order to retain soils, prevent adverse impacts to waterways, and provide for a healthy ecosystem. For example, in order to protect and restore soil, and to prevent sediment from flowing into local watersheds, the Forest Service planted various species of trees, including pines, on slopes that otherwise were prone to erosion, including slopes within the Project area.

42.     The 2006 Forest Plan aims to continue "the historic mission of the Hoosier for watershed protection and restoration." The Forest Plan includes a "goal," or an "overall purpose of the Forest," to "Maintain and Restore Watershed Health." The Forest Plan notes that "[t]his goal emphasizes collaborative stewardship of watersheds" and avers that "[t]he Forest will contribute to the restoration of water quality and soil productivity to improve the condition of those watersheds impacted by past land use practices." The Plan further states that the Forest Service will "[g]ive priority to stabilizing areas discharging soil into watercourses, especially those that affect the watershed of municipal or recreational reservoirs."

### B.     _Water Resources Within the Project Area_

43.     The Hoosier National Forest abuts Lake Monroe, which is a 10,750-acre reservoir created in 1964 by damning Salt Creek. The largest lake in Indiana, Lake Monroe serves as the sole source of drinking water for more than 145,000 people in Bloomington, Indiana; at Indiana

19

University; and in surrounding communities. In addition to thus being a critical environmental resource, Lake Monroe is also an important recreational and economic resource, attracting roughly 1.5 million visitors each year and contributing significantly to the local economy.

44.     Lake Monroe is fed by three main tributaries: the North, Middle, and South Forks of Salt Creek. The entire Lake Monroe watershed spans 441 square miles and can be subdivided into four major sub-watersheds: the South Fork of Salt Creek sub-watershed; the North Fork of Salt Creek sub-watershed; the Middle Fork of Salt Creek sub-watershed; and the Lake Monroe Basin sub-watershed.

45.     Lake Monroe and its tributaries suffer from significant water quality issues caused by pollution from nearby land uses, including nutrient overloading from agricultural and septic runoff and sedimentation from agricultural and forestry management activities in the watershed. Sediment in particular is a major concern for the watershed. Sediment carries the nutrients phosphorous and nitrogen as it moves through the watershed. These nutrients, in turn, promote eutrophic conditions and the incidence of harmful algal blooms, impairing the quality and safety of drinking water and diminishing recreational use. Sediments are accumulating in Lake Monroe, entering the lake through its tributaries. A significant source of this sediment is soil erosion. Approximately 76% of the Lake Monroe watershed is considered highly erodible due to steep slopes and soil type, and erosion has been documented at 86% of observed stream sites within the watershed.

46.     The pollution of Lake Monroe and its tributaries from these and other sources has resulted in a significant degradation of water quality. Indeed, Lake Monroe has been designated as "impaired" under the Clean Water Act due to taste and odor, algal blooms, and mercury in fish. Relevant here, the South Fork of Salt Creek and one of its unnamed tributaries have also

been designated as "impaired" under the Clean Water Act due to "low dissolved oxygen and low biological communities." The South Fork of Salt Creek also contributes the largest amount of nitrogen to Lake Monroe of any of its tributaries.

47.    Sediment and pollution in Lake Monroe and its tributaries particularly increase the incidence of harmful algal blooms, which typically occur in warm summer months. Each year for the past eight years, harmful algal blooms in Lake Monroe have led the state of Indiana's Department of Environmental Management to issue warnings to the public that exposure to algal blooms can result in rashes, skin or eye irritation, nausea, stomach aches, and neurological symptoms, and advising members of the public that they should contact a physician if they experience any symptoms after recreational activities in Lake Monroe. These recreational advisories also note that the algal blooms can be poisonous to animals and that pets should not swim or drink where algae is present. Sedimentation and algal blooms also substantially increase the cost of treating the water of Lake Monroe for use as drinking water and have caused an increase in toxic disinfectant byproducts in the drinking water, which further impairs public health and safety. In the past few summers, disinfectant byproducts caused significant taste and odor problems in the City of Bloomington drinking water. Forestry activities such as timber harvesting contribute sedimentation and nutrient runoff that exacerbate the degraded conditions in Lake Monroe and its tributaries.

48.    The Project is located within the South Fork of Salt Creek sub-watershed, which is part of the larger Lake Monroe watershed. Thus, all streams within the Project area ultimately drain into Lake Monroe. The Project occupies roughly 35.5% of the South Fork of Salt Creek sub-watershed. The South Fork of Salt Creek watershed in turn constitutes 102.4 square miles of the total 432 square miles of Lake Monroe's drainage area (or roughly 24%), and the Forest

Service has found that the South Fork of Salt Creek contributes roughly 30% of the water that flows into Lake Monroe.

49.     The Service is the single largest landowner in the Lake Monroe watershed. The Hoosier National Forest represents roughly 20% of the total acreage of the watershed, and constitutes over 40% of the South Fork of Salt Creek sub-watershed. National Forest land within the South Fork of Salt Creek sub-watershed is generally characterized by steep slopes with highly erodible soil.

50.     Although the Forest Service takes various measures to mitigate the extent to which its authorizations cause sedimentation and contamination of waterways, the 2006 Forest Plan notes that "soil and water mitigation and protection measures" have only "moderate" reliability. No mitigation measure or management practice proposed by the Forest Service is 100% effective in preventing sediment or other runoff from entering streams.

### C.     *Lake Monroe Watershed Management Plan*

51.     In 2018, Plaintiff Friends of Lake Monroe began organizing local officials, concerned citizens, and representatives of the Indiana Department of Environmental Management to fund and develop a watershed management plan for Lake Monroe according to the provisions of the Clean Water Act governing nonpoint source pollution, *see* 33 U.S.C. § 1329.[3] Following three years of water sampling and analysis, and routine community

---

[3] This section of the Clean Water Act compels state officials to "prepare and submit to the [U.S. Environmental Protection Agency] for approval a management program . . . for controlling pollution added from nonpoint sources to the navigable waters within the State and improving the quality of such waters." 33 U.S.C. § 1329(b)(1). The Watershed Management Plan satisfies this requirement for the State of Indiana and the Lake Monroe watershed. *See id.* § 1329(b)(3) (encouraging state officials to "involve local public and private agencies and organizations which have expertise in control of nonpoint sources of pollution" in the development of watershed management plans).

engagement to better understand the challenges facing Lake Monroe's water quality, FLM completed the Watershed Management Plan for Lake Monroe in January 2022. The next month, February 2022, the Indiana Department of Environmental Management and U.S. Environmental Protection Agency officially approved the Watershed Management Plan.

52.     In broad terms, the Watershed Management Plan "studied problems facing [Lake Monroe], quantified their magnitude, identified their source(s), and created a strategic action plan for addressing them." In relevant part, the Watershed Management Plan explains that the "key to protecting and improving water quality in the lake is to keep pollutants . . . from reaching the streams that flow into Lake Monroe." To improve water quality, the Watershed Management Plan calculated the current and target loads for the three main pollutants in the watershed: sediment; nitrogen; and phosphorous. "Based on these target loads, significant reductions are required." Indeed, total phosphorus loads must be reduced by 80% overall, total nitrogen loads must be reduced by 20% overall, and total sediment loads must be reduced by 41% overall. Significantly, the South Fork of Salt Creek sub-watershed—where the Project will occur—"is the most impaired and therefore has the most opportunity for improvement." Within the sub-watershed, phosphorus loads must be reduced by 86%, nitrogen loads must be reduced by 47%, and sediment loads must be reduced by 60%.

53.     Notably, the Watershed Management Plan also recognizes that "[o]ver 82% of the Lake Monroe watershed is forested and forestry management activities such as logging, burning or herbicide application may have a negative impact on water quality." The Watershed Management Plan thus establishes goals of "[m]aintain[ing] forested land within the watershed as forested land" and "[m]inimiz[ing] impacts to water quality from forest management."

D.    ___Project: Logging, Burning, and Road Building___

54.    The Project at issue here entails a significant amount of clearcutting, commercial logging, and prescribed burning. It will impact 13,500 acres, or roughly 21 square miles, in the northern part of the Hoosier National Forest within the South Fork of Salt Creek sub-watershed, which ultimately drains into Lake Monroe and is in the northwestern portion of this sub-watershed that is closest to Lake Monroe. If implemented, the Project will constitute the single largest project to log and burn the Hoosier National Forest in its 89-year history.

55.    The Project area includes very steep slopes in areas that will be subject to Project activities. As stated in the original EA, "steep slopes on much of the forested land exist in the South Fork Salt Creek watershed." The original EA explains that the slopes in the Project area are, at best, "moderately suited" to the use of timber harvest equipment and acknowledges that the steeper slopes in the Project area pose a "very severe" risk of erosion and are "poorly suited" to the use of timber harvest equipment.

56.    The Service will conduct clearcuts over 401 acres, and will conduct other forms of timber harvest over another nearly 4,000 acres. This timber harvest will require the construction of 3.2 miles of new, permanent logging roads, 8.3 miles of new, "temporary" logging roads, the reconstruction of another 4.9 miles of logging roads, and potentially hundreds of miles of trails and lanes created by skidders and other heavy equipment to drag and carry heavy logs over thin soils (most of which will be on steep hillsides and sloping ground throughout the Project area).

57.    The Project will include prescribed burns repeatedly across as many as 13,500 acres. The Forest Service plans to burn an average of 1,500 acres, or 2.3 square miles, annually, and plans to burn the same areas repeatedly. These burns will require potentially hundreds of

miles of fire lanes to be cleared to duff and bare soil throughout the project area to manage and contain fire activities, and these activities will leave toxic ash on the ground that precipitation then sweeps into rivers or creeks that drain into Lake Monroe. Furthermore, while there are no seasonal limits placed on the burns, most burning activities will occur in the winter and early spring when higher precipitation levels and the lack of leaf canopy in the Project's deciduous forests will contribute to the highest potential for erosion and highest runoff volumes to Lake Monroe.

58.     According to the Forest Service, no timber harvesting will occur within the 100-year floodplain, which "is the highest soil disturbance risk area of sedimentation impairing the watershed." Of course, this will not prevent high sediment runoff from logging and burning on slopes into streams that then traverse the floodplain to the South Fork of Salt Creek. Furthermore, prescribed burning activities may occur within the 100-year floodplain.

59.     The Project entails long-term upheaval in the Hoosier National Forest. The Service anticipates that the clearcutting and other logging activities will take roughly 12 to 15 years to complete, while the Forest Service intends to conduct repeated prescribed burns in the Project area for the next 20 years. Most areas to be logged are also slated to be burned.

### E.    *The Forest Service's Original EA and Related Litigation*

60.     On November 26, 2018, Service issued a scoping notice inviting the public to comment on its then-proposed decision to authorize the Project. Plaintiffs submitted comments opposing the Project on various grounds. Their comments emphasized the critical importance of Lake Monroe, the degraded nature of its water quality, and the fact that erosion and sedimentation—like that produced by timber harvesting and prescribed burning—exacerbates the existing harms to the Lake. Commenters also pointed out that the Forest Service "do[es] not have

to conduct this timber management project in the Lake Monroe watershed," and that "[t]here are alternative locations to choose from . . . that do not directly supply surface runoff for community drinking water." Despite Plaintiffs' urging, the Forest Service largely ignored the Project's impacts to Lake Monroe.

61.     On July 26, 2019, the Forest Service issued a draft EA and draft FONSI for the Project. The draft EA claimed that the Project would not have any significant impacts on the environment, including on Lake Monroe or on any aesthetic or recreational resources. The draft EA likewise denied that the Project would have direct or indirect effects on Lake Monroe, and refused to consider cumulative impacts on Lake Monroe from the Project in light of other activities in the Lake's watershed. Instead, the draft EA limited the scope of its analysis of cumulative impacts solely to the South Fork Salt Creek sub-watershed, refusing to consider whether the Project might have cumulative impacts on the downstream Lake Monroe.

62.     Numerous members of the public, including Plaintiffs, submitted comments on the draft EA that criticized the draft EA's conclusion that the Project would not significantly impact water quality in Lake Monroe. Commenters also criticized the draft EA's refusal to consider cumulative effects on the Lake Monroe watershed, and specifically described how the Project will have numerous significant environmental impacts. Accordingly, as commenters explained, the Forest Service was obligated to analyze the Project in an EIS.

63.     On November 5, 2019, the Forest Service issued a Final EA and a response to public comments. Like the draft EA and FONSI, the final EA and FONSI claimed that the Project would not have any significant impact on the environment. Despite the numerous comments explaining serious inadequacies in the draft EA's analysis of various issues, the final EA claimed that the impacts from the Project had been sufficiently analyzed in the draft EA.

Likewise, the Forest Service responded to comments explaining that the EA was incorrect to conclude that impacts on the environment would not be significant by simply pointing the commenter back to the relevant sections of the EA.

64.     On May 13, 2020, Plaintiffs filed a lawsuit against the Forest Service in this Court alleging various violations of NEPA in connection with its environmental review of the Project. Relevant here, Plaintiffs alleged that the Forest Service violated NEPA by failing to consider the environmental impacts of the Project on Lake Monroe, particularly in light of the lake's degraded condition. Plaintiffs' lawsuit also alleged that the Forest Service violated NEPA by failing to prepare an EIS to assess the significant impacts that the Project will have on area resources, including the cumulatively significant impacts of the Project on water quality within the Lake Monroe watershed.

65.     On March 30, 2022, this Court issued an order on the parties' cross-motions for summary judgment. Relevant here, this Court "agree[d] with Plaintiffs that [the Forest Service] failed to evaluate the potential impact of the [Project] on Lake Monroe." *Monroe I*, 595 F. Supp. at 723. In particular, the Final EA "failed to adequately consider or discuss the legitimate concerns the [Project] could have on Lake Monroe," the "sole source of drinking water for 120,000 people in southern Indiana." *Id.* This Court noted that although the Final EA "discuss[es] the possibility of sedimentation to the South Fork Salt Creek and the use of best practices to reduce negative impacts, there is no mention of the present concerns regarding Lake Monroe's water or how the [Project] may exacerbate these problems." *Id.* at 723-24. Because the Forest Service never conducted the analysis of impacts required by NEPA in the first place, the agency thus "failed" to provide a "convincing statement of reasons" explaining why the impacts to Lake Monroe will not be significant. *Id.* ("[A]n agency's failure to address certain critical

factors that are essential to the decision to prepare an [EIS] or not can render its [FONSI] unreasonable."). Accordingly, this Court concluded that the Forest Service "violated NEPA by failing to fully evaluate the environmental effects to Lake Monroe," and remanded this "portion of the decision" to the agency in order for the Forest Service to conduct the requisite "analysis consistent with federal law." *Id.* at 724-25.

> F.    *The Forest Service's Second Attempt and Related Litigation*

66.    On October 6, 2022, the Forest Service announced its intent to issue a draft SIR aimed at addressing this "Court's ruling that the Forest Service violated [NEPA] by 'failing to fully evaluate the environmental effects to Lake Monroe.'" After a strict 30-day public comment period, the Service finalized the SIR in the same material form as the draft and planned to begin implementing the Project the following spring. As relevant here, the final SIR concluded that Project measures (i.e., BMPs) would prevent Project "sediments [and other pollutants] from reaching streams" within the Lake Monroe watershed, thereby obviating any measurable effects beyond the "background level."

67.    Plaintiffs filed suit again on January 25, 2023, both to challenge the final SIR and enjoin the Project's implementation until the Service had complied with NEPA and the APA.

68.    The Court sided with Plaintiffs on March 29, 2023, and enjoined Project implementation until the Service made "a showing sufficient to pass muster under the NEPA and the APA."

*69.*    Rather than defend its decision in merits briefing, the Forest Service decided to withdraw the SIR on April 4, 2023 "to allow the [Service] to further evaluate the original decision." Joint Stipulation of Dismissal at 1, *Monroe II*, 23-cv-00012, Mo No. 32. In response, Plaintiffs agreed to voluntarily dismiss their suit challenging the SIR on April 13, 2023. *Id.*

70.     In an effort to avoid further litigation over the Project, Plaintiffs sent a letter to the relevant Service officials on April 26, 2023 that succinctly outlined Plaintiffs' concerns over the magnitude of the Project's effects on the Lake Monroe watershed, the agency's analysis to date, and how the Service could have addressed those issues before approving the Project. The Service never responded to Plaintiffs' letter.

### G.      *The Forest Service's Third Attempt Compelling This Litigation*

(i)     Draft Supplemental Environmental Assessment

71.     On October 20, 2023, the Service announced that it had prepared a draft SEA in support of the Project. According to the Service, the SEA is meant to supplement the 2019 final EA and "the information contained within it will be considered [by the Service] in making a decision on the [Project]." The draft SEA did not propose any changes to the Project as originally authorized by the Service and described above, *see supra* ¶¶ 54-59.

72.     The draft SEA reproduced the same purpose and need as that found in the final EA and SIR, again claiming the Project is needed to "meet Forest Plan objectives and to increase the resiliency and structure of forested areas (stands) by restoring the composition, structure, pattern, and ecological processes necessary to make these ecosystems sustainable." The draft SEA's alternatives analysis thus remains the same all-or-nothing approach as that presented by the original EA; it does not incorporate those alternatives offered by the Plaintiffs through prior comments on the Project, including any of the mid-range alternatives proposed by the Plaintiffs that would reduce the logging and burning in the Project and improve the Project's monitoring to lessen its adverse impacts while still achieving the Project's stated purpose and need.

73.     Like the SIR, the SEA purported to consider only "new information that was brought forward since the original [Project] decision was issued" and "further analysis on the

29

potential impacts to Monroe Lake to address the Court's ruling that the Forest Service violated [NEPA] by 'failing to fully evaluate the environmental effects to Lake Monroe.'" Indeed, the cover letter to the draft SEA made clear the Service would only consider public comments "on the supplemental environmental analysis on Monroe Lake and the new information that has arisen since the original EA was completed."

74.     The draft SEA summarized the "new information" identified and considered by the Service as the intervening endangered listing of two bat species present in the action areas[4]; a new nationwide prescribed fire program; perceived "oak decline" detected within ten percent of the Project area; and the U.S. Secretary of Agriculture's nationwide directive to the Service "to inventory and protect mature and old-growth forests to aid in climate resilience and carbon stewardship."

75.     As to the latter, i.e., nationwide orders mandating the conservation of mature and old-growth forests, the draft SEA acknowledged that "much of the [P]roject area is characterized by mature hardwood stands," but claims those forests "do not meet Old Growth characteristics as defined in the [Forest Service-wide report]" prepared in response to Executive Order 14,072. Without explaining that conclusion, the draft SEA then claimed the Project is beyond the ambit of those orders because "much of the project area . . . is not considered old-growth forest."[5] Instead, the draft SEA characterizes the Project area as "low mature/low old-growth" forests,

---

[4] Since 2019, the U.S. Fish and Wildlife Service has listed the Northern long-eared bat as endangered, and formally proposed listing the Tricolored bat as endangered. Both species are present and regularly documented in the Project area.

[5] This assertion in the draft SEA makes clear that at least "[some] of the project area . . . *is* []" considered old-growth forest" (emphasis added); however, neither the SEA nor subsequent decision documents even attempt to explain why those areas should not be protected in accordance with the Service's nationwide duty to protect and promote the conservation of old-growth forests.

terms that are not defined in the SEA. Still, the draft SEA fails to explain why "low old-growth" forest "is not considered old-growth forest," or why the "low mature/low old-growth" forests impacted by the Project do not qualify as "mature and old-growth forests" worthy of protection under the Secretary's order.

76.     The draft SEA also purports to compile "additional information" about the Project's effects on Lake Monroe; that analysis, however, is virtually indistinguishable from those twice rejected by this Court. Like the original EA and SIR, the draft SEA concluded the Project "would have minimal to no effects on water quality in any water body and particularly to Lake Monroe itself, which lies several miles downstream from the project sites" so long as the Service adheres "to Forest Plan guidance, the use of design features and BMPs, and proper monitoring" when implementing the Project.[6]

77.     The draft SEA remained silent on the threats to human health identified by Plaintiffs in prior correspondence with the Service, including the Project's likely introduction of Glyphosate and other herbicides to the Lake Monroe drinking water supply as a result of the broadcast spraying on roads, harvest areas, skidder trails and fire lanes.

78.     After publishing the draft SEA on October 20, 2023, the Service allotted thirty (30) days, i.e., until November 19, 2023, for the public to submit comments on the draft SEA. On October 27, 2023, the Monroe County Commissioners asked the Service to extend the comment deadline for various reasons, including to afford them sufficient time to consult the County's subject-matter experts in an effort to prepare more detailed comments and further assist the

---

[6] The draft SEA does not specify what, if any, corrective measures the Service will take if Project implementation fails to comply with any one of these supposed precautionary measures, let alone all three, as has occurred during the Service's implementation of similar logging projects.

agency's analysis. The Service summarily denied that request, citing the agency's regulations purportedly barring the extension of comment periods during the NEPA process.

(ii)   Plaintiffs' Comments on the Draft SEA

79.   Plaintiffs timely submitted joint comments on the draft SEA on November 17, 2023. In those comments, Plaintiffs voiced serious concerns with the Project's inevitable effects on the Hoosier National Forest and Lake Monroe, as well as the Service's environmental analyses of the Project's various components. For instance, Plaintiffs' comments took issue with the alleged purpose and need for the Project, explaining that the issues identified by the Service and driving the Project's implementation are merely illusory. For example, despite the Service's alleged concern over "oak decline" in the Project area, Plaintiffs' comments pointed out that the agency had not modified the Project to address the areas where the Service allegedly discovered such decline "between 2019 and 2023, but instead [focused on] logging the same areas that the agency has been unsuccessfully trying to log for many years."

80.   Because 35% of the forests in the action areas are 100 years or older—mature forested stands that are elusive in the Central Hardwoods Region—Plaintiffs' comments also warned the Service that the Project appeared inapposite to the purposes of the forthcoming National Old Growth Amendment, President Biden's Executive Order 14,072. As such, they asked the Service "to explain how the logging of very old trees—indeed, some of the oldest hardwoods in the eastern United States—is consistent with the current Administration's own stated policy of preserving mature trees to help with climate resilience and carbon stewardship." At the very least, Plaintiffs argued, the Service must "acknowledge the age class of the trees it will log," define the terms "low old growth" and "low mature," and specify which Project areas qualify for protection under the Secretary's June 2022 directive.

81.    Plaintiffs' comments also renewed their objections to the scope of the Service's effects analysis. For example, Plaintiffs explained that the draft SEA analysis of impacts to Lake Monroe "essentially rehashed [the Service's] prior assertions and conclusions without any new supporting information or evidence." Indeed, the draft SEA "failed to provide any data from prescribed burns that have been carried out in the Hoosier National Forest that could be used to assess the water quality impacts that will occur from the unprecedented levels of prescribed burning proposed as part of this Project."

82.    The absence of supporting data is telling. Compared to other National Forests, the Hoosier National Forest has found it especially difficult to comply with BMPs; in fact, random auditing by the Service has shown that for projects much smaller than this one, the Hoosier National Forest "is achieving no to marginal implementation of BMPs." The draft SEA does not explain why the Service believes this Project will be any different, i.e., what the agency will do to ensure effective BMP implementation despite its chronic failures to do so in the past. Plaintiffs also explained that regardless of the Service's ability to properly implement them, BMPs merely reduce water pollution caused by logging by some measure but do not (and cannot) eliminate that pollution entirely. In support, Plaintiffs provided the Service with a copy of a peer-reviewed study, which documented that logging in a similarly hilly deciduous forest in Kentucky, with BMPs more stringent than those proposed in this Project, resulted in a statistically significant increase in sediment loads downstream (i.e., fourteen times higher than sediment loads in an adjacent, paired watershed where logging was not conducted and remained significantly elevated downstream from the logged site for many months after the logging was completed.). Hence, the draft SEA's assertion that BMPs will eliminate water quality effects is patently untrue and arbitrary.

83.     Similarly, Plaintiffs' comments also took issue with the Service's misguided reliance on "monitoring" as a basis for overlooking impacts to Lake Monroe. The Service contends but does not explain how monitoring will nullify any adverse effects to the watershed caused by Project implementation. As Plaintiffs explained in their comments, though, Project monitoring is an inherently backwards-looking measure that "cannot prevent impacts from occurring in the first instance, as the Forest Service suggests." Regardless, Plaintiffs observed, the Project lacks *any* monitoring for prescribed-burn runoff on approximately 2,600 acres in the northwest corner of the Project area (i.e., that closest to Lake Monroe) because it will drain downstream of the Project's monitoring points. Hence, regardless of the type of monitoring imposed by the Service (let alone the nominal monitoring proposed here by the Service), the Project's effects on Lake Monroe will "occur *before* the agency could take corrective action in response to monitoring data demonstrating those effects." It is therefore arbitrary for the draft SEA to claim that monitoring renders the Project's likely effects on Lake Monroe insignificant.

84.     Plaintiffs' comments further explained the reasons the monitoring proposed by the Service will not (and cannot) detect adverse environmental effects from the Project. Despite greenlighting thousands of acres of Project actions (i.e., repeated burning across 13,500 acres, logging 4,375 acres, building many miles of roads and lanes, and applying spot treatments of herbicides to 1,970 acres and broadcast applications of herbicides to potentially many more acres), the Service only plans to monitor one parameter of water quality, turbidity, at *four* sites far from the vast majority of Project logging and burning. This means the agency "is unlikely to capture most (or any) of the water quality effects stemming from the Project." Even at those four sites, the object of monitoring is not clear since the only threshold specified by the Service is an increase in turbidity "relative to the pre-treatment levels during project activities" and the draft

SEA does not explain how it will account for natural fluctuations in turbidity. Assuming that turbidity threshold can be crossed, which is highly doubtful, the only corrective measure the Service plans to deploy is "further investigation and remediation . . . to ensure proper BMP usage."

85.    Plaintiffs' comments renewed their concerns over the Project's inevitable impact on rare and endangered species, including several federally endangered bats and the state endangered Cerulean warbler. As Plaintiffs explained then, the draft SEA failed to grapple with data provided to the Service demonstrating that the Project area is one "of both regional and national importance for bat diversity and provides habitat for five species that are listed or under review for listing under the Endangered Species Act." Despite this, the draft SEA refuses to acknowledge that this data even exists, let alone explain why it does not merit further examination in an EIS.

86.    Plaintiffs also noted in their comments the draft SEA's failure to acknowledge the unique recreational and scenic value of the Project area. Indeed, the entirety of the Project area is currently proposed for protection in Congress as either "wilderness," in which no Project activities will be permitted, or inclusion in the Benjamin Harrison National Recreation Area, where Project activities would be severely curtailed (if allowed to proceed at all). *See* S. 4402, 118th Cong. (2024); *see also* H.R. 8535, 118th Cong. (2024). In addition to this, Plaintiffs also asked the Service to consider the Project's likely effects on Indiana's only long-distance backpacking trail, the Knobstone Trail, and the pristine Fork Ridge Trail, both of which would be converted into major logging roads for extended periods.

87.    Finally, Plaintiffs' comments also argued that the Project's significant direct, indirect, and cumulative impacts merited full evaluation in an EIS. In support, Plaintiffs offered a

factor-by-factor explanation of the ways in which the effects of this massive Project implicate the factors defining "significance" under the applicable NEPA regulations.

(iii)    Final SEA, Draft Decision Notice, and FONSI

88.    On April 26, 2024, the Service published a final draft of the SEA. Apart from the changes discussed below, the final SEA's analysis of the Project mirrors the draft version in all material respects. The final SEA does not expand its consideration of alternatives, as requested by Plaintiffs' comments, examine or address the new information presented by Plaintiffs, or even respond to Plaintiffs' criticisms of the Service's alleged purpose and need for the Project.

89.    Like the draft, the final SEA maintains that "the [Project] would have no effect to Monroe Lake" if the Service is able to follow "the Forest Plan standards and guidelines, the proper design criteria, and the proper implementation of BMPs......." The final SEA does not acknowledge this particular National Forest's chronic inability to implement BMPs effectively, or the inherent inability of those BMPs to fully mitigate foreseeable Project effects to the Lake Monroe watershed, as explained by Plaintiffs' comments.

90.    Like the draft, the final SEA concludes that Project actions will not affect old-growth forests because "no stands proposed for treatment in the Project Area meet the old growth characteristics" utilized by the Service in the SEA. In this regard, the Service's conclusion in the final SEA is predicated on an entirely new and unexpected rationale not present (or subject to public comment) in the draft SEA: according to the final SEA, the Forest Service decided here to rely on the definition of "old-growth forest" from a different geographic region (Region 8, the Southern Region) because it was "the most applicable *to the project*," not the existing conditions. In any case, the final SEA fails to acknowledge that the Project will log

multiple stands that already meet the Region 8 definition of old-growth forest, or explain how such logging serves the Forest Service's goal of protecting these very forest types.

91.     In the Service's separate response to comments urging the agency to acknowledge the Project's significance, the Service defends its decision to forgo an EIS by pointing out that this "Court did not order the Forest Service to complete an EIS" but does not explain or even attempt to respond to the factor-by-factor concerns raised by Plaintiffs' comments that demonstrate the myriad reasons this large-scale, multi-decade Project is environmentally "significant" and deserving of the corresponding level of scrutiny and public awareness afforded to EISs.

92.     Along with the final SEA, the Service released a draft Decision Notice and FONSI that proposed authorizing the Project in full and without further analysis under NEPA. The Service purportedly considered the ten significance factors in NEPA's implementing regulations, but there is little evidence of that consideration on the face of the FONSI, which consists of the Service's unexplained conclusion that none of the determinative factors will be implicated by the Project, despite substantial record evidence demonstrating the inverse.

(iv)    Administrative Review, Decision Notice, and FONSI

93.     Under the Service's regulations, publication of the final SEA triggered a pre-decisional administrative review period during which Plaintiffs were required to submit any objections to the Service's then-proposed authorization of the Project and its effects on the environment. In compliance with the Service's pre-decisional review regulations, Plaintiffs jointly submitted objections to the Service's proposed Decision Notice and FONSI on June 10, 2024. The objections noted the absence of any material changes to the Service's flawed analyses from the draft to final SEA. Plaintiffs' objections therefore renewed their concerns with both the

Project and the Service's analysis thereof, as consistently described in Plaintiffs' comments on the draft SEA, pre-decisional objections, and correspondence with the Service concerning the Project.

94.    On July 16, 2024, Plaintiffs met with the responsible Forest Service officials in an attempt to resolve their concerns over the Project and obviate this litigation. In the run up to that meeting, Plaintiffs carefully crafted a list of modest Project alterations that, if enacted, would allow the Service to meet its stated "purpose and need" for the Project while simultaneously reducing its negative effects on the environment. Plaintiffs presented these proposals to the Service before and after the July 16 meeting. Via email sent August 1, 2024, the Service summarily rejected Plaintiffs' proposals, alleging they would hamper its ability to achieve the Project's purpose and need without explaining why.

95.    On August 14, 2024, the Service announced that it had signed a final Decision Notice and FONSI, thus consummating the agency's decisionmaking process for the Project. The FONSI lists the reasons the Service believes the Project does not implicate any of the factors delineating "significance" under NEPA's implementing regulations. The FONSI sets forth the Service's final decision about whether an EIS will be prepared for the Project.

### CLAIM FOR RELIEF

### Count One: Violations of NEPA and the APA

96.    Plaintiffs incorporate all preceding paragraphs by reference.

97.    By preparing an EA to authorize the Project without assessing that Project's impacts on Lake Monroe and its watershed—even after this Court determined that the Forest Service never took the legally-required "hard look" at the direct, indirect, and cumulative

impacts of the Project in the agency's previous environmental decisionmaking processes—the Forest Service has violated NEPA, its implementing regulations, and the APA.

98.    By failing to conduct a complete analysis of the direct, indirect, and cumulative impacts of the Project on the Lake Monroe watershed and its environmental resources in either the final SEA or the agency's previous environmental review of the Project, the Forest Service violated NEPA, its implementing regulations, and the APA.

99.    By concluding that the Project will not result in significant impacts to Lake Monroe—or any other affected resource in or near the Project area—the Forest Service failed to take a "hard look" at the effects of its action including on the basis of scientific and factual evidence in the record running contrary to the agency's conclusion, and thus violated NEPA, its implementing regulations, and the APA.

100.    By deciding not to prepare an EIS examining the highly significant impacts of the Project—despite the existence of substantial impacts to several of NEPA's "significance" factors identified at 40 C.F.R. § 1508.27(b), including but not limited to factor (b)(2), (b)(3), (b)(4), (b)(5), (b)(7), and (b)(10)—the Forest Service violated NEPA, its implementing regulations, and the APA.

101.    By segmenting the agency's consideration of impacts from Lake Monroe from all other highly significant impacts previously identified to the agency through public comments, the Forest Service violated NEPA, its implementing regulations, and the APA.

102.    By relying on an inapplicable definition of "old-growth forest" to escape disclosure of the Project's easily foreseeable effects on the forthcoming Forest Plan amendments meant to protect the same old-growth trees at risk of destruction in the Project, the Forest Service has arbitrarily predetermined the outcome of its analysis in violation of NEPA and the APA.

103.    By failing to adequately consider or respond to myriad substantive comments and new information supplied during the public comment process for the SEA, the Forest Service violated NEPA, its implementing regulations, and the APA.

104.    By refusing to consider whether the Project's effects on Lake Monroe and/or "new information," including a plainly foreseeable Forest Plan amendment and two pending bills in Congress meant to protect the very resources targeted by the Project, are sufficiently significant in their own right to warrant the preparation of an EIS, the Service violated NEPA, its implementing regulations, and the APA.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

(1)    Declaring that Defendants' Final SEA, Decision Notice, and FONSI are arbitrary and capricious;

(2)    Enjoining Defendants from taking any action to implement the Project pending compliance with federal law;

(3)    Vacating the Decision Notice, Final SEA, and FONSI;

(4)    Remanding the challenged decisions to the Forest Service for further analysis and decisionmaking consistent with its duties under NEPA and the APA;

(5)    Directing the Forest Service to prepare an EIS to examine the Project's highly significant impacts on the environment;

(6)    Awarding Plaintiffs their reasonable attorneys' fees and costs in this action; and

(7)    Providing any other relief that the Court deems proper.

Respectfully Submitted,

_____*/s/ W Russell Sipes*_____

W Russell Sipes
The Sipes Law Firm PC
101 W Ohio St, #760
Indianapolis, IN 46204
(855) 747-3752
wrs@sipeslawfirm.com

William S. Eubanks II
(*Pro Hac Vice Application Forthcoming*)
Eubanks & Associates, PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
Phone: (970) 703-6060
bill@eubankslegal.com

Matthew R. Arnold
(*Pro Hac Vice Application Forthcoming*)
Eubanks & Associates, PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
Phone: (843) 718-4513
matt@eubankslegal.com