# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

|  |  |  |
|---|---|---|
| MONROE COUNTY BOARD OF COMMISSIONERS, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 1:24-cv-01560-SEB-MKK |
| UNITED STATES FOREST SERVICE, et al., | ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

Matthew R. Arnold
William S. Eubanks II
EUBANKS & ASSOCIATES PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(843) 718-4513
matt@eubankslegal.com

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

Local Rule 7-1(e) Statement of Issues ...................................................................................... iii

Table of Authorities ........................................................................................................................ iv

Table of Acronyms ........................................................................................................................ viii

Introduction ....................................................................................................................................... 1

Background ......................................................................................................................................... 3

    I.   Statutory and Regulatory Background ........................................................................... 3

        A. The National Environmental Policy Act ................................................................ 3

        B. The Administrative Procedure Act ......................................................................... 5

    II.  Factual Background ........................................................................................................ 6

        A. The Hoosier National Forest ..................................................................................... 6

        B. Lake Monroe and the Watershed Management Plan ......................................... 7

        C. The Houston South Project and Previous Litigation ...................................... 11

        D. The New Supplemental EA—Materially the Same as the SIR—Suffers the Same Defects as Both Decisions Previously Invalidated by This Court ................................................. 19

Argument ......................................................................................................................................... 24

    I.   Plaintiffs Have Standing To Pursue Their Claims ....................................................... 24

    II.  The Service Violated NEPA (For a Third time) By Refusing to Consider Project Impacts on Lake Monroe .................................................................................................. 25

    III.  The Service's Unsupported and Indefensible Decision to (Thrice) Forgo An EIS IS Arbitrary and Violates NEPA ........................................................................................ 33

        A. The Service, Including the Hoosier National Forest, Usually Prepares EISs for Projects of This Magnitude, and Courts Often Order EISs for Comparably Significant Projects if the Service Refuses to Do So ............................................................................................ 34

        B. The Project Squarely Implicates Multiple Criteria Under NEPA's Regulations Indicating That This Project is "Significant" ....................................................................... 36

    IV.  The Service's Chronic Noncompliance with NEPA MErits Vacatur of The Challenged Decisions .......................................................................................................... 44

Conclusion ....................................................................................................................................... 45

## <u>LOCAL RULE 7-1(E) STATEMENT OF ISSUES</u>

The issues in this case are:

(1)     Whether the United States Forest Service violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347, by refusing to take a hard look at the environmental impacts the Houston South Project, including the Project's foreseeable direct, indirect, and/or cumulative impacts to Lake Monroe, the sole source of drinking water for approximately 145,000 citizens of southern Indiana;

(2)     Whether the United States Forest Service violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347, by concluding that the Houston South Project would not have significant effects on the environment and, therefore, declining to prepare an Environmental Impact Statement.

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
  273 F.3d 1229 (9th Cir. 2001) ...............................................................5, 6

*Bark v. U.S. Forest Serv.*,
  958 F.3d 865 (9th Cir. 2020) ...................................................................35

*Blue Mountains Biodiversity Proj. v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ...........................................................32, 35

*Cal. Cmties. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ...................................................................45

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011) .................................................................34

*Cascadia Wildlands v. U.S. Forest Serv.*,
  937 F. Supp. 2d 1271 (D. Or. 2012) .......................................................35

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004).....................................................................................3

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) ....................................................................33

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
  681 F.2d 1172 (9th Cir. 1982) .................................................................34

*Friends of the Earth v. Laidlaw Env't Servs., Inc*,
  528 U.S. 167 180-83 (2000) ....................................................................24

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002)................................................................36

*Habitat Educ. Ctr. v. Bosworth*,
  363 F. Supp. 2d 1090 (E.D. Wis. 2005)..................................................25

*Highway J Citizens Grp. v. Mineta*,
  349 F.3d 938 (7th Cir. 2003) .....................................................................4

*Humane Soc'y v. Dep't of Commerce*,
  432 F. Supp. 2d 4 (D.D.C. 2006)............................................................42

*Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*,
    325 F.3d 851 (7th Cir. 2003) ........................................................................33, 34

*Klamath–Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
    No. 2:05-cv-0299, 2006 WL 1991414 (E.D. Cal. July 14, 2006).............................28

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) ....................................................................25, 27, 41

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
    373 F. Supp. 2d 1069 (E.D. Cal. 2004)...................................................................35

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)..............................................................................................3, 5

*Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.* (*Monroe I*),
    595 F. Supp. 3d 713 (S.D. Ind. 2022) (Pratt, C.J.)...............15, 16, 17, 20, 34, 40

*Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.* (*Monroe II*),
    4:23-cv-00012, 2023 WL 2683125 (S.D. Ind. Mar. 29, 2023) (Pratt, C.J.)............19, 20, 44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).....................................................................................................5

*Nat'l Parks Conserv. Ass'n v, Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019).................................................................33, 36, 37

*Nat'l Wildlife Fed'n v. Norton*,
    332 F. Supp. 2d 170 (D.D.C. 2004)........................................................................37

*NLRB v. Brown*,
    380 U.S. 278 (1965)...................................................................................................6

*Or. Wild v. Bureau of Land Mgmt.*,
    No. 6:14-cv-0110, 2015 WL 1190131 (D. Or. Mar. 14, 2015) ....................29, 31, 35

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) .............................................................................44, 45

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989).................................................................................................2, 3

*Sierra Club v. U.S. Forest Serv.*,
    843 F.2d 1190 (9th Cir. 1988) .................................................................................35

*Simmons v. U.S. Army Corps of Eng'rs*,
    120 F.3d 664 (7th Cir. 1997) .....................................................................................3

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  985 F.3d 1032 (D.C. Cir. 2021) ..................................................................33, 37, 38, 39

*W. Watersheds Project v. Christiansen,*
  348 F. Supp. 3d 1204 (D. Wyo. 2018) ..................................................................16, 33

*WildEarth Guardians v. Conner,*
  920 F.3d 1245 (10th Cir. 2019) ..................................................................33

**Statutes**

5 U.S.C. § 706(2)(A) ..................................................................5

16 U.S.C. § 1604(f)(5) ..................................................................6

33 U.S.C. § 1329 ..................................................................10, 12

42 U.S.C. § 4332(C) ..................................................................3

42 U.S.C. § 4332(E) ..................................................................4

**Other Authorities**

36 C.F.R. § 218.1 ..................................................................15

36 C.F.R. § 219.7 ..................................................................6

36 C.F.R. 220.4 ..................................................................25

36 C.F.R. § 220.7 ..................................................................4

40 C.F.R. § 1501.4 ..................................................................4

40 C.F.R. §§ 1502.16 ..................................................................3

40 C.F.R. § 1508.7 ..................................................................3, 4, 25, 41

40 C.F.R. § 1508.8 ..................................................................3, 4, 25

40 C.F.R. § 1508.9 ..................................................................4

40 C.F.R. § 1508.27 ..................................................................4, 14

40 C.F.R. § 1508.27(a) ..................................................................33, 34

40 C.F.R. § 1508.27(b) ..................................................................5, 33, 45

40 C.F.R. § 1508.27(b)(1) ..................................................................36, 37

40 C.F.R. §§ 1508.27(b)(2)............................................................................................39, 40

40 C.F.R. § 1508.27(b)(3)................................................................................................43

40 C.F.R. § 1508.27(b)(4)........................................................................................37, 39

40 C.F.R. § 1508.27(b)(7)........................................................................................41, 42

40 C.F.R. §§ 1508.27(b)(10)...................................................................................39, 40

Exec. Order No. 14,072, 87 Fed. Reg. 24,851 (April 22, 2022)...................................22

U.S. Forest Serv., *German Ridge Restoration Project* (2007),
    https://bit.ly/3V3a0uF ............................................................................................35

## **TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BMPs | Best Management Practices |
| CEQ | Council on Environmental Quality |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| NEPA | National Environmental Policy Act |
| NFS | National Forest System |
| SEA | Supplemental Environmental Assessment |
| SIR | Supplemental Information Report |

## INTRODUCTION

Plaintiffs Monroe County and three conservation organizations challenge the U.S. Forest Service's ("Service's") authorization and underlying environmental analysis of the Houston South Project ("Project"), which is the largest logging and prescribed burning project ever undertaken by the Hoosier National Forest ("Forest"), and one that threatens lasting, irreversible damage to Lake Monroe. This case represents the third time Plaintiffs have been forced to come to this Court over this Project. Each time previously, the Court has correctly rejected the Service's analysis as inconsistent with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, because the Service refused to consider the Project's foreseeable impacts on Lake Monroe—an already impaired water body that must be intensively treated to fulfill the demands of the 145,000 citizens who depend on it for drinking water—and/or whether those impacts, alone or in combination with others from the Project, merit further analysis in an EIS.

Nothing has changed in the decision under review. Here, too, the Service excuses its decision to forgo detailed analysis of Project impacts on Lake Monroe by claiming that "best management practices ("BMPs"), e.g., erosion control strategies, employed during Project implementation will sufficiently negate any possibility of the Project contributing sediment or nutrients to Lake Monroe. But, the Service's recent track record with implementing these same BMPs in this specific Forest paint a different picture—one where the Service has been only marginally successful in implementing and/or documenting its use of BMPs to mitigate logging impacts on surrounding watersheds. Still, without offering any explanation as to why, the Service insists the public should just trust the agency that the BMPs won't fail this time. Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, that is not enough to show a reasoned choice between the facts the Service found and the decision it made and, therefore, insufficient to

demonstrate the Service took the "hard look" at Project impacts that NEPA requires, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

The Service's intransigence over the appropriate scope of its effects is particularly concerning in this instance because this Project is both the largest and most expensive the Hoosier National Forest has *ever* undertaken in its *entire* history. The sheer magnitude of this Project compared to prior actions makes it difficult to see how the Service could rationally conclude that this Project is *not* "significant" within the meaning of NEPA and, therefore, unworthy of the more rigorous review that accompanies all "significant" actions.

Indeed, the record demonstrates the opposite. For the past six years, Plaintiffs repeatedly explained how and why the Project plainly implicates multiple parts of the regulatory definition of "significance" under NEPA. For instance, the Forest is home to some of the oldest, most mature stands in the Midwest. Not only does the Forest filter pollution that would otherwise enter Lake Monroe, it also plays host to Indiana's most abundant biodiversity, including threatened and endangered species, all of which depend on the Forest and its ecosystem services. The Project's foreseeable effects to those resources deserve the close scrutiny that accompanies a "significance" finding under NEPA. The Service's adamant refusal to acknowledge the Project's significance—notwithstanding credible evidence and consistent, detailed criticism undermining the Service's bottom-line conclusion that no EIS is needed—fails to make the "convincing case" necessary to sustain the agency's "finding of no significant impact" under NEPA and the APA.

If the Court agrees that the Service has yet to validate its decision with the rational explanation required by the APA and this Court's prior orders, Plaintiffs are entitled to the APA's default remedy of vacatur; that is, the Court should find the Service's chronic inability to comply with NEPA outweighs any minimally disruptive consequences to the Service as a result

of its own failed decisionmaking, and the Court set aside the Project authorizations during any subsequent remand to the Service for further decisionmaking consistent with federal law.

## BACKGROUND

### I.    STATUTORY AND REGULATORY BACKGROUND

#### A.    The National Environmental Policy Act

NEPA is "the nation's central and unique environmental policy," *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997). By its terms, it "declares a broad national commitment to protecting and promoting environmental quality" and "establishes some important action-forcing procedures" meant to ensure that federal agencies "take a hard look at [the] environmental consequences" of its decisions. *Robertson*, 490 U.S. at 348, 350.

NEPA forces a "hard look" by "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and by "guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

In practice, this means that an agency must prepare an Environmental Impact Statement ("EIS") for all "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS describes (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." *Id.* § 4332(C)(i)–(iii). The three kinds of effects discussed in an EIS are "direct effects," "indirect effects," and "cumulative impacts." 40 C.F.R. §§

1502.16, 1508.7, 1508.8 (2019).[1] "Direct effects" are those "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). "Indirect effects" are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

However, not all federal decisions affect the environment "significantly" and thus, do not require an EIS. Where an agency is unsure of whether an action may have "significant" impacts that require preparation of an EIS, it may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4. "An EA is a shorter, rough-cut, low-budget EIS" that "provides evidence and analysis that establishes whether or not an EIS or a Finding of No Significant Impact ('FONSI') should be prepared." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003).[2] Although less rigorous than an EIS, an EA must "include brief discussion" of environmental impacts and reasonable alternatives. 40 C.F.R. § 1508.9; 42 U.S.C. § 4332(E).

An EA must consider whether a project may have "significant" impacts based on the project's "context" and ten factors regarding the "intensity" of its impacts. 40 C.F.R. § 1508.27. Although discussed in further detail below, those factors include: "[t]he degree to which the proposed action affects public health and safety," the "[u]nique characteristics of the geographic

---

[1] Although NEPA's regulations have been amended since the Project's inception, those amendments only apply to actions "begun after May 20, 2022." AR0012528. Thus, the Project was evaluated under and Plaintiffs cite to the prior version of those regulations throughout this memorandum.

[2] Where, as here, the Service decides to proceed with an action or project evaluated in an EA and FONSI, the agency's regulations also require the responsible official to document the "rationale" for the agency's decision, including "the conclusions drawn and the decision[] made based on the supporting record," in a "decision notice" ("DN"). 36 C.F.R. § 220.7(c).

area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "the degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may adversely affect an endangered or threatened species," and "[w]hether the action threatens a violation of Federal, State, or local law." *Id.* § 1508.27(b); *see also* AR0012528 (Project's final FONSI).

**B.    The Administrative Procedure Act**

An agency's compliance with NEPA is reviewable under the APA. The reviewing "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.*

While arbitrary and capricious review is deferential, "[j]udicial review is meaningless . . . unless [the court] carefully review[s] the record to 'ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.'" *Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). Thus, courts "must not 'rubber-stamp . . . administrative decisions that

they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Id*. (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92 (1965)).

## II.    FACTUAL BACKGROUND

The Court is likely well versed in the circumstances of this case given that it now represents the third time the Court has been asked to review this same iteration of the Project and the fundamentally unsound environmental review meant to validate it. Nevertheless, in the interest of contextualizing the arguments presented below, Plaintiffs briefly recap pertinent aspects of the Service's ultimate decision and the administrative processes that preceded it.

### A.    The Hoosier National Forest

The Hoosier National Forest—which the Service calls "a local treasure," AR0000095 — is the only national forest in the State of Indiana. AR0016146. As such, it provides some of the most popular and accessible opportunities for outdoor recreation in Indiana. AR0011637. The "driving force for establishing the [Forest] was to stabilize and restore eroding lands and protect watersheds from sediment" resulting from decades of heavy logging. AR0016196

At present, the Service manages the Hoosier National Forest according to the 2006 *Land and Resource Management Plan* ("Forest Plan"), which purports to "establish[] a framework for future management" of the Forest, AR0016144; AR0016184-85 (same), including continuing the "the historic mission of the Hoosier for watershed protection and restoration." AR0016196.[3] According to the Forest Plan, an "overall purpose of the Forest" is the maintenance and restoration of watershed health. AR0016195-96. The Forest Plan notes that "[t]his goal

---

[3] The Service's enabling legislation and implementing regulations both specify that forest plans "must be revised at least every 15 years," if not sooner. 36 C.F.R. § 219.7; *see also* 16 U.S.C. § 1604(f)(5); AR0016148 (acknowledging same). Thus, the severely outdated 2006 Forest Plan expired even before the twenty-year Project at issue here begins. AR0011458.

emphasizes collaborative stewardship of watersheds" and commits the Service Forest "to the restoration of water quality and soil productivity to improve the condition of those watersheds impacted by past land use practices." AR0016196. The Plan further states that the Service will "[g]ive priority to stabilizing areas discharging soil into watercourses, especially those that affect the watershed of municipal or recreational reservoirs." AR0016212.

**B.    Lake Monroe and the Watershed Management Plan**

*1.    Lake Monroe Is Already in Serious Trouble*

The Hoosier National Forest abuts Lake Monroe, which is a 10,750-acre reservoir created in 1964 by damming Salt Creek. The largest lake in Indiana, Lake Monroe serves as the sole source of drinking water for more than 145,000 people in Bloomington, Indiana; at Indiana University; and in surrounding communities. In addition to being a critical environmental resource, Lake Monroe is also an important recreational and economic resource, attracting roughly 1.5 million visitors each year and contributing significantly to the local economy. AR0009901 ("Lake Monroe is the largest lake in Indiana, providing drinking water for over 130,000 people and generating over $40 million annually in recreational spending.").

Lake Monroe and its tributaries suffer from significant water quality issues caused by pollution from nearby land uses, including nutrient overloading from agricultural and septic runoff and sedimentation from agricultural and forestry management activities in the watershed. AR0009904. Sediment in particular is a major concern for the watershed because it transports nutrients phosphorous and nitrogen as it moves through the watershed. *Id.* These nutrients, in turn, promote eutrophic conditions and the incidence of harmful algal blooms, impairing the quality and safety of drinking water and diminishing recreational use. AR0009903. Sediments are accumulating in Lake Monroe, entering the lake through its tributaries. Soil erosion is a

significant source of sediment. Roughly 76% of the Lake Monroe Watershed is considered highly erodible due to steep slopes and soil type, and erosion has been documented at 86% of observed stream sites within the watershed. AR0009904.

Elevated levels of pollution in Lake Monroe and its tributaries from these and other sources have cumulatively resulted in a significant degradation of water quality. In fact, Lake Monroe has been designated as "impaired" under the Clean Water Act due to taste and odor, algal blooms, and mercury in fish. AR0009922. Relevant here, the South Fork of Salt Creek and one of its unnamed tributaries have also been designated as "impaired" under the Clean Water Act due to insufficient quantities of dissolved oxygen and compromised biological integrity. *Id.* The South Fork of Salt Creek—where the Project will take pace—also contributes the largest amount of nitrogen to Lake Monroe of any of its tributaries. AR0009970.

Sediment and pollution in Lake Monroe and its tributaries increase the incidence of harmful algal blooms, which occur in warm summer months. AR0009904. For the last ten years, harmful algal blooms in Lake Monroe have prompted the Indiana Department of Environmental Management to issue public warnings that exposure to algal blooms can result in rashes, skin or eye irritation, nausea, stomach aces, and neurological symptoms, and advising members of the public that they should contact a physician if they experience any symptoms after recreational activities in Lake Monroe. AR0009902; AR0009910. These advisories also note that the algal blooms can be poisonous to animals, and pets should not swim or drink where algae is present.

Sedimentation and algal blooms also substantially increase the cost of treating the water of Lake Monroe for use as drinking water and have caused an increase in toxic disinfectant byproducts in the drinking water, which further impairs public health and safety. In the past few summers, disinfectant byproducts caused major taste and odor problems in drinking water for the

City of Bloomington. Forestry activities such as timber harvesting contribute sedimentation and nutrient runoff that exacerbate the degraded conditions in Lake Monroe and its tributaries, resulting in an increased reliance on disinfectants that produce these toxic byproducts.

The Project "area falls exclusively within the South Fork Salt Creek watershed, a watershed that ultimately drains into Monroe Lake." AR0012394. The Project occupies roughly 35.5% of the South Fork of Salt Creek sub-watershed. AR0000668. The South Fork of Salt Creek watershed in turn constitutes 102.4 square miles of the total 432 square miles of Lake Monroe's drainage area (or roughly 25%), and the Service has found that the South Fork of Salt Creek contributes roughly 30% of the water that flows into Lake Monroe. AR0012049.

The Service is the single largest landowner in the Lake Monroe watershed. The Hoosier National Forest represents 20% of the total acreage of the watershed, and constitutes over 40% of the South Fork of Salt Creek sub-watershed. National Forest land within the South Fork of Salt Creek sub-watershed is generally characterized by steep slopes with highly erodible soil.

Although the Service takes various measures to mitigate the extent to which its project authorizations cause sedimentation and contamination of waterways, the 2006 Forest Plan notes that "soil and water mitigation and protection measures" have only "moderate" reliability. No mitigation measure or management practice proposed by the Service is 100% effective in preventing sediment or other runoff from entering streams. AR0011565.

### 2. *The Lake Monroe Watershed Management Plan*

Recognizing the dire predicament facing Lake Monroe (even without additional sediment/nutrient deposition from the Project), Plaintiff Friends of Lake Monroe ("FLM") began organizing local officials, concerned citizens, and the Indiana Department of Environmental Management to fund and develop a Lake Monroe watershed management plan pursuant to the

Clean Water Act's provisions governing nonpoint source pollution, *see* 33 U.S.C. § 1329. AR0009910. Following three years of water sampling and analysis, and community engagement to better understand the challenges facing Lake Monroe's water quality, FLM completed the Watershed Management Plan for Lake Monroe in January 2022. AR0009902. The next month, February 2022, the Indiana Department of Environmental Management and U.S. Environmental Protection Agency officially approved the Watershed Management Plan.

In broad terms, the Watershed Management Plan studied problems facing Lake Monroe, quantified their magnitude, identified their sources, and created a strategic action plan for addressing them. *See* AR0009901-08. In relevant part, the Watershed Management Plan explains that the "key to protecting and improving water quality in the lake is to keep pollutants . . . from reaching the streams that flow into Lake Monroe." AR0009905. To improve water quality, the Watershed Management Plan calculated the current and target loads for the three main pollutants in the watershed: sediment; nitrogen; and phosphorous. "Based on these target loads, significant reductions are required." AR0010052. Indeed, total phosphorus loads must be reduced by 80% overall, total nitrogen loads must be reduced by 20% overall, and total sediment loads must be reduced by 41% overall. *Id.* Significantly, the South Fork of Salt Creek sub-watershed—where the Project will occur—"is the most impaired and therefore has the most opportunity for improvement." AR0010051. Within the sub- watershed, phosphorus loads must be reduced by 86%, nitrogen loads must be reduced by 47%, and sediment loads must be reduced by 60%.

Notably, the Watershed Management Plan explains that "[o]ver 82% of the Lake Monroe watershed is forested and forestry management activities such as logging, burning or herbicide application may have a negative impact on water quality." AR0010038. The Plan therefore

establishes goals of "[m]aintain[ing] forested land within the watershed as forested land" and

"[m]inimiz[ing] impacts to water quality from forest management." AR0010057.

### C.    The Houston South Project and Previous Litigation

The Houston South Project is objectively massive and it will have significant effects on

the Lake Monroe Watershed. It calls for multiple rounds of logging, burning, and herbicide

application for more than a decade across thousands of acres, including some of the oldest, most

mature hardwood forests in the eastern United States. AR0011540. Specifically, the Project

entails burning 13,500 acres of the Forest multiple times, logging 4,375 of those acres, applying

toxic herbicides to at least 1,970 acres and a potentially significant number of additional acres to

control eruptions of ecologically harmful, nonnative plants that displace native vegetation and

harm forest regeneration. AR0012368-72. The magnitude of this Project makes it a rarity for this

Forest; if implemented, it will be the "largest, most extensive logging and burning project ever

conducted in the Hoosier National Forest"—and it is not even close. *See* AR0011540 (explaining

that this Project is "roughly *twice the size* of the largest comparable project undertaken in the

Hoosier National Forest").

The Project footprint, which spans roughly 21 square miles, will be located in the

northern part of the Hoosier National Forest in an area that drains into Lake Monroe (i.e., the

South Fork of Salt Creek sub-watershed). Importantly, the Project area is marked by extremely

steep slopes that "encourage greater run-off, [and] sediment and nutrient losses than otherwise

observed on flatter slopes." AR0003353. This area, the Service has explained, is, at best, only

"moderately suited" to the use of timber harvesting equipment; at worst, it runs a "very severe"

risk of erosion, making it "poorly suited" to the use of harvesting equipment. AR0003435-36.

The ecological upheaval stemming from the Project is not only immense in size and

scope, but will also span multiple decades. AR0012380 ("[T]he time needed to complete the

silvicultural treatments" prescribed by the Project is "12-15 years."); *see also* AR0012378

("[T]he timeframe needed to complete all prescribed burns associated with the [Project]" is "20

years."). During that time, the Service plans to close off large areas of the Forest to public

access, including significant portions of the Knobstone, Fork Ridge and Hickory Ridge trails,

which are immensely popular destinations for outdoor recreation in this region. AR0000571.

Closing these areas to the public will have enormous financial consequences, as they are

significant economic drivers for the Hoosier National Forest itself, *id.*, and for the local economy

in nearby communities that depends on the tourism revenue attracted by the Forest, AR0011543.

### 1. The Original Project EA and DN/FONSI

The Service first published a draft EA purporting to examine the environmental effects of

the Project in July 2019. AR0003246-327. The draft EA found that the Project would "not result

in a significant impact" on the environment because, in the Service's view, "mitigations and

management requirements," i.e., "Best Management Practices" ("BMPs"), "would minimize or

eliminate the potential for adverse impacts caused by the proposed project." AR0003306.[4]

In response, Plaintiffs submitted extensive comments identifying serious defects in the

Service's analysis. AR0001560; AR0001545-56; AR0001595-1606; AR0001607-22. For

example, Plaintiffs expressed concern that the EA failed to take a hard look at foreseeable effects

to Lake Monroe even though the Project would "increase nutrient and sediment loading to the

most impaired part of the watershed," i.e., the South Fork watershed, which is legally designated

---

[4] "Examples of forestry BMPs include minimizing stream crossings, minimizing the slope of
skid trails, installing water bars to reduce soil loss, and proper closure and seeding of trails and
landings at the end of a timber harvest." AR0011571.

as "impaired" under Section 303 of the Clean Water Act and is "not expected to meet state water quality standards" absent substantial improvements. AR0000449. Plaintiffs explained that sediment and nutrient loading would likely come from, *inter alia*, the highly erodible soil and steep terrain in the Project area, the removal of buffer vegetation that would otherwise minimize sediment transfer, and the mobilization of sediment that accompanies large-scale burns of the kind called for in this Project. AR0001546; AR0001614; AR0001600.

Plaintiffs' comments also took issue with the Service's misguided reliance on BMPs as a panacea for all Project impacts given that the Service in this Forest has routinely failed to either fully implement those BMPs, or document their implementation at all. AR0001547; AR0001550; AR0001553-54. In light of the Service's past inability to successfully (or even regularly) implement these BMPs, Plaintiffs thus asked the Service to explain how or why it suddenly expected BMPs to totally preclude Project impacts on Lake Monroe. *E.g.*, AR0000635 (questioning whether the Service has "the resources necessary to ensure 100% compliance with [BMP]s to prevent soil losses," and the agency's "recent track record of compliance").

And, assuming those BMPs will *not* be a perfect cure, Plaintiffs urged the Service to explain how much additional sediment and nutrient loading can be expected in Lake Monroe and by the residents of Monroe County, "one of the largest populations in Indiana who depend upon [the] surface supplied drinking water" coming from that Lake. AR0001560; *see also* AR0000449 (same); AR0000635 ("What models [is the Service] using to evaluate the amount of sediment and nutrients like organics and phosphorous that will be released in the watershed and ultimately into the lake?"). Such information is especially important here, Plaintiffs noted, because Lake Monroe is already "impaired" under the Clean Water Act, making treatment and monitoring for downstream users in Monroe County more costly and uncertain in the face of the additional

13

impairment coming from the Project. AR0000635-36; *see also* AR0011557 (explaining that "[a]s the presence of algae and sediment in this water source increases . . . water-treatment plants run by the City of Bloomington must resort to additional treatment measures such as increasing quantities of chlorine to treat that water," which ultimately results in "the presence of toxic, disinfectant byproducts" in the drinking water supply and receiving water-treatment facilities).

Finally, based on the Project's magnitude, and its implication of numerous NEPA intensity criteria, *see* 40 C.F.R. § 1508.27, Plaintiffs also implored the Service to recognize the significance of this Project to southern Indiana, and to prepare an EIS to examine and disclose the Project's clearly significant impacts on the environment. AR0001607-13.

The Service refused. Rather, in November 2019, the Service published a final EA that mirrored the draft version in all material respects, AR0003413, and a response to comments, which essentially shrugged off Plaintiffs' criticisms of the EA and its so-called analysis by claiming, without support, that "Forest Plan standards and guidelines, BMPs, and specific project design criteria" will broadly "ensure protection of soil and water resources." AR0001673. The Service did not, however, substantively respond to comments questioning the Service's ability to actually implement those measures successfully, or those pointing out that BMPs will not eliminate all erosion and polluted runoff from the Project's intensive activities on steep slopes with highly erodible soils.

Alongside the final EA, the Service also published a draft DN/FONSI, AR0003583, that concluded the Project as proposed did "not pose any significant short or long-term effects because site-specific design measures," BMPs, and Forest Plan standards and guidelines would all "limit adverse effects to such an extent that they will not be significant[]." AR0003586.

14

Under the Service's project-level planning regulations, 36 C.F.R. § 218.1 *et seq.*, the publication of the draft DN/FONSI triggered a 45-day pre-decisional administrative review period. AR003615. Plaintiffs timely filed objections to the Service's still-flawed NEPA analysis in the original EA and draft DN/FONSI. AR0008761-70; AR0008771-88; AR0008789-95; AR0008800-08. There, Plaintiffs renewed their objections to, *inter alia*: the Service's failure to consider specific Project impacts, like those to Lake Monroe and its watershed; the Service's inexplicable unwillingness to accommodate recreational interests in the Project area; and the agency's unsupported finding of no significant impact. Plaintiff Monroe County summarized those objections well when it noted that "the Project's NEPA documentation" evinces a troubling "disregard for the welfare of [the] local community" that depends on Lake Monroe and its Watershed as the "community's sole municipal drinking water supply." AR0008876.

Undeterred, in February 2020, the Service signed a final DN/FONSI and released the agency's response to pre-decisional objections. AR0008820-59. Those responses, like the EA, refused to grapple with Plaintiffs' concerns whatsoever, instead recursively citing to the very same analysis that Plaintiffs objected to as flawed in the first instance. *E.g.*, AR0008821.

### 2. *Monroe I, and This Court's Invalidation of the EA and DN/FONSI*

Left with no other option for protecting their interests in the Forest and Lake Monroe, Plaintiffs filed suit in this Court in 2020. *See Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.* (*Monroe I*), 595 F. Supp. 3d 713 (S.D. Ind. 2022) (Pratt, C.J.); *see also* AR0009331-51 (slip copy of the Court's *Monroe I* decision). As relevant here, Plaintiffs' suit maintained that the Service violated NEPA by failing to prepare an EIS for the Project, and for declining to examine "cumulative or indirect impacts to Lake Monroe when planning for the Houston South Project," despite the entirety of the Project taking place in the "South Fork Salt Creek watershed, which

15

contributes thirty percent of Lake Monroe's water . . . ." *Monroe I*, 595 F. Supp. 3d at 722. The Service argued that it had "considered erosion and increased sedimentation in the Lake Monroe watershed, . . . and analyzed what [BMP]s would need to be taken to reduce impacts" below the significance threshold that would otherwise compel the agency to prepare an EIS. *Id.* at 722-23.

The Court was unpersuaded by the Service's position. To the contrary, the Court's March 2022 order resolving the parties' cross-motions for summary judgment explains that the Court "agree[d] with Plaintiffs that [the Forest Service] failed to evaluate the potential impact of the [Project] on Lake Monroe." *Id.* at 723. In reaching that conclusion, the Court found that the Final EA "failed to adequately consider or discuss the legitimate concerns the [Project] could have on Lake Monroe," the "sole source of drinking water for 120,000 people in southern Indiana." *Id.* In the Court's view, even though the Final EA "discuss[ed] the possibility of sedimentation to the South Fork Salt Creek and the use of [BMPs] to reduce negative impacts, there is no mention of the present concerns regarding Lake Monroe's water *or how the [Project] may exacerbate these problems*." *Id.* at 723-24 (emphasis added). Having found that the Service overlooked this crucial aspect of the problem, the Court correctly concluded the Service had thus "failed" to provide a "convincing statement of reasons" as to why the impacts to Lake Monroe will not be significant. *Id.*; *see also id.* ("[A]n agency's failure to address certain critical factors that are essential to the decision to prepare an [EIS] or not can render its [FONSI] unreasonable.").

The Court's merits order thus concluded that the Service "violated NEPA by failing to fully evaluate the environmental effects to Lake Monroe," and remanded to the agency in order for the Service to conduct the requisite "analysis consistent with federal law." *Id.* at 724-25.

### *3.   The Service's Second Attempt: Supplemental Information Report*

On remand, the Service hatched a new plan to force the Project through quickly. Rather than prepare a supplemental EA or EIS as required by NEPA and this Court's summary judgment order, in October 2022, the Service published a draft "Supplemental Information Report" ("SIR"). AR0008891-933. The draft SIR purported to "address [this Court's] ruling that the Forest Service violated [NEPA] by 'failing to fully evaluate the environmental effects to Lake Monroe'" from the Project. AR0008894. The draft incorrectly characterized the Court's order as merely requiring further explanation from the Service as to "why the impacts to Lake Monroe would not be significant." *Id.* In doing so, the Service refused to acknowledge the thrust of the Court's ruling—that the Service had failed to conduct a NEPA-compliant analysis of the Project's impacts to Lake Monroe in the first instance. *Cf. Monroe I*, 595 F. Supp. 3d at 723-24.

Still, the SIR was flawed in other ways. For example, despite failing to include any meaningful analysis, the draft SIR concluded with "a high level of confidence" that the Project "will not add to the impairments of the Lake Monroe watersheds." AR0008916; AR0008902-03. Like the EA and DN/FONSI before it, the draft SIR reached this no-impact conclusion by relying heavily on the unsupported (and misplaced) assumption that this particular Forest, the Hoosier National Forest, is capable of achieving a 100% successful implementation of its erosion control BMPs. AR0008916. For instance, despite recognizing that erosion is a "major concern" for Lake Monroe, and that forest management activities including timber harvesting and prescribed burning have contributed, and will continue to contribute, additional sediment to the Watershed, AR0008896, without presenting any data or research demonstrating that successful BMP implementation will eliminate pollution, the draft SIR nevertheless insists that BMPs will

17

"confine sediment within the Project area, preventing it from reaching Monroe Lake." AR0008915.

The Service allotted a strict 30-day window in which the public was allowed to comment on the draft SIR. AR0008889. Once again, Plaintiffs timely provided detailed, science-based comments to the Service calling out the agency's continued refusal to examine the effects of the Project on Lake Monroe. AR0010813-27; AR0010829-31; AR0010833-46. In those comments, Plaintiffs reiterated the reasons that the Service's wholesale reliance on BMPs as preclusive of all downstream impacts was a misguided conclusion, including because the staff at this specific Forest has not proven its ability to successfully implement those BMPs with a 100% success rate, and that the Project "activities, as proposed, have a high probability of causing sediment and nutrient pollution in Lake Monroe." *E.g.*, AR0010821. Indeed, the best available science indicates that even the most successful deployment of BMPs can only *reduce* Project impacts, not eliminate them entirely, Plaintiffs explained. AR0010816. For these reasons, amongst others, Plaintiffs thus "urge[d]" the agency to prepare an EIS. AR0010822.

The Service refused again. In December 2022, the agency issued a final SIR and cover letter, claiming the SIR brought the Service into legal compliance with the Court's order. AR0008934-35 (cover letter); AR0008936-78 (final SIR). The final SIR mirrored the draft version in all pertinent respects and dismissed Plaintiffs' detailed comments out of hand, alleging that "no further information or clarification was needed" from the Service because it had already addressed those concerns in the original "EA and project record." AR0008934.

### 4.   *Monroe II and This Court's Invalidation of the SIR*

With their concerns again arbitrarily dismissed by the Service, Plaintiffs returned to this Court to vindicate their interests in safeguarding the Forest and the Lake Monroe Watershed.

This time, however, because the Service planned to implement the Project within four months of the final SIR's publication (i.e., by April 2023), Plaintiffs were forced to ask this Court for a preliminary injunction to preserve the Court's discretion to remedy Plaintiffs' injuries. *See Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.* (*Monroe II*), 4:23-cv-00012, 2023 WL 2683125 at *1 (S.D. Ind. Mar. 29, 2023) (Pratt, C.J.); *see also* AR0009331-51 (slip copy of Court's order granting Plaintiffs' motion for preliminary injunction).

On March 29, 2023, the Court again sided with Plaintiffs, finding they had "made a 'strong' showing that the [Service's] decision to forgo a Supplemental NEPA document in light of the [Court's summary judgment] Order was arbitrary and capricious." *Monroe II*, 2023 WL 2683125 at *6. In enjoining the Project, the Court held that the Service had used the SIR to inappropriately "present information and analysis that it was required, but according to the [summary judgment] Order, failed to include in its initial NEPA document." *Id.* The Service's failure to do so, the Court explained, prevented that analysis from making "an important contribution to the decision-making process" and allowed the Service to use it inappropriately instead as a rationalization or justification for "a decision already made." *Id.* at *5.

Five days after the Court's injunction, the Service announced that it had decided to withdraw the SIR "to allow the [F]orest to further evaluate the original decision." *See* Project Record, *Monroe II*, 4:23-cv-00012 (S.D. Ind. Apr. 4, 2023), ECF No. 32-1. Hence, Plaintiffs agreed to dismiss their suit shortly thereafter on April 13, 2023. *See id.* at ECF No. 32.

**D.    The New Supplemental EA—Materially the Same as the SIR—Suffers the Same Defects as Both Decisions Previously Invalidated by This Court**

The decision under review in this case represents the Service's third attempt at justifying a decision already made (i.e., its decision to implement *this* specific version of the Project). Remarkably though—despite receiving two mulligans from the Court—this most recent decision

is infected with the same serious defects that led the Court to invalidate the Service's decisions

twice before. Indeed, as explained below and via Plaintiffs' comments during the administrative

proceedings leading to this third decision, the Service's "supplemental" analysis is anything but.

In fact, as explained in further detail below, that supplemental analysis fails to include "*any* new

supporting information or evidence that can change the fact that the Project will result in

significant impacts to Lake Monroe and its water quality." AR0011427 (emphasis added).

      The absence of new information or analysis validating the Project and the Service's

arbitrary forecast of its effects is perhaps unsurprising given that the Service acted

uncharacteristically quickly to publish a full, draft supplemental EA ("SEA") less than six

months after the parties agreed to dismiss *Monroe II. See* AR0010931 (announcing the

availability of the draft SEA for comment on October 20, 2023).

      The reason the Service was able to act so swiftly is no doubt due to the fact that the

relevant portions of the draft SEA (i.e., those related to Lake Monroe effects and the Service's

significance determination) remain virtually the same as those published in the SIR. AR0011407.

That is, the SEA makes zero changes to the Project's design as originally proposed, and although

it purports to respond to the Court's summary judgment order in *Monroe I*, it still refuses to

accept that the Project will impact Lake Monroe or its watershed in any significant way by

hiding behind demonstrably false notions about the effectiveness of known-to-fail mitigation

measures. AR0012322 (claiming "this project would have minimal to no effects on water quality

in any water body and particularly to Lake Monroe itself"); *see also* AR0012332 ("Any direct or

indirect impacts of the proposed actions would be mitigated; therefore, no cumulative effects are

expected."). Again, without any new data or information, the Service reached that now-familiar

conclusion the same way it has before—by claiming that "adherence to Forest Plan guidance, the

use of design features and BMPs, and proper monitoring" will obviate any and all "downstream"

impacts to Lake Monroe. AR0012322; *see also* AR0012435 (alleging the same in the draft

DN/FONSI).

In response to the draft SEA, the Service once again received comments from the public,

including Plaintiffs, that expressed overwhelming opposition to the Project and the Service's

alleged analysis of the same. AR0011495-582; AR0011643-49. Unsurprisingly, those comments

rehashed the same concerns Plaintiffs have expressed since the Project's inception. Again,

Plaintiffs explained that because the Service had not supplied any new information about *why* it

believed that BMPs would be 100% effective—especially in light of its recent track record of

BMP implementation showing the opposite—the SEA's refusal to quantify downstream effects

on Lake Monroe is arbitrary, and fails to satisfy NEPA's "hard look" standard. *See* AR0011515-

25. Plaintiffs attempted to illustrate why the Service's total reliance on BMPs in this instance is a

mistake by providing on-point studies, including one from Kentucky that showed that these *same*

BMPs could not *eliminate* downstream sedimentation in circumstances virtually identical to the

Project. AR0011518-20 (citing AR0011583-97). Indeed, this study showed that when logging

steep terrain like that found in the Project area, watersheds downstream of areas cut according to

BMPs received similar quantities of nutrients compared to those areas cut *without* adherence to

BMPs. *Id.*; *see also* AR0011431-32 (observing that the same study also recorded "statistically

significant increase[s]" in sediment transfer in the BMP-cut watershed).

Plaintiffs' comments also took issue with the SEA's failure to disclose and/or discuss

prescribed fire's well-documented role in accelerating sediment and nutrient loading in adjacent

water bodies. AR0011520. This is a particularly notable omission from the SEA given both the

substantial acreage the Service proposes to burn here (repetitively) over the next 20 years, and

21

the fact that the Service plans to conduct those prescribed burns during the seasons (winter and spring) most susceptible to heavy precipitation and significant run-off events. AR0011521.

Looking beyond issues related to Lake Monroe, Plaintiffs also urged the Service to align the Project with a recently announced initiative by the Biden Administration aimed at protecting old-growth forested land. AR0011511-12; *see also* Exec. Order No. 14,072, 87 Fed. Reg. 24,851 (April 22, 2022) (directing the Service to develop and implement plans to "conserve America's mature and old-growth forests on Federal lands"). As Plaintiffs noted, "large swaths of the Project area constitute some of the oldest, most mature forests in the eastern United States, where almost all forested land has been developed or logged at least several times in the past century." AR0011511. These include many native hardwood forest tracts whose entire canopies will be removed in shelterwood logging. The loss of these ancient trees is catastrophic not only because they take so long to mature, but because cutting them down eliminates the invaluable ecosystem services they provide like removing and storing significant quantities of carbon dioxide that would otherwise contribute to climate change, AR0011511-12, and filtering pollutants from rainwater and sediment to detoxify it before it enters Lake Monroe, AR0009994.

Finally, Plaintiffs' comments again explained the myriad ways the Project qualifies as "significant" under NEPA's implementing regulations (and common sense), thereby compelling the Service to prepare an EIS to fully examine Project impacts. AR0011452-59. For example, Plaintiffs pointed out that the dispute between Plaintiffs and the Service over the likelihood of downstream effects makes the Project "highly controversial" under NEPA. AR0011455-56.

By this point, it should come as no surprise that the Service ignored Plaintiffs' well-founded concerns because the Service had no serious interest in re-evaluating a decision it made years ago. Thus, following the close of public comments, the Service decided to forge ahead with

the Project as originally proposed and analyzed back in 2018 (i.e., without *any* additional data or research supporting its claim of no harm to water quality, or *any* changes responsive to Plaintiffs' concerns) by publishing a final SEA that mirrors the draft versions in all material respects, as well as a draft DN/FONSI memorializing the Service's decision to forgo further NEPA analysis. AR0012448-523 (final SEA); AR0012431-42 (draft DN/FONSI).

With respect to the Service's "significance" determination, the draft DN/FONSI purports to "consider[]" each of the ten intensity factors under NEPA's implementing regulations; however, "consideration" is a generous characterization, since the DN/FONSI merely entails a list of those intensity factors, paired with a cursory finding by the Service summarily rejecting each factor's applicability to the Project. *E.g.*, AR0012529 ("This project would not have any significant effects on unique characteristics of the geographic area."). In other words, the DN/FONSI does not (as one might expect) *explain* why those factors have not been implicated, let alone respond to Plaintiffs' detailed comments applying those factors to this Project.

To the extent the Service actually considered Plaintiffs' comments, the only indication of such consideration exists in the Service's "30-day Comment Summary." AR0011904-19 (draft SEA comment matrix). There, the Service practically admits that it did not even consider whether the Project's effects could rise to the level of "significance" requiring an EIS because, purportedly, the "Court did not order the Forest Service to complete an EIS." AR0011904.

With respect to the Project's foreseeable impacts on Lake Monroe, the Service yet again invoked "Forest Plan guidance [], the use of design features and BMPs, and proper monitoring" as sufficient bases for excusing the Service's failure to quantify and examine downstream Project effects. AR0011907. However, notably absent from the Service's responses is any credible explanation of why the public should trust the Service to successfully implement those

23

mitigation measures (even if they could be 100% effective) when it has not been able to demonstrate their ability to implement even the most rudimentary BMPs in a consistent manner.

The publication of the draft DN/FONSI in late April 2024 again triggered the Service's pre-decisional administrative review process by the agency. AR0012443-44. Plaintiffs timely submitted objections renewing the criticisms they have leveled against the Project since 2018. AR0015589-620; AR0015670-73. Unfortunately, the Service once again disregarded Plaintiffs' detailed and well-documented concerns in favor of preserving the Project as originally proposed. To that end, the Service signed a final DN/FONSI in August 2024 with the same arbitrary conclusions of the draft DN/FONSI. AR0012524-34. Under the Service's implementing regulations, the agency's approval of the final DN/FONSI culminated the administrative decisionmaking process for this Project. AR0012535 (explaining that the Project "can be implemented immediately").

## <u>ARGUMENT</u>

### I.    PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS

Plaintiffs—comprising local government bodies, non-profit organizations, and individuals—continue to challenge the Project because they have been and will be severely harmed by the Project and the faulty decisionmaking process meant to validate it. *See* Exs. A, B (Plaintiff declarations demonstrating Article III standing); *see also Friends of the Earth v. Laidlaw Env't Servs., Inc*, 528 U.S. 167 180-83 (2000) (outlining the requirements of Article III standing, and holding that "plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity").

## II.    THE SERVICE VIOLATED NEPA (FOR A THIRD TIME) BY REFUSING TO CONSIDER PROJECT IMPACTS ON LAKE MONROE

NEPA requires analysis of the Project's direct, indirect, and cumulative impacts, the last of which is any "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*; see also 36 C.F.R. § 220.4(f) (requiring "[c]umulative effects analysis" under 40 C.F.R. § 1508.7). Because this analysis "must be more than perfunctory," an agency must include "quantified or detailed information," unless it can justify "why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993-94 (9th Cir. 2004). An agency must identify "the geographic area within which a project's cumulative impact" may occur, and this "choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Habitat Educ. Ctr. v. Bosworth*, 363 F. Supp. 2d 1090, 1097 (E.D. Wis. 2005). Likewise, NEPA requires agencies to consider indirect effects, which "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," and which include "changes in the pattern of land use . . . and related effects on air and water." 40 C.F.R. § 1508.8(b).

Despite now having a *third* go at it in the SEA and DN/FONSI now under review, the Service still fails to satisfy the agency's duty under NEPA, or this Court's prior orders, to take a "hard look" at the foreseeable effects of its decision on Lake Monroe. This renders the Service's analysis arbitrary and capricious for the reasons explained below.

A.    **The Project Threatens Severe and Lasting Degradation to Lake Monroe and Those Who Depend on Its Critically Important Water Supplies**

The record in this case is abundantly clear: the Project *will* adversely impact Lake Monroe, only further exacerbating the dire condition of the lake due to cumulative effects that have severely degraded its water quality. As Plaintiffs have consistently explained for the past six years, the majority of the Project will occur on steep slopes with "highly erodible soils" of the kind already contributing to Lake Monroe's impairment and catalyzing the "hazardous algae blooms" that now prompt recreational advisories in the Lake each year. AR0000449; AR0011553 (Decl. of Dr. Mitchell-Bruker); AR0011563 (Decl. of Dr. Mitchell-Bruker). In fact, neither the SEA nor the FONSI actually dispute that the Project will have both direct and indirect "negative effects to watershed health" as a result of "soil movement and sedimentation." AR0012398; *see also* AR0003353 (acknowledging that Project area "conditions . . . encourage greater run-off, sediment and nutrient losses than otherwise observed on flatter slopes").[5]

Nor does the Service dispute that downstream nutrient loading via sedimentation is the kind of effect that must be considered under NEPA. *Cf.* AR0012408 (recognizing that "forestry sites 'with insufficient'. . . erosion control[s]" can contribute to downstream sedimentation and pollution, but disclaiming any need to examine that here because the "Project would not have insufficient erosion control methods"); *id.* (asserting that "no cumulative effects are expected" because "[a]ny direct or indirect impacts of the proposed actions would be mitigated"). Nor can

---

[5] While insisting that "this project would have minimal to no effects on water quality in any waterbody and particularly to Lake Monroe," the Service also confusingly tries to hedge its bets by asserting that any potential adverse effects to "water quality" caused by the Project would be proportionate "to the percentage of the watershed in [Service] ownership." AR0012398. The Service does not explain why this matters, let alone how polluting nearly 20% of the Lake Monroe Watershed (i.e., "the percentage of the watershed in [Service] ownership," AR0012398), could be considered insignificant under NEPA such that an EIS would not be required.

26

the Service credibly argue otherwise; sedimentation like that expected here is a classic example of the direct and indirect impacts NEPA requires agencies to study (along with cumulative effects). "The most obvious way" these kinds of impacts "can be significant . . . is that the total magnitude of the environmental effects—such as . . . the total amount of sediment to be added to streams within a watershed—may demonstrate by itself that the environmental impact will be significant." *Klamath-Siskiyou*, 387 F.3d at 994. "For example, the addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all . . . [b]ut the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that no salmon survive." *Id.*

In short, there is no dispute here that in the absence of *completely* effective BMPs (i.e., BMPs that will prevent **100%** of Project-caused erosion, pollution, and sediment from reaching Lake Monroe), the Project *will* cause sediment and nutrients to enter Lake Monroe, contributing additional pollutants to an already overtaxed waterbody. Nor is there is a dispute that this is the kind of cumulative effect that must be studied under NEPA when present. By adopting a pigeonholed position in the SEA's effects analysis and admitting that it did not consider those effects based on the (flawed) assumption that BMPs will *completely* obviate "[a]ny direct or indirect impacts" from the Project, the Service has made this issue an easy one to resolve: Assuming the Court agrees with Plaintiffs that the Service has not carried its burden to make a "convincing case" for why these BMPs will be **100% effective** in preventing all downstream effects on Lake Monroe, then it follows that the Service's refusal to consider those effects violated NEPA and the Court should again grant judgment in Plaintiffs' favor on this issue.

> **B.    The Service's Misplaced Faith in Demonstrably Flawed BMPs Is Arbitrary and Cannot Excuse a Fulsome Examination of Foreseeable Project Effects**

27

Having established that the Lake Monroe Watershed and Lake Monroe itself will incur Project effects in the absence of completely effective BMPs, the next question is whether the Service has adequately explained why "adherence to Forest Plan guidance, the use of design features and BMPs, and proper monitoring," AR0012398, will nullify "*all* direct and indirect" Project effects such that no impacts to Lake Monroe are foreseeable, AR0012408 (emphasis added). After spending six years repeatedly requesting, but being denied, that explanation, it comes as no surprise to Plaintiffs that the record here is devoid (for the third time) of any cogent justification for the effectiveness of these BMPs. Below, Plaintiffs discuss the various reasons that the Service's entirely uncritical reliance on the BMPs is an arbitrary and capricious basis for evading consideration of foreseeable (indeed, obvious) Project impacts on Lake Monroe.

*First*, as a threshold matter, it is unclear how or why the Service believes that "proper monitoring" will avoid, minimize, or even mitigate any downstream impacts flowing from the Project. Plaintiffs raised this point repeatedly in their comments, explaining that monitoring is inherently a *backwards-looking* measure that merely documents effects as they occur and thus cannot prevent impacts from occurring in the first place. Regardless, the monitoring called for by the Service here is an empty gesture both because the Service has refused to disclose the baseline metrics by which future water samples will be measured, and because the Service has positioned its few monitoring stations so as to avoid detection of any sedimentation caused by the Project. *See* AR0011523-24 (calling attention to multiple issues in the Service's water quality monitoring plan, including a lack of baseline turbidity data and faulty positioning of the four monitoring stations upstream from where significant runoff is expected). This is patently unlawful. *See, e.g.*, *Klamath–Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, No. 2:05-cv-0299, 2006 WL 1991414 (E.D. Cal. July 14, 2006) (holding that Service's "failure to disclose background turbidity levels

was a violation of NEPA" because those metrics are "essential" to "a careful evaluation of [a comparable logging project] under NEPA," and to "an evaluation of the BMPs themselves").

*Second*, the Service's rationale for why it expects the BMPs to be entirely effective at eliminating all direct and indirect Project effects rests on untenable circular logic. While acknowledging that forestry projects undertaken *without* sufficient "erosion control" measures are a "major source[] of sedimentation," the Service attempts to distinguish *this* Project on the basis that it will "not have insufficient erosion control methods because Forest Service personnel and contractors would use Forest Plan standards and guidelines and design criteria, along with implementing BMPs." AR0012408. But the Service fails to mention that the Forest Plan standards and guidelines, Project design criteria, and BMPs are the *same thing* as the erosion control measures it extolls. *See* AR0012417 (Design Measures calling for the installation of "erosion control measures along road construction"); AR0012417 (same); AR0012421 (Forest Plan guidance requiring "effective erosion control" to mitigate all "[s]oil-disturbing activities" prescribed by the Plan); AR0012422 (recommending the installation of "erosion control measures" as a BMP); AR0012423 (same); AR0012424 (same); AR0012428 (BMPs identifying "water diversion and erosion control measures" as means "to control runoff into and from the [Project]"). Put differently, the Service therefore claims in the SEA that the "Project would not have insufficient erosion control methods because Forest Service personnel and contractors would use [sufficient erosion control measures]." AR0012408. That kind of "circular reasoning" does not (and inherently cannot) "articulate a rational connection between the facts found and the conclusions reached" by the Service. *See, e.g.*, *Or. Wild v. Bureau of Land Mgmt.*, No. 6:14-cv-0110, 2015 WL 1190131 at *12 (D. Or. Mar. 14, 2015). This point alone is sufficient to invalidate the SEA.

Third, the Service's circular logic to justify the effectiveness of BMPs is conspicuous because, as Plaintiffs' comments emphasized, the simple fact remains that the Service has not provided any evidence to conclude that its BMPs can be 100% effective. Moreover, the staff at this particular Forest, the Hoosier National Forest, have demonstrated a chronic inability to implement even the most rudimentary BMPs consistently or effectively. AR0011518; AR0001561; AR0011561 (concluding that "the Hoosier National Forest lacks the requisite (or any) documentation of its BMPs' effectiveness to conclude with any reasonable certainty that the Project will be adequately mitigated by BMP implementation" such that the Project "will not contribute sediment or other pollutants to Lake Monroe"); AR0011566-68 (documenting Hoosier-specific examples of BMPs the Service did not fully implement, and "a very poorly documented monitoring program with results indicating that BMPs were rarely evaluated in the Hoosier National Forest, and when evaluated the BMPs were often found to be not implemented or not effective.").[6]

Fourth, the supposition animating (and arbitrarily delimiting) the Service's conclusions about Project impacts on Lake Monroe—i.e., that BMPs can *fully* eliminate Project effects downstream thus excusing any consideration of those impacts in the SEA—is just plainly false. The SEA itself recognizes that Lake Monroe should anticipate more than zero effects from the Project, even if the Service tries to downplay those effects as merely "minimal." AR0012398.

---

[6]At multiple junctures in the record the Service (misleadingly) suggests that the Hoosier National Forest enjoys a 96.5% success rate when implementing BMPs. AR0012381; AR0003438. But the 96.5% effectiveness rate cited by the Service is actually a *national* average of BMP effectiveness across *all* "federal lands" including with much flatter terrain, not the Hoosier specifically. *See* AR0012399. To the contrary, the Hoosier-specific examples identified by Plaintiffs in which the Service has either unsuccessfully employed or failed to document its BMPs plainly demonstrate that the actual success rate experienced by this particular office lags far behind the alleged national average success rate of 96.5% (assuming that average is correct).

Regardless, Dr. Sherry Mitchell-Bruker—a recognized expert, and the lead author of the Lake Monroe Watershed Plan, who served as a hydrologist, watershed program manager, and prescribed burn response coordinator *for the Service*—has provided sworn testimony twice explaining that although BMPs can "*reduce* the severity and likelihood of negative water quality impacts," those practices cannot fully *eliminate* impacts. AR0011565; AR0011561 ("Based on that experience and the information made publicly available, it is my view that the Hoosier National Forest lacks the requisite (or any) documentation of its BMPs' effectiveness to conclude with any reasonable certainty that the Project will be adequately mitigated by BMP implementation and thus will not contribute sediment or other pollutants to Lake Monroe.").[7]

The inherent inability of BMPs to nullify Project effects is also borne out in the relevant scientific literature. For example, Plaintiffs' comments directed the Service's attention to a directly on-point study from southeastern Kentucky wherein researchers showed that receiving streams in forested areas (with topography nearly identical to the Project area) logged with and without BMPs *both* eventually showed statistically significant increases in nutrient loading. AR0011431 (citing Arthur et al., *Effects of Best Management Practices on Forest Streamwater Quality in Eastern Kentucky*, 34 J. OF AM. WATER RES. ASS'N 481 (1998)). That same study also found that BMP-cut areas of the forest experienced notable increases in sediment flux; for example, during logging operations, even areas logged *with use of all BMPs* observed sediment levels *14 times higher* than uncut areas in the same watershed, and those levels remained

---

[7] Rather than grapple with the merits of Dr. Mitchell-Bruker's criticisms, the Service attempted instead to dismiss those concerns outright by pointing to a sentence in a 2009 paper authored by Dr. Mitchell-Bruker stating that BMPs "continue to be an effective method for protecting and preserving water on National Forests." AR0011906. That generic statement is entirely consistent with Dr. Mitchell-Bruker's declarations, which note the effectiveness of BMPs at *reducing* but not *eliminating* sediment and nutrient deposition from logging projects.

elevated at least 17 months after the logging operation concluded. *Id.* ("[S]ediment flux was 4 times higher from the BMP-cut watershed than from the uncut watershed" 17 months later).

The Service's response to this study is wholly unpersuasive and, if anything, illustrates the problem with the agency's wholesale reliance on BMPs to avoid examining impacts on Lake Monroe. Without offering any record support for its assertion, the Service alleges that the Kentucky study "is not comparable to [the Project]" because it was conducted on "very steep slopes that averaged 45% incline," whereas "only a small portion" of this Project contains comparable terrain. AR0011907. In making that argument, however, the Service plainly undermines its own statements in the EA that admit "*much of the terrain in Houston South is relatively steep,*" AR0003439 (emphasis added), including parts with "very steep slope gradient," i.e., "45% or higher," AR0003436-37; AR0003353 ("[C]onditions [in the Project area] encourage greater run-off, sediment and nutrient losses than otherwise observed on flatter slopes."). Indeed, the record in this case clearly reveals that the *overwhelming majority* of logging operations will occur on gradients with "35% slope or more." *See* AR0000451-52 (overlaying Project treatment areas on a map measuring gradient of the Project area).

Despite this, the Service fails to explain at all why the 10% gradient difference matters to the agency's bottom-line significance determination, or why the Service does not expect the Project treatment areas that *do* share a comparable gradient to the Kentucky study (i.e., averaging 45%) to contribute a significant quantity of sediment and nutrients to the Lake Monroe Watershed, despite evidence to the contrary that the Service does not dispute. *Cf.* AR0011907 (failing to refute Kentucky study's core finding—that BMPs cannot, and do not, fully ameliorate nutrient export in steep terrain like that found in "much" of the Project area).

For all these reasons, the Service's unsupported assertion that its BMPs totally absolve the agency of having to take a "hard look" at the Project's foreseeable effects on Lake Monroe (the drinking water supply for over 145,000 Indiana citizens) is plainly arbitrary, and violates NEPA and the APA. *See, e.g.*, *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (finding the Service's "discussion of mitigation measures inadequate" under NEPA where it relied upon "a series of [BMPs] designed, in part, to reduce the erosion from the logging and roadbuilding activities," but there was "nothing in the EA to support the [] Service's conclusion that the proposed BMPs will be adequate in a severely burned area" to prevent erosion, especially where "even before the fire[,] water quality was suffering" and "failed to meet [state] water quality standards").[8]

### III.    THE SERVICE'S UNSUPPORTED AND INDEFENSIBLE DECISION TO (THRICE) FORGO AN EIS IS ARBITRARY AND VIOLATES NEPA

Agencies must determine whether a project may have "significant" impacts by considering ten "intensity" factors in their appropriate "context." 40 C.F.R. § 1508.27(b) (listing the factors); *see also id.* § 1508.27(a) (explaining that "[s]ignificance varies with the setting of the proposed action"). Although the Seventh Circuit has "not address[ed] the issue of whether any one factor could be determinative of intensity," *Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 857 n.8 (7th Cir. 2003), other circuits have held that a single factor may necessitate an EIS. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th

---

[8] There are multiple instances in the SEA where the Service suggests (but does not actually assert) that Project impacts on the Lake Monroe Watershed are likely to be insignificant compared to those from non-federal entities also abutting Lake Monroe. This exercise in misdirection is a red herring. Engaging in the kind of disingenuous "whataboutism" the Service attempts here cannot excuse it from examining *its* contribution to the problems currently facing the Lake Monroe Watershed. *W. Watersheds Project v. Christiansen*, 348 F. Supp. 3d 1204 (D. Wyo. 2018) (rejecting the argument that an agency may be excused from examining its own impacts when the actions of non-federal entities also contribute impacts on that same resource).

Cir. 2022); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1039 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1187 (2022); *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019). Where an agency refuses to prepare an EIS, it must "make a convincing case for its finding of no significant impact." *Nat'l Parks Conserv. Ass'n v, Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019). As this Court has explained, "an agency's failure to address certain critical factors that are essential to the decision to prepare an [EIS] or not can render its finding of no significant impact unreasonable." *Monroe I*, 595 F. Supp. 3d at 723 (Pratt, C.J.) (citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982)).

Importantly, a plaintiff challenging the agency's decision to prepare a FONSI instead of an EIS "need not show that significant effects will in fact occur"; "if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011). "[T]his is a low standard." *Id.*; *see also Ind. Forest All., Inc.*, 325 F.3d at 857 (Seventh Circuit relying on the "substantial body of [NEPA] case law . . . in the Ninth Circuit").

**A.    The Service, Including the Hoosier National Forest, Usually Prepares EISs for Projects of This Magnitude, and Courts Often Order EISs for Comparably Significant Projects if the Service Refuses to Do So**

NEPA's implementing regulations explain "that the significance of an action must be analyzed in several contexts" like the "the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). "[I]n the case of a site-specific action" like this Project, "significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id.* As noted above, the Service itself has called this Forest a "local treasure" due to its unique status in Indiana as one of the only readily accessible parcels of federal land. AR0000095; *see also* AR0015698 ("The Hoosier comprises approximately 25 percent of the

public lands in Indiana, and is within a day's drive of several major metropolitan areas, including Chicago, Cincinnati, Evansville, Fort Wayne, Indianapolis, Louisville, and St. Louis."). For these reasons, the Service has specifically acknowledged that "[t]he Hoosier National Forest *is significant* to the state and local community." AR0010929 (emphasis added).

The record here demonstrates that in this locale, this Project is without precedent in terms of magnitude, scope, and cost. AR0015698. Indeed, the Project is the largest and most expensive logging project *ever* undertaken in the Hoosier National Forest. The Service (and federal courts) have repeatedly recognized that National Forest projects of a comparable magnitude (and many that are considerably smaller) almost always require an EIS. *See, e.g.*, *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020) (ordering EIS for logging and related activities that would affect up to 11,742 acres); *Blue Mountains Biodiversity Proj.*, 161 F.3d at 1214 (9th Cir. 1998) (ordering EIS for logging 4,186 acres of burned forests and revegetating 4,500 acres); *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193–95 (9th Cir. 1988) (ordering EIS for several modest timber lease sales); *Oregon Wild v. BLM*, No. 6:14-CV-0110-AA, 2015 WL 1190131, (D. Or. Mar. 14, 2015) (ordering EIS for 265 acres of logging, 180 acres of which was mature forest of 80 years or older); *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1280-84 (D. Or. 2012) (ordering EIS for 2,100 acres of logging through thinning and gap creation methods); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1080 (E.D. Cal. 2004) (ordering EIS for logging 1,354 acres scattered throughout project area).

The same is true of prior projects undertaken by the Hoosier National Forest, specifically. For example, the Forest prepared not one, but two EISs, a Final and Supplemental EIS, for the German Ridge Restoration Project, a logging project that covered a mere 432 acres (355 acres of pine removal and 77 acres of shelterwood cuts) and 2,170 acres of prescribed burns—i.e., orders

of magnitudes fewer than the steep-slope acreage the Service proposes to log and burn in this Project. *See* U.S. Forest Serv., *German Ridge Restoration Project* (2007), https://bit.ly/3V3a0uF. Because this is the same national forest and it involves the same natural resources—indeed, if anything, the Houston South Project area contains much more sensitive recreational resources, substantially greater wildlife habitat, and poses a serious public health and safety threat to a large public water supply (Lake Monroe) in contrast to the German Ridge project—there is no legal or logical justification for merely preparing an EA for this Project. This is further underscored by the fact that much of the Houston South Project area contains the unique resources of some of the best, most mature hardwood forest anywhere in the eastern United States. Accordingly, consistent with projects of similar or lesser sizes, the sheer magnitude and scope of the Project and its effects requires the preparation of an EIS for the Project in order to comply with NEPA.

> **B.     The Project Squarely Implicates Multiple Criteria Under NEPA's Regulations Indicating That This Project is "Significant"**

Here, numerous factors, any one of which is sufficient to require an EIS, indicate the obvious—this Project will have (extremely) significant impacts. And while the Service's FONSI purports to briefly consider each factor, AR0012528-30, the agency has continued to ignore crucial impacts, thus failing to make any case, let alone a "convincing case," for the FONSI. *Nat'l Parks*, 916 F.3d at 1082; *see also Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("[S]tating that a factor was considered . . . is not a substitute for considering it.").

The record here demonstrates the Project will have significant impacts on the environment of southern Indiana and the Lake Monroe Watershed because it implicates numerous intensity factors under the regulations implementing NEPA. Although implicating any one of these factors is sufficient to compel an EIS, the Project's implication of multiple factors— each in a substantial manner—makes an EIS all the more necessary.

36

### 1. The Service Says the Project's Benefits Will Be Insignificant

As a threshold matter, it is important to point out that the Service itself acknowledges that any and all beneficial aspects of the Project will be insignificant. The regulations implementing NEPA require the Service to consider "both beneficial and adverse" impacts from the Project. 40 C.F.R. § 1508.27(b)(1). And, if those beneficial impacts are significant, the Service must prepare an EIS—"even if [it] believes that on balance the effect will be beneficial." *Id.*

The Service's FONSI states that the beneficial aspects of the Project "will not have a significant effect on the quality of the environment." AR0012529. Thus, despite the Service repeatedly touting alleged benefits of the Project, like those it says will ostensibly accrue to early successional forests and wildlife in the long-term, the agency's own record ultimately concludes that the results of the Project will be insignificant for the Forest. AR0012529. To the extent the Service alleges otherwise (i.e., that the Project will yield significant benefits for the Forest), those significant effects compelled the Service to prepare an EIS. 40 C.F.R. § 1508.27(b)(1).

### 2. The Project is "Highly Controversial" Within the Meaning of NEPA and the Service's Failure to Resolve that Controversy Leaves the Project's Effects Uncertain

NEPA requires agencies to prepare an EIS whenever the effects of a proposed action "are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). In this context, courts have explained that "controversy" means more than mere disagreement with the proposed action; instead, a proposed action is "highly controversial" where there is a "substantial dispute . . . as to the size, nature, or *effect*" of that action. *Standing Rock*, 985 at 1042-43 (D.C. Cir. 2021) (quoting *Nat'l Parks*, 916 F.3d at 1083). A dispute over an action's effect can take the form of "repeated criticism from . . . consultants and organizations with on-point expertise." *Id.* at 1043; *see also id.* ("Because those criticisms reflected the considered responses . . . of highly

specialized governmental agencies *and organizations* rather than the hyperbolic cries of . . . not-in-my-backyard neighbors, we found the effects of the [agency]'s decision 'highly controversial.'" (emphasis added) (internal quotation marks and citation omitted)); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 185 (D.D.C. 2004) ("Such a controversy exists where the Corps is presented with scientific evidence specifically evaluating the environmental effects of the project or calling into question the adequacy of the EA.").

The Project squarely satisfies this test. During each previous attempt by the Service to force this Project through, Plaintiffs—including "consultants and organizations with on-point expertise" in Lake Monroe Watershed issues and the forest ecology of southern Indiana, *Standing Rock*, 985 at 1042-43—have repeatedly criticized straightforward defects in the Service's analysis of this Project, all while supporting that criticism with on-point studies and specific evidence. For example, Dr. Mitchell-Bruker of FLM, an author and originator of the Lake Monroe Watershed Management Plan, approved by both the U.S. Environmental Protection Agency and Indiana Department of Environmental Management, has expressed consistent concerns over the sediment- and nutrient-loading potential of this specific Project, and its potential to seriously undermine the Lake Monroe Watershed Management Plan. *See*, *e.g.*, AR0011560 (The Project "will directly undercut the goals of the WMP and will result in irreparable harm to Lake Monroe and its users by adding significant quantities of phosphorous, nitrogen, and sediment to an already impaired waterbody, thereby making the lake's water quality recovery significantly more difficult."). She has also questioned these specific BMPs' ability to eliminate those potential effects, and the Service's unexplained faith in those BMPs anyway, which leaves serious analytical holes in the Service's EA and significance determination. AR0011561. Surely, if anybody qualifies as an expert with "on-point expertise"

in the likely effects to Lake Monroe, *Standing Rock*, 985 F.3d at 1043, it would be Dr. Mitchell-Bruker. *See* AR0011553-62 (detailing Dr. Mitchell-Bruker's relevant expertise, including as a Forest Hydrologist and Watershed Program Manager for the Forest Service, and co-author of the Lake Monroe Watershed Management Plan); *see also* AR0011564-70 (attesting to a dearth of "credible documentation or other scientific evidence" showing the Service will "safeguard the water quality in Lake Monroe by implementing BMPs and sparse monitoring for the Project" based on the record, prior implementation of the BMPs, and Dr. Mitchell-Bruker's tenure as a "lead hydrologist, watershed program manager, and prescribed burn response coordinator" for the Service itself).

Faced with Dr. Mitchell-Bruker's detailed criticism, not to mention from other Plaintiff organizations with on-point expertise, it was incumbent on the Service to resolve those criticisms before publishing a DN/FONSI—or prepare an EIS. *Standing Rock*, 985 F.3d 1043 ("[A]n EIS is perhaps especially warranted where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain."). Because the Service did neither here, the Project continues to be "highly controversial" under NEPA, 40 C.F.R. § 1508.27(b)(4), and its effects on Lake Monroe remain undisclosed and uncertain, *id.* § 1508.27(b)(5).

### 3.  *The Project Threatens to Undermine the Lake Monroe Watershed Management Plan, and Negatively Affect Public Health*

The Project's foreseeable potential to "directly undercut the goals of the [Watershed Management Plan]," AR0011560, by increasing (rather than decreasing) the deposition of sediment and nutrients in the Lake Monroe Watershed (and, thus, eventually in Lake Monroe itself), also implicates two more NEPA significance factors. Those provisions require agencies to prepare an EIS where a proposed action "threatens" to violate a "local law *or requirements* imposed for the protection of the environment," and/or when the decision "affects public health

39

or safety." 40 C.F.R. §§ 1508.27(b)(10), (b)(2) (emphasis added); *see also* AR0001651 (acknowledging that "[l]and management activity," like that prescribed by the Project, is only "permitted within an impaired watershed if it does not compound the current reason for impairment."). Undermining the Lake Monroe Watershed Management Plan does both.

The Plan itself explains that it seeks to benefit public health by improving the water quality of Lake Monroe, in part for the purpose of improving and ultimately safeguarding the drinking water supply originating from the Lake, including by significantly reducing and/or eliminating the "dangerous bacteria" toxic byproducts presently found in the Lake. AR0009913-14. "The key to protecting and improving water quality in the lake," the Plan explains, "is to keep pollutants *such as sediment*, fertilizer, animal manure, and septic system leakage from reaching the streams that flow into Lake Monroe," which is a daunting task given that "[a]nything on the ground in the watershed can be washed into the lake when it rains" and "[a]ny activity that disturbs the soil increases the likelihood of sediment (and its associated nutrients) being washed into Lake Monroe." AR0009905-06 (emphasis added).

But the Project cuts against the outcomes envisioned and urged by the Watershed Management Plan by doing the very thing it repeatedly warns against—depositing additional sediment in the most impaired part of the Watershed, AR0011560, which also happens to be an area that originates 30% of Lake Monroe's total water supply, *Monroe I*, 595 F. Supp. 3d at 722; *see also* AR0012371. Thus, to the extent the Project is allowed to become a persistent source of sediment and nutrients over the next two decades, it will significantly undermine public health for those who depend on the Lake as their sole source of drinking water by undercutting a local requirement meant to protect the environment. 40 C.F.R. §§ 1508.27(b)(10), (b)(2).

    **4.** ***The Service's Brazen Refusal to Examine the Project's Cumulative Impact on Lake Monroe is Plainly Arbitrary***

Even if the Court finds that Project impacts will not be significant on their own, they are nevertheless significant when considered in combination with other, highly degrading impacts to Lake Monroe. For example, NEPA's implementing regulations explain that an action can be significant when it "is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7); *see also id.* § 1508.7 ("*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.").

In this decision, however, the Service washed its hands of having to conduct the requisite cumulative effects analysis for Lake Monroe by summarily concluding that "no cumulative effects are expected" because "[a]ny direct or indirect impacts of the proposed actions would be mitigated." AR0012408. In other words, the Service contends the Project mitigation (i.e., erosion control measures) will prevent the Project from contributing even an "individually insignificant" or "incremental impact" to the Lake's future water quality. 40 C.F.R. §§§ 1508.7, 1508.27(b)(7).

The discussion above shows why the Service is just plain wrong when it says the Project will not have *any* impact at all on Lake Monroe. *See supra* at 21-22 (detailing the Project's likely effects on Lake Monroe); *see also id.* at 28-32 (explaining why the Service should anticipate downstream effects notwithstanding its use of mitigation measures like BMPs). Indeed, the Service's own record acknowledges that the Project will have at least *some* effect on Lake Monroe's water quality. *See* AR0012398 (concluding in the SEA that the "[P]roject would have *minimal* to no effects on water quality in any waterbody and particularly to Lake Monroe itself" (emphasis added)). In the context of cumulative effects, "some" impact is enough to compel the Service to quantify the Project's effects on Lake Monroe and analyze whether that quantum in

41

combination with other sources of sediments and nutrients in the Watershed rises to the level of significance such that an EIS is required. *See, e.g.*, *Klamath-Siskiyou*, 387 F.3d at 994 ("[T]he addition of a small amount of sediment to a creek may have only a limited impact . . ., or perhaps no impact at all. But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will" yield a significant impact on the environment.).

The record here establishes that it was "reasonable" for the Service "to anticipate" and study the potentially "cumulatively significant impact[s]" flowing from this Project. 40 C.F.R. § 1508.27(b)(7). Indeed, the Lake Monroe Watershed Management Plan makes it abundantly clear that nutrient transfer via sedimentation is a serious concern for the Lake, and that forestry practices like those embodied by the Project can be a major source of such sediment, AR0009904; AR0010063—even with the use of BMPs, AR0011431. The Plan also puts the Service on notice of other specific action categories with the potential to contribute sediment and nutrients to the Lake's already impaired baseline status. *See* AR0009988; AR0010062 ("[P]otential sources of pollution appear to be agricultural land with resource concerns; eroding stream banks and lakeshores; lack of riparian buffer; and failing septic systems."). Moreover, the Service's own statements in the SEA strongly suggest the agency already has a model for forecasting and apportioning cumulative impacts within the Lake Monroe Watershed. *See* AR0012398 (explaining that the Forest Plan EIS was able to predict that forest management actions like the Project would affect Lake Monroe's water quality in proportion "to the percentage of the watershed in NFS ownership"); *see also* AR0015923-24 (same).

In sum, the record demonstrates that the Service could have reasonably quantified and studied the Project's cumulative impact on Lake Monroe; however, the agency refused to do so

based on an arbitrary (and, frankly, overconfident) assessment of its ability to completely negate Project effects to Lake Monroe. By omitting that discussion from the SEA and the Service's significance determination, the agency overlooked an important aspect of the problem, rendering its decision arbitrary under the APA and NEPA. *See Humane Soc'y v. Dep't of Commerce*, 432 F. Supp. 2d 4, 17-19 (D.D.C. 2006) (holding that agency had "not made a convincing case" that an EIS is unwarranted where "the issue is not addressed in the agency's EA").

### 5. *The Project Threatens to Permanently Impair Unique Characteristics of the Geographic Area*

Even setting aside its effects on Lake Monroe, the Project is significant within the meaning of NEPA for other reasons. For instance, NEPA's regulations make it incumbent on federal agencies to prepare an EIS for any project that will impact "[u]nique characteristics of the geographic area," including "ecologically critical areas." 40 C.F.R. § 1508.27(b)(3).

As explained, the Project area is unique in this region because it hosts "some of the oldest, most mature forests in the eastern United States," a part of the country that has lost almost all of its old-growth forest to development and/or logging during the past century. AR0011511; AR0012363 (stands in the Project area exceed 100+ years old, with some older than 140 years).

Moreover, both the Forest itself and Lake Monroe serve as "major" destinations in the region for outdoor recreation and tourism, especially for visitors from the surrounding metropolitan areas. AR0015939. The Project area, for instance, hosts a significant portion of the Knobstone Trail, which is Indiana's "longest hiking and backpacking trail." AR0015672. Lake Monroe alone attracts upwards of one million visitors annually, which, in turn, generates roughly "$40 million annually in recreational spending." AR0009910, AR0009901. Recreation- and tourism-driven revenue is an enormously important economic source for southern Indiana, where the median household income hovered around $35,000/year in 2006. AR0015939.

Understandably, the loss of the Hoosier's old-growth forests, and/or the closure of Lake Monroe due to eutrophication would prove to be a devasting loss for the local economy. That reality weighs in favor of a finding that the Project implicates 40 C.F.R. § 1508.27(b)(3). The Service's unexplained conclusion to the contrary cannot and should not be sustained.

Accordingly, for all of these reasons, the undeniable significance of this massive Project—no matter how one looks at it—required (and still requires) preparation of an EIS.

## IV.    THE SERVICE'S CHRONIC NONCOMPLIANCE WITH NEPA MERITS VACATUR OF THE CHALLENGED DECISIONS

If the Court again finds the Service has not provided the requisite analysis of downstream effects, as it very well should, or that the Service must prepare an EIS, Plaintiffs are entitled to and hereby request the APA's default remedy of vacatur of the decision, FONSI, and EA. *See* 5 U.S.C. § 706 (A "reviewing court *shall* . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

This case is not one of the "limited circumstances" in which equity demands "remand without vacatur." *Pollinator*, 806 F.3d at 532 ("When determining whether to leave an agency action in place on remand, we weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." (internal quotation marks and citation omitted)). First, vacating the Service's Project authorization will not "result in possible environmental harm." *Id.* To the contrary, vacatur will ensure that the Service undertakes the requisite "hard look" at Project effects *before* the agency begins implementing its decision. *See, e.g.*, *Monroe II*, 2023 WL 2683125 at *8 ("Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts *before* major federal

44

projects may go forward. Suspending the Project until that consideration has occurred thus comports with the public interest.").

Second, the analytical errors plaguing the Service's NEPA analysis here are "serious" in the sense that they cannot be easily cured on remand. *Pollinator*, 806 F.3d at 532. To the extent the Court finds that the Service either has failed to fully examine foreseeable Project effects, or erred in its significance determination, the agency will be foreclosed from resurrecting the *same* DN/FONSI because, on remand, the Service will require either a brand-new evaluation of NEPA's significance factors, 40 C.F.R. § 1508.27(b), or an entirely different NEPA document (i.e., an EIS) to evaluate the clearly significant effects of the Project.

Finally, the Service's chronic noncompliance outweighs any potentially disruptive consequences brought about by the agency's adamant refusal to conduct the analysis required by NEPA and specifically ordered by this Court. *Pollinator*, 806 F.3d at 532 (quoting *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)). In any case, the Service has twice demonstrated that it is capable of moving inordinately quickly to produce new decisions authorizing the Project, *see supra* at 17-19, which suggests the agency is capable of curtailing any potential disruptions attributable to administrative delay.

For these reasons, vacatur of the Project authorizations is the proper remedy in this case.

## CONCLUSION

The Service has thumbed its nose at NEPA (and the public) in planning this Project, needlessly wasting taxpayer dollars conducting the exact same glaringly incomplete analysis three different times. The Service's decision and underlying analyses are arbitrary, capricious, and formulated in violation of NEPA. As it has twice before, the Court should reject those fatally flawed analyses, and set aside the DN, SEA, and FONSI in accordance with the APA.

Respectfully submitted,

/s/ *Matthew R. Arnold*

Matthew R. Arnold
Eubanks & Associates PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(843) 718-4513
matt@eubankslegal.com

William S. Eubanks II
Eubanks & Associates PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com

W. Russell Sipes
The Sipes Law Firm PC
101 W Ohio St, #760
Indianapolis, IN 46204
(855) 747-3752
wrs@sipeslawfirm.com

*Counsel for Plaintiffs*