**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MONROE COUNTY BOARD OF COMMISSIONERS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:24-cv-1560-TWP-KMB |
| UNITED STATES FOREST SERVICE, *et al.*, | ) ) ) | |
| Federal Defendants. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

LOCAL RULE 7-1(E) STATEMENT OF ISSUES ..................................................... iii

TABLE OF AUTHORITIES.............................................................................. iv

INTRODUCTION .......................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ........................................ 2

    Hoosier National Forest ........................................................................... 3

    The Project.............................................................................................. 5

    Prior Litigation........................................................................................ 7

    Supplemental Environmental Assessment ................................................. 8

LEGAL BACKGROUND ................................................................................ 11

STANDARD OF REVIEW .............................................................................. 12

EVIDENTIARY OBJECTIONS........................................................................ 13

ARGUMENT ............................................................................................... 14

    I.    Plaintiffs Lack Standing to Bring Their Claim ..................................... 15

    II.    The Forest Service Considered the Environmental Effects of the Project........... 18

        A.    The Forest Plan EIS Considered the Impacts of Timber Activities on Lake Monroe.............................................................. 19

        B.    The Supplemental EA Considered the Environmental Effects of the Project on Lake Monroe........................................... 20

    III.    The Forest Service Complied with NEPA by Completing a Supplemental EA ..................................................................... 31

        A.    The Forest Service Considered the Context of the Project ...................... 33

        B.    The Forest Service Considered the Intensity of the Project...................... 35

            1.    Beneficial and Adverse Impacts.................................. 36

            2.    Highly Controversial.................................................. 37

            3.    Local Law or Requirements......................................... 38

i

4.    Public Health ................................................................................ 39

5.    Cumulative Impacts ....................................................................... 40

6.    Unique Characteristics ................................................................. 41

IV.    Federal Defendants Request Supplemental Briefing on Remedy ......................... 42

CONCLUSION ........................................................................................................ 42

## **LOCAL RULE 7-1(E) STATEMENT OF ISSUES**

(1) Whether the U.S. Forest Service's determination that the Houston South Vegetation Management and Restoration Project will not have a significant effect on the environment, specifically Lake Monroe, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act's deferential standard of review.

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul.Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................... 42

*Bark v. U.S. Forest Serv.*,
  958 F.3d 865 (9th Cir. 2020) ................................................ 34

*Biodiversity Conservation All. v. Jiron*,
  762 F.3d 1036 (10th Cir. 2014) ............................................ 27

*Blue Mountains Biodiversity Proj. v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ........................................... 8, 29

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011) .............................................. 32

*Cascade Forest Conservancy v. U.S. Forest Serv.*,
  577 F. Supp. 3d 1163 (W.D. Wash. 2021) ......................... 36, 41

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
  669 F.3d 1203 (11th Cir. 2012) ............................................ 33

*Coliseum Square Ass'n Inc. v. U.S. Dep't of Housing*,
  465 F.3d 215 (5th Cir. 2006) ................................................ 36

*Colorado Env't Coal. v. Dombeck*,
  185 F.3d 1162 (10th Cir. 1999) ............................................ 26

*Cronin v. U.S. Dep't of Agric.*,
  919 F.2d 439 (7th Cir. 1990) ............................... 3, 12, 14, 19

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ............................................................. 15

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004) ........................................................ 16, 32

*Ecology Center v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) ................................................ 27

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) .......................................... 27, 35

*Env'tl Law and Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*,
  470 F.3d 676 (7th Cir. 2006) ........................... 2, 11, 18, 42

*Fed. Commc'nc Comm'n v. Prometheus Radio, Proj.*,
 592 U.S. 414 (2021) ........................................................................................... 12

*Fla. Power & Light Co. v. Lorion*,
 470 U.S. 729 (1985) ................................................................................ 2, 12, 13

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*,
 528 U.S. 167 (2000) .......................................................................................16, 17

*Glisson v. U.S. Forest Serv.*,
 876 F. Supp. 1016 (S.D. Ill. 1993) ...................................................................... 19

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
 673 F.3d 518 (7th Cir. 2012) .........................................................................18, 28

*Highway J. Citizens Group v. Mineta*,
 349 F.3d 938 (7th Cir. 2003) ........................................ 11, 12, 18, 30, 32, 38

*Hunger v. Leininger*,
 15 F.3d 664 (7th Cir. 1994) ................................................................................. 13

*Ind. Forest All., Inc. v. U.S. Forest Serv.*,
 No. 99-0214-C-H/G, 2001 WL 912751 (S.D. Ind. July 5, 2001) ............... 2, 13, 19, 31, 36, 37

*Indiana. Forest All., Inc. v. U.S. Forest Serv.*,
 325 F.3d 851 (7th Cir. 2003) ......................................................... 13, 31, 37, 38

*Inland Empire Pub. Lands Council v. Schultz*,
 992 F.2d 977 (9th Cir. 1993) ............................................................................... 26

*Klamath Forest All. v. U.S. Forest Serv.*,
 No. 23-CV-03601-RFL, 2024 WL 4017202 (N.D. Cal. Aug. 23, 2024) ................ 34

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*,
 387 F.3d 989 (9th Cir. 2004) .........................................................................28, 29

*Lands Council v. Vaught*,
 198 F. Supp. 2d 1211 (E.D. Wash. 2002) ............................................................ 27

*Little Co. of Mary Hosp. v. Sebelius*,
 587 F.3d 849 (7th Cir. 2009) .............................................................................. 14

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) .......................................................................................15, 16

*Marsh v. Or. Nat. Res. Council*,
 490 U.S. 360 (1989) ........................................... 2, 12, 13, 25, 32, 38, 42

*Metro. Edison v. People Against Nuclear Energy*,
 460 U.S. 766 (1983) ............................................................................................ 16

*Mississippi v. EPA*,
 744 F.3d 1334 (D.C. Cir. 2013) .......................................................................... 25

*Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.,*
   4:23-cv-12-TWP-KMP, 2023 WL 2683125 (S.D. Ind. March 29, 2023) ............................. 2, 8

*Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.,*
   595 F. Supp. 3d 713 (S.D. Ind. 2022) .......................................................... 7, 12, 13

*Morongo Band of Mission Indians v. FAA,*
   161 F.3d 569 (9th Cir. 1998) .................................................................... 25

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs.,*
   75 F.4th 743 (7th Cir. 2023) ............................................................. 12, 14, 30

*Native Ecosystems Council v. U.S. Forest Serv.,*
   428 F.3d 1233 (9th Cir. 2005) ................................................................... 33

*Newton Cnty. Wildlife Ass'n v. Rogers,*
   141 F.3d 803 (8th Cir. 1998) ................................................................... 20

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,*
   402 F.3d 846 (9th Cir. 2005) ................................................................... 34

*Palmer v. Marion Cnty.,*
   327 F.3d 588 (7th Cir. 2003) ................................................................... 11

*Protect Our Parks, Inc. v. Buttigieg,*
   39 F.4th 389 (7th Cir. 2022) ............................................. 13, 31, 33, 35, 40, 41, 42

*Rhodes v. Johnson,*
   153 F.3d 785 (7th Cir. 1998) ................................................................... 15

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ..................................................................... 1, 11, 18

*Rosebud Sioux Tribe v. Gover,*
   104 F. Supp. 2d 1194 (D.S.D. 2000) ........................................................... 37

*Sauk Prairie Conservation All. v. U.S. Dep't of the Interior,*
   944 F.3d 664 (7th Cir. 2019) ................................................................... 25

*Sierra Club v. Marita,*
   46 F.3d 606 (7th Cir. 1995) ............................................................... 12, 13

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ............................................................................ 17

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ........................................................................... 16

*Town of Chester v. Laroe Estates, Inc.,*
   581 U.S. 433 (2017) ........................................................................... 15

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
   305 F.3d 1152 (10th Cir. 2002) ................................................................. 18

*Van Abbema v. Fornell*,
   807 F.2d 633 (7th Cir. 1986) ................................................................. 11

*W. Watersheds Project v. Perdue*,
   No. CV-21-00020-TUC-SHR, 2023 WL 6377287 (D. Ariz. Sept. 29, 2023) .......... 35

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ................................................................. 11

*WildEarth Guardians v. Conner*,
   920 F.3d 1245 (10th Cir. 2019) ............................................................. 35

*Wildwest Inst. v. Bull*,
   468 F. Supp. 2d 1234 (D. Mont. 2006) .................................................... 27

**Statutes**

16 U.S.C. § 583 ..................................................................................... 31

16 U.S.C. 1604(f)(5)(A) ............................................................................ 3

42 U.S.C. § 4321 .................................................................................... 11

42 U.S.C. § 4331 .................................................................................... 11

42 U.S.C. § 4332(2)(C) ............................................................................ 12

42 U.S.C. § 4336(b)(2) ............................................................................ 31

5 U.S.C. § 706(2)(A) ........................................................................... 12, 32

5 U.S.C. §§ 701-706 ................................................................................ 12

Consolidated Appropriations Act of 2022,
   Pub. L. No. 117-103, 136 Stat. 49 (2022) ................................................... 3

Consolidated Appropriations Act of 2023,
   Pub. L. No. 117-328, 136, Stat. 4459 (2022) ............................................... 3

**Rules**

Fed. R. Civ. P. 56(c)(1) ........................................................................... 13

**Regulations**

36 C.F.R. § 220.7 ................................................................................... 31

36 C.F.R. § 220.7(b)(3) ............................................................................ 12

40 C.F.R. § 1501.3(b)(3) ........................................................................... 32

40 C.F.R. § 1508.27 ................................................................................ 32

40 C.F.R. § 1508.27(a) ......................................................................... 32, 34

40 C.F.R. § 1508.27(b)(1) ......................................................................... 36

40 C.F.R. § 1508.27(b)(1) ................................................................................. 36, 37

40 C.F.R. § 1508.27(b)(10) ............................................................................... 38, 39

40 C.F.R. § 1508.27(b)(2) ...................................................................................... 39

40 C.F.R. § 1508.27(b)(3) ...................................................................................... 41

40 C.F.R. § 1508.27(b)(4) ...................................................................................... 37

40 C.F.R. § 1508.27(b)(7) ................................................................................. 40, 41

**INTRODUCTION**

The Houston South Vegetation Management and Restoration Project ("Project") on the Hoosier National Forest is designed to improve oak-hickory ecosystem health through management activities that will restore forest composition and structure for long-term sustainability. Oak decline in the Project area is progressing rapidly, and the Project will reduce density stressors (such as the effects from drought, disease, and insects) that contribute to oak decline and will also provide for greater oak-hickory regeneration. The Forest Service evaluated the environmental effects of the Project, including any effects on Lake Monroe, and provided multiple opportunities for public comment, fulfilling its obligations under the National Environmental Policy Act ("NEPA"). NEPA is a procedural statute—it does not "mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Plaintiffs make clear in their summary judgment briefing, however, that it is the result, not the process, which they challenge. Plaintiffs' Motion for Summary Judgment, ECF No. 24, fails as a result.

As an initial matter, the Court should dismiss this case for lack of subject matter jurisdiction because Plaintiffs have failed to prove the elements required for Article III standing: injury in fact, causation, and redressability. While Plaintiffs offer two declarations, neither support standing to challenge the agency action with respect to Lake Monroe, and Plaintiffs fail to even submit standing declarations for Plaintiffs Monroe County Board of Commissioners and Hoosier Environmental Council, Inc.

If the Court proceeds to the merits of Plaintiffs' claim, Plaintiffs have not met their burden to show the Forest Service's decision is arbitrary and capricious under the Administrative Procedure Act's ("APA") deferential standard of review. Plaintiffs rely on their purported expert,

1

asserting that the Project will have significant effects on Lake Monroe, an already-impaired water body. But federal agencies in APA cases are entitled to rely on their own experts, *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989), and a mere disagreement with the agency's conclusions is not enough to demonstrate that the agency's decision was arbitrary, capricious, or a violation of law. *Ind. Forest All., Inc. v. U.S. Forest Serv.*, No. 99-0214-C-H/G, 2001 WL 912751, at *1 (S.D. Ind. July 5, 2001), *aff'd* 325 F.3d 851 (7th Cir. 2003).

Plaintiffs also rely heavily on their prior briefing related to this Project. But the Forest Service, by completing a Supplemental Environmental Assessment ("Supplemental EA"), fully considered the potential impacts of the Project on Lake Monroe in compliance with NEPA and the Court's prior orders. This Court most recently faulted the Forest Service not for the substance of its analysis, but for its failure to produce a particular *type* of NEPA analysis. *Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv. (Monroe II)*, No. 4:23-cv-12-TWP-KMP, 2023 WL 2683125, at *6 (S.D. Ind. March 29, 2023) ("Were this merely a question of science, this decision would likely favor the Forest Service. But the type of deficiency here is a procedural one."). The Forest Service has now remedied that procedural defect. The Forest Service took the requisite "hard look" at the environmental effects of the Project on Lake Monroe in its Supplemental EA, and its conclusion that those effects will not be significant is reasonable and entitled to deference. *Env'tl Law and Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 685 (7th Cir. 2006). The Court should grant summary judgment in favor of Federal Defendants.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

This is an APA case that does not require fact finding. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking. . . . [C]ourts are to decide, on the basis

of the record the agency provides, whether the action passes muster under the appropriate APA standard of review."); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 443 (7th Cir. 1990) (stating district court in APA case "is a reviewing court," like an appellate court, and "does not take evidence"). As such, Federal Defendants cite to the Administrative Record.

**<u>Hoosier National Forest</u>**

The Hoosier National Forest (the "Forest") consists of a patchwork of over 200,000 acres across nine counties in Indiana. AR0016146. Within the Forest boundary, approximately 54 percent is private land. *Id.*; AR0016187 (Hoosier Forest vicinity map). Management of the Forest is guided by the Hoosier National Forest Land and Resource Management Plan (the "Forest Plan").[1] AR0016184. The Forest Plan sets forest-wide goals and objectives as well as standards and guidance for management activities. *Id.* These goals include conserving habitat for threatened and endangered species; maintaining and restoring sustainable ecosystems—including by use of vegetation management and prescribed fire; maintaining watershed health; protecting cultural heritage; and providing for a visually pleasing landscape, recreation, a usable landbase, and human and community development. AR0016195-98. The Forest Plan divides the Forest into ten management areas according to desired conditions and uses, AR0016224, including timber production. AR0016299. Site-specific projects are then designed to carry out the direction in the Forest Plan. AR0016185.

---

[1] Plaintiffs assert that the Forest Plan has "expired," ECF No. 24-1 at 14 n.3, but Congress has made it clear that a Forest Plan does not "expire" after 15 years. AR0011908-09; Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, § 407 ("The Secretary of Agriculture shall not be considered in violation of section 6(f)(5)(A) of the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1604(f)(5)(A)) solely because more than 15 years have passed without revision of the plan for a unit of the National Forest System."); Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, § 407 (same).

Decades of fire suppression and the planting of nonnative pines have disrupted the natural ecological processes in the Forest, changing its composition from predominantly oak-hickory to less fire tolerant, more shade tolerant species. AR0012458; AR0012469. Overstocked conditions are contributing to tree stress, "making them more vulnerable to the increasing climate change stressors of drought, disease, and pests, including oak decline." AR0012469. Oak decline is caused by a combination of environmental stresses, including resource competition and fungal pests. AR0012469; *see also* AR0014965-72. The understory of the Forest is now dominated by shade-tolerant species such as beech and maple, with which oak and hickory seedlings cannot compete. AR0012453-54; AR0012457. Nonnative pine stands also reduce the amount of sunlight that reaches the forest floor, resulting in little (if any) other plant life. AR0012454. As discussed in the Forest Plan, without "silviculture treatments, oak systems will continue to decline (in terms of species richness and ecological function), converting from oak to mesophytic forests within a generation." AR0016292; AR0012458 ("Without management to limit competition, oak-hickory regeneration will continue to decline . . . ."). The orange areas in following map shows the progression of oak decline within the Project area between 2018 and 2022 alone:



AR0012469.

**<u>The Project</u>**

The Project is designed to improve forest health and resiliency by restoring forest composition and structure through oak-hickory regeneration. AR0012525. "Reducing the density of the trees in the infested areas would increase the vigor of the remaining trees allowing them to continue to provide the ecological benefits such as food and cover for wildlife and improved water quality into the future." AR0012469. Reintroducing prescribed fire will promote oak and hickory regeneration. AR0012454. The Project will also improve wildlife habitat and the Forest's ability to sequester carbon. AR0012525. Finally, the Project includes three large culvert replacement projects that will allow for better aquatic organism passage and streamflow for 14 upstream miles of habitat within the South Fork Creek Watershed. AR0012464 ("Natural flow regimes promote less excessive bank erosion and help mitigate channel incision."). In addition to

5

benefiting aquatic biological communities "for miles both upstream and downstream," AR0002400 (Effects to Aquatic Resources Specialist Report), these replacements will reduce the current rate of erosion and sedimentation. AR0012464.

The Project is located primarily in Jackson County, with a small portion in Lawrence County, as shown below:



AR0003241. Lake Monroe—a 10,750-acre reservoir constructed and operated by the U.S. Army Corps of Engineers—is approximately 5.1 miles downstream of the Project boundary, AR0012464; AR0012487, and 10 miles downstream from the nearest Project silviculture activity. AR0012496. While the Forest Service manages approximately 19% of the land in the four watersheds that drain into Lake Monroe, Project silviculture activities will occur on only 1.6%. *Id.* The Project will be implemented over a period of 10 or more years, such that Project

silviculture activities will occur on "less than 0.16 percent" of the Lake Monroe watershed in any given year. *Id.*

The Forest Service initiated the NEPA process for the Project in 2018 with public meetings, a scoping letter, and public comment period. AR0003622. The Forest Service released a draft Environmental Assessment ("EA") on July 24, 2019, and a 30-day comment period ensued. AR0003623. After addressing public comments, the Forest Service issued a Final EA and draft Decision Notice and Finding of No Significant Impact ("FONSI"). AR0003413 (Final EA); AR0003603 (draft Decision Notice); AR0003613. Following the objection period, the District Ranger signed the final Decision Notice and FONSI ("2020 Decision"). AR0003620.

## **Prior Litigation**

Plaintiffs challenged the 2020 Decision, bringing claims under NEPA, the National Forest Management Act, and the Endangered Species Act. *Monroe Cnty. Bd. of Comm'rs (Monroe I)*, 595 F. Supp. 3d 713, 718 (S.D. Ind. 2022). In its 2022 decision, this Court held that (1) the Forest Service considered a reasonable range of alternatives in compliance with NEPA, *id.* at 721; (2) the Forest Service violated NEPA by not adequately considering "concerns the [Project] could have on Lake Monroe," *id.* at 723; (3) the Forest Service and U.S. Fish and Wildlife Service complied with the Endangered Species Act, *id.* at 726; and (4) Plaintiffs abandoned their National Forest Management Act claims by not asserting them on summary judgment, *id.* at 718 n.1. Accordingly, the Court remanded the decision for the sole purpose of evaluating the effects of the Project on Lake Monroe. *Id.* at 726. ("[The] Forest Service violated [NEPA] by failing to fully evaluate the environmental effects to Lake Monroe, *this portion of the decision must be remanded* to United States Forest Service for analysis consistent with federal law." (emphasis added)). Notably, the Court did not order the Forest Service to complete an EIS. *Id.* at 724.

7

("USFS should have at least provided a 'convincing statement of reasons' that explained why the impact to Lake Monroe would not be significant." (quoting *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998))).

Thereafter, the Forest Service prepared a Supplemental Information Report ("SIR") to further evaluate the effects of the Project on Lake Monroe and address new information from the February 2022 Lake Monroe Watershed Management Plan. *Monroe II*, 2023 WL 2683125, at *3-4. Plaintiffs filed a lawsuit asserting the SIR violated NEPA, the APA, and the Court's Order in *Monroe I*, and moved for a preliminary injunction. *Id.* at 4. The Court granted the motion for preliminary injunction, reasoning that Plaintiffs were likely to succeed on the merits because an SIR is not a NEPA document and thus could not cure the NEPA violation found in *Monroe I*. *Id.* at 6 ("Were this merely a question of science, this decision would likely favor the Forest Service. But the type of deficiency here is a procedural one."). The Forest Service subsequently withdrew the SIR. Stipulation of Dismissal, Exhibit A, *Monroe II*, No. 4:23-cv-12-TWP-KMP, ECF No. 32-1.

**<u>Supplemental Environmental Assessment</u>**

The Forest Service issued a draft Supplemental EA on October 20, 2023. AR0010931; AR0010933; AR0012279 (draft Supplemental EA). The draft Supplemental EA was available for public comment for 30 days, AR0010931; AR0010933, and Plaintiffs provided comments during that time. AR0011406-59. On April 25, 2024, Forest Service issued the Final Supplemental EA, draft Decision Notice, and FONSI, which were subject to a 45-day objection period. AR0012355 (Final Supplemental EA); AR0012431 (Draft Decision Notice and FONSI); AR0012443. Following an objection resolution meeting on July 16, 2024, the Forest Service addressed

objections, AR0012532-33, and updated the Final Supplemental EA in August 2024. AR0012448.

The Supplemental EA considered new information received since the 2020 Decision—including changes in federally listed species under the Endangered Species Act, agency policy on climate resilience, agency policy on prescribed fire, declining Forest health conditions, and the 2022 Lake Monroe Watershed Management Plan—and provided further analysis of the Project's potential effects on Lake Monroe. AR0012452; AR0012465-70; AR0012487-501. In the Supplemental EA, the Forest Service considered the existing condition of Lake Monroe, including the land management practices impacting water quality, such as nutrient loading from agriculture and septic systems, sedimentation from agriculture, and construction, among others. AR0012488. The Forest Service noted that the Lake Monroe Watershed Management Plan identifies "water quality issues resulting from sedimentation, high levels of phosphorous, lakeshore erosion, turbidity, over-recreation, urbanization of the watershed, [and] algal blooms," and states that "[s]horeline erosion is exacerbated by fluctuations in water level due to the management of the reservoir for flood control." *Id.* The Supplemental EA also notes that the Lake Monroe Watershed Management Plan identifies key contributors of sedimentation as "streambank erosion, inadequate riparian buffers, heavy livestock usage and their access to streams, farmed wetland areas, crop tillage, boat resuspension of sediment, and poorly designed driveways and stream crossings." AR0012488-89; AR0012501 (According to the Lake Monroe Watershed Management Plan, "[s]treambank erosion accounts for approximately 86% of observed sedimentation."). Critically, the Supplemental EA acknowledges that Monroe County zoning explicitly exempts agricultural uses and rural forestry harvesting from erosion control

9

measures. AR0012501 (citing AR0014630). Plaintiff Monroe County Board of Commissioners does not regulate these potential sources of sedimentation. *Id.*

The Forest Service then assessed the potential environmental effects of the Project on the already degraded water quality of Lake Monroe. AR0012491-501. The Forest Service considered Forest Plan guidance, Project design measures, research on the effectiveness of best management practices ("BMPs"), research on the water quality effects of prescribed burns, research on herbicide use, the benefits of culvert replacement, and the "significant distance" between the Project and Lake Monroe, AR0012491-97, and concluded that "the [Project] would not further negatively impact Monroe Lake, but instead would improve the water quality by repairing and decommissioning degraded roads, improving and re-routing trails, and implementing [aquatic organism passages] to improve streamflow and streambank stability." AR0012501.

On August 14, 2024, the Forest Service issued the Final Decision Notice and FONSI ("2024 Decision"), AR0012533, which supplements the 2020 Decision. AR0012524. Like the 2020 Decision, the 2024 Decision authorizes timber harvesting to remove non-native pine and restore native hardwood; shelterwood harvest for oak-hickory regeneration; selection harvest to promote age class diversification; midstory removal to enhance light conditions; selective herbicide applications for stand improvement; prescribed fire; culvert replacement; road decommissioning and reconstruction; and road construction to facilitate the Project. AR0012525. In total, the 2024 Decision authorizes silviculture treatments on 4,375 acres, prescribed fire on up to 13,500 acres (depending on adjacent landowner participation), and herbicide spot treatment on up to 1,970 acres, all over a period of 10-15 years. AR0012524; AR0012462-63; AR0012465. Timber harvests of some degree will occur on an average of 266 acres per year. AR0011812.

On September 11, 2024, Plaintiffs filed their Complaint in this case challenging the 2024 Decision. ECF No. 1. Plaintiffs assert a single claim: that the Forest Service violated NEPA and the Administrative Procedure Act ("APA") by failing to consider the environmental effects of the Project on Lake Monroe. *Id.* (Count 1).[2]

**LEGAL BACKGROUND**

NEPA ensures that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331. It is a procedural statute that does not itself "mandate particular results." *Robertson*, 490 U.S. at 350. Instead, it serves the twin aims of informing agency decisionmakers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public. *Id.* at 349. As a result, a "court must avoid passing judgment on the substance of an agency's decision. Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350); *Highway J. Citizens Group v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003) ("Again, our review is not the agency's substantive judgment, but . . . the sufficiency of the agency's consideration of reasonable alternatives."). The Court's role is not to "second-guess" but to "merely consider whether the [agency] followed required procedures, evaluated relevant factors and reached a reasoned decision." *Env'tl Law and Policy Ctr.*, 470 F.3d at 685 (quoting *Van Abbema v. Fornell*, 807 F.2d 633, 636 (7th Cir. 1986)).

---

[2] In that claim, Plaintiffs also allege that the Forest Service did not comply with the Draft Old Growth Amendment, Compl. ¶ 102, ECF No. 1; but they have abandoned that argument by not asserting it on summary judgment. *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003).

NEPA requires preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). Where the environmental impacts are either insignificant or significance is unknown, NEPA allows an agency to prepare an EA, which is a "concise public document" setting forth either the "basis of such agency's finding of no significant impact or determination that an [EIS] is necessary." *Id.* § 4336(b)(2); 36 C.F.R. § 220.7(b)(3) (requiring EA to "briefly provide sufficient evidence and analysis" to determine whether to prepare an EIS or a finding of no significant impact ("FONSI")).

### STANDARD OF REVIEW

Courts review federal agency action under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706. *Highway J Citizens Grp.*, 349 F.3d at 952. An agency action may be set aside only if plaintiffs prove the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court's review is highly deferential to the agency, asking only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Highway J Citizens Grp.*, 349 F.3d at 952-53 (quoting *Marsh*, 490 U.S. at 378); *see also Monroe I.*, 595 F. Supp. 3d at 718; *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one."). The court may not "substitute [its] own policy judgement for that of the agency." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs.*, 75 F.4th 743, 749 (7th Cir. 2023) (quoting *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021)). In short, in APA cases, the district court "is a reviewing court," like an appellate court. *Cronin*, 919 F.2d at 443. It considers only matters within the Administrative Record, *Fla. Power & Light Co.*, 470 U.S. at 743-44, and agencies are entitled to deference on

matters within their expertise. *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 399 (7th Cir. 2022) (holding agency conclusion "implicates substantial agency expertise and is entitled to deference") (quoting *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859 (7th Cir. 2003)). Plaintiffs have the burden of proving the decision is arbitrary, capricious, or otherwise a violation of law, *Monroe I.*, 595 F. Supp. 3d at 718 (citing *Marsh*, 490 U.S. at 378), which is a "high standard." *Sierra Club*, 46 F.3d at 619.

"Where the court's task is to review an administrative record and to apply legal standards to that record, summary judgment is an appropriate vehicle for deciding the case." *Ind. Forest All., Inc.*, 2001 WL 912751, at *5 (citing *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)).

## EVIDENTIARY OBJECTIONS

1. Federal Defendants object to the assertions in Plaintiffs' brief that are unsupported by citations to the Administrative Record. *See* Fed. R. Civ. P. 56(c)(1) (requiring parties to support assertions with citations to the record); S.D. Ind. Local Rule 56-1(e) ("A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence. The evidence must be in the record or in an appendix to the brief. The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."); *see also* S.D. Ind. Local Rule 56-1(h) ("No Duty to Search Record. The court has no duty to search or consider any part of the record not specifically cited in the manner described in subdivision (e).").

2. Federal Defendants object to the declarations of Sherry Mitchell-Bruker, ECF No. 24-2, and Jeff Stant, ECF No. 24-3, to the extent they purport to offer expert testimony, which is beyond the scope of record review. *Fla. Power & Light Co.*, 470 U.S. at 743-44

("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." (citation omitted)); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009) ("As a general rule, under the APA, review of an agency's decision is confined to the administrative record[.]"). "Confining the district court to the record compiled by the administrative agency rests on practical considerations that deserve respect." *Cronin*, 919 F.2d at 444. Because agencies "deal with technical questions," courts should not consider information "unless the evidence has first been presented to and considered by the agency." *Id.* To allow otherwise, would permit the court to substitute its judgment for that of the agency. *Nat'l Wildlife Fed'n*, 75 F.4th at 749. The Court should (1) reject Plaintiffs' attempt to impermissibly expand the Administrative Record and (2) disregard any information in Plaintiffs' declarations that goes beyond standing.

## ARGUMENT

Plaintiffs only remaining challenge to this Project is whether the Forest Service complied with NEPA in its analysis of the Project's effects on Lake Monroe. ECF No. 24-1 at 3 (Plaintiffs' Local Rule 7-1(E) Statement of Issues).[3] The Forest Service took the requisite "hard look" at the Project's effects on Lake Monroe water quality and reasonably determined that those effects would not be significant and that an EIS would not be required. As discussed below, not only have Plaintiffs not met their burden of standing in this case but they cannot meet their burden of proving the 2024 Decision was arbitrary, capricious, or a violation of law. The Court should grant summary judgment in favor of Federal Defendants.

---

[3] Federal Defendants cite to the ECF-stamped page number in Plaintiffs' Memorandum.

## I.    Plaintiffs Lack Standing to Bring Their Claim.

Plaintiffs fail to prove standing to bring their claim in this case. For Article III standing, Plaintiffs must prove (1) they have suffered an "injury in fact" that is "concrete and particular" and "actual or imminent"; (2) the injury is "fairly traceable" to defendants' conduct; and (3) the injury can be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have not even attempted to make this showing. Instead, they merely refer the Court to their attached declarations. ECF No. 24-1 at 32. But Plaintiffs have the burden of proving standing to invoke this Court's jurisdiction. *Lujan*, 504 U.S. at 561. "Since they are not mere pleading requirements but rather an <u>indispensable</u> part of the plaintiff's case, each [standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof[.]" *Id.* (emphasis added). Further, "a plaintiff must demonstrate standing <u>for each claim he seeks to press</u> and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added)). "[S]tanding is not dispensed in gross." *Davis*, 554 U.S. at 734. Standing is also a threshold jurisdictional issue, which this Court must resolve before proceeding to the merits. *Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998) (stating the district court must confirm standing irrespective of whether it is challenged by the parties).

Review of Plaintiffs' declarations confirms that Plaintiffs cannot meet their burden of proving standing. Plaintiffs submitted two declarations: the Declaration of Jeff Stant, ECF No. 24-3, on behalf of Indiana Forest Alliance ("IFA"), and the Declaration of Sherry Mitchell-Bruker, ECF No. 24-2, on behalf of Friends of Lake Monroe. Neither declarant asserts a concrete and particularized injury to their personal interest in Lake Monroe caused by the Project that

would be redressable by a favorable decision. Plaintiffs failed to submit standing declarations for Plaintiffs Monroe County Board of Commissioners and Hoosier Environmental Council, Inc. Consequently, Plaintiffs have not met their burden of proving this Court has jurisdiction.

Mr. Stant does not assert the Project will harm his or IFA's interests in Lake Monroe. In fact, the Stant Declaration makes no mention of any potential Project impacts on Lake Monroe at all. While Mr. Stant asserts a threatened injury to his recreational use of Hoosier National Forest, that injury would not be redressed by a remand to the Forest Service for further analysis of the Project's effects on Lake Monroe. Mr. Stant's declaration is irrelevant to Plaintiffs' only remaining claim: whether the Forest Service adequately assessed the environmental effects of the Project on Lake Monroe.

The Declaration of Sherry Mitchell-Bruker fares no better. Dr. Mitchell-Bruker has not asserted a harm to her or her organization's interests that is both concrete and particularized— potential harm to the environment is not enough. *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff."). A general interest in protecting Lake Monroe's water quality is insufficient for standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (noting "generalized harm to the forest or the environment will not alone support standing"). The injury must affect the *plaintiff* in a "personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

Nor does the Mitchell-Bruker declaration establish a nexus between the Project and any concrete and particularized harm. "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004) (citing *Metro. Edison v. People Against Nuclear Energy*, 460 U.S. 766, 774

16

(1983)). While Dr. Mitchell-Bruker highlights the already impaired water quality of Lake Monroe, that is the existing condition of the environment not the impact from the Project. And, arguably, any harm stemming from the existing condition of Lake Monroe's water quality was caused by Plaintiff Monroe County Board of Commissioners' failure to regulate. AR0014630 (zoning ordinance exempting agricultural uses and rural forest harvesting from erosion control measures).

Finally, the Mitchell-Bruker declaration does not demonstrate that a favorable ruling will redress any concrete and particularized injury. For standing, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.*, 528 U.S. at 181; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). It is speculative at best that a decision favorable to Plaintiffs would prevent further impairment of Lake Monroe given the numerous sources degrading its water quality. *See e.g.*, AR0013792 ("Fluctuations in water level within the lake are also believed to directly exacerbate erosion of both the lakeshore and the stream beds."); AR0013794 ("Reservoirs by nature trap sediment[.]") ("shoreline erosion may be a significant source of sediment in the lake"); AR0013825 ("Septic systems are prevalent throughout the watershed despite the lack of suitable soils."); AR0013841 (noting North Folk largest contributor of sediment); AR0013863 (streambank erosion identified at 86% of observed sites); AR0013912 (listing sediment sources). Nor would a decision favorable to Plaintiffs require Plaintiff Monroe County Board of Commissioners to regulate sedimentation from other sources. AR0014630 (zoning ordinance exempting agricultural uses and rural forest harvesting

from erosion control measures); *see also* AR0012501 ("Future actions on private land will likely add to historic soil disturbances, resulting in more soil and water quality degradation.").

Plaintiffs have not met their burden of proving standing to invoke this Court's jurisdiction, and the Court should grant Federal Defendants' Motion for Summary Judgment.

## II.     The Forest Service Considered the Environmental Effects of the Project.

Plaintiffs also cannot meet their burden of proving the 2024 Decision was arbitrary, capricious, or a violation of law because the Forest Service fully considered the environmental effects of the Project on Lake Monroe. Plaintiffs claim the Forest Service must "nullify" the Project's impacts on Lake Monroe, ECF No. 24-1 at 36, but this is not the standard under NEPA. Rather, NEPA requires only that the Forest Service take a "hard look" at the environmental effects. *Env'tl Law and Policy Ctr.*, 470 F.3d at 682 (citing *Mineta*, 349 F.3d at 953). In reviewing whether the agency has taken a "hard look," courts must distinguish between mere "flyspecks" and deficiencies "significant enough to defeat the goals of informed decisionmaking and informed public comment." *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 528 (7th Cir. 2012) (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002)); *Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action.").

Here, the Forest Service acknowledged Lake Monroe's current water quality, analyzed the Project's potential impacts on that water quality, and determined that given the parameters of the Project, including Forest Plan standards, Project design features, and BMPs, that the Project would not have a direct, indirect, or cumulative impact on Lake Monroe's water quality. AR0012473; AR0012487-501. The Forest Service's analysis was sufficient to meet NEPA's goals of informed participation and decision making, and the Forest Service's conclusion is entitled to

18

deference. *Env'tl Law and Policy Ctr.*, 470 F.3d at 682 ("If an agency has considered the proper factors and makes a factual determination regarding the significance of environmental impacts, that determination implicates substantial agency expertise and is entitled to deference.").

## A.    The Forest Plan EIS Considered the Impacts of Timber Activities on Lake Monroe.

As a preliminary matter, the Forest Service considered the potential impacts to Lake Monroe of *any* timber operations permissible under the Forest Plan. The Forest Plan EIS considered five alternatives for managing the Forest, including the effects on Lake Monroe and other nearby reservoirs, and determined that "[a]ny of the alternatives would have little to no effect on these reservoirs and their watersheds. Guidance included for vegetation management and other Forest management would mitigate any potential soil movement and sedimentation to the background level." AR0015923. "In combination with the practices (past and ongoing, as well as reasonably foreseeable future ones) on other lands, the actions permitted by the alternatives would not impair the water quality of the lakes." AR0015924. This analysis applies to *any* timber activities on the Forest authorized consistent with the Forest Plan, including the Project.

The Forest Service appropriately incorporated the Forest Plan EIS analysis into its environmental analysis for this Project. AR0012452 (incorporating Forest Plan EIS into Supplemental EA); AR0012491 (referencing Forest Plan EIS analysis of effects to Lake Monroe); AR0012532 (tiering to Forest Plan EIS). This type of tiering is permissible under NEPA. *See e.g. Ind. Forest All, Inc..*, 2001 WL 912751, at *2 ("Tiering allows the Forest Service to undertake a broad analysis of an issue at the forest plan level and to study the details later when a smaller-scale project is developed."); *Glisson v. U.S. Forest Serv.* 876 F. Supp. 1016,

19

1033 (S.D. Ill. 1993) (citing *Cronin*, 919 F.2d at 447-48) (holding appropriate for Forest Service to tier site specific NEPA review to the Forest Plan EIS), *aff'd* 51 F.3d 275 (7th Cir. 1995); *see also Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998) ("If an agency has prepared an EIS for a large action, the regulations encourage it to incorporate EIS conclusions into EAs prepared for smaller, subsequent actions included within the broad[er] program.").

### B. The Supplemental EA Considered the Environmental Effects of the Project on Lake Monroe.

The Forest Service then engaged in an even more detailed analysis of this Project and Lake Monroe in the Supplemental EA. First, the Forest Service assessed the current condition of Lake Monroe water quality and the sources of impairment. AR0012488 (noting Lake Monroe Watershed Management Plan identifies water quality issues from nutrient overloading from agriculture and septic systems; E. coli bacteria from septic systems; sedimentation from agriculture; and construction) (occurrence of harmful algal blooms caused by agricultural uses) (additional water quality issues from "sedimentation, high levels of phosphorous, lakeshore erosion, turbidity, over-recreation, urbanization of the watershed, algal blooms, and the lack of a comprehensive watershed management plan"); AR0012489-90 (photos of lakeshore erosion).

The Forest Service also collected baseline information on pre-harvest and pre-burn turbidity conditions in the South Fork Salt Creek watershed to facilitate monitoring of Project effects, including any potential effects to Lake Monroe. AR0002563; AR0002564 ("Background information on these sites are being collected to assess current water quality in relation to sedimentation."); AR0002565 (baseline turbidity readings); AR0012493 (explaining locations of turbidity monitoring). Turbidity measures water clarity and is "commonly used to indicate increased sedimentation during soil disturbing projects." AR0002564.

Next, the Forest Service acknowledged the risk of sedimentation from forest management, AR0003519-24 (describing risks to soil and water quality from silvicultural activities); AR0012471-78 (summary of effects on water quality analyzed in EA), but reasoned that Forest Plan standards, Project design features, and BMPs reduce that risk such that the Project will have "minimal to no effects on water quality in any water body and particularly to Lake Monroe itself, which lies several miles downstream from the project sites." AR0012491. As noted in the Supplemental EA, the Forest Plan requires compliance with standards to protect soil and water quality, including (1) how to design and maintain roads; (2) prohibiting equipment in streambeds; (3) construction of waterbars on skid trails; (4) avoidance of clay-like soils when the water table is within 12 inches of the surface; (5) retaining logging slash in place where topsoil is less than 1-inch thick; and (6) limitations on roads and trails in riparian corridors, among others. AR0012512-13.

Project design features provide additional guardrails for the protection of soil and water quality. AR0012491. These design features are part of the 2024 Decision. AR0012525 ("My decision includes the design measures listed in Appendix A of the [Supplemental] EA."). They include (1) limitations on skid trail slope; (2) soil scientist and fish biologist approval for log landing locations; (3) seasonal limitations on equipment operation to between June 1 and November 15, "when soils are not saturated" unless soils are otherwise suitably dry or frozen; and (4) a 25-foot buffer between timber activities and perennial streams, among others. AR0012509-10.

The 2024 Decision also provides that Project activities must follow an extensive list of Indiana state BMPs for logging and forestry, including (1) keeping skid trail grades to 2-10% when possible, with distance limitations for steeper grades; (2) maintaining buffers between

roads and waterways; and (3) installing properly sized culverts, among others. AR0012514-22; AR0012526.

These Forest Plan standards, design features, and BMPs far exceed the "priority best management practices" advocated for by Plaintiff Friends of Lake Monroe in the Lake Monroe Watershed Management Plan. AR0013936 (recommending Forest management plan, training of foresters and loggers, critical area seeding, and forest trails and landing improvement for forestry sites with "active erosion"); *see also* AR0012493 (noting exceedance of Lake Monroe Watershed Management Plan's recommended BMPs).

The Forest Service reviewed literature on the effectiveness of design features and BMPs. AR0012492. Researchers have found that implementation of BMPs reduce the loss of sediment and nutrients, *id.* (citing AR0014386 (Wynn et al (2000))); "effectively minimize negative water quality effects of harvesting and site preparation," AR0012492 (citing AR0012543 (Aust and Blinn (2004))); and that there is "a 96.4 percent effectiveness of BMPs on federal lands," AR0012492 (citing AR0013442 (McCoy and Sobecki (2017))) (emphasis added). *See also* AR0002964-3143 (The Effectiveness of Best Management Practices that Have Application to Forest Roads: A Literature Synthesis). As noted in the Supplemental EA, The Lake Monroe Diagnostic and Feasibility Study states that the "implementation of agricultural, forestry, and urban BMPs has proven over the years to be very effective in reducing watershed erosion and runoff, and ultimately, in reducing the delivery of NPS [non-point source] pollutants to lakes." AR0012492 (quoting AR12652 (Jones et al. (1997))) (emphasis added).

The Forest Service also considered its own success with BMPs. AR0011906 (noting that the BMP effectiveness of every project monitored in the Hoosier National Forest 2020 and 2021 Biennial Monitoring Report was "excellent."). Even the Lake Monroe Watershed Management

Plan states "impacts can be minimized if best management practices are used[.]" AR0013915. Likewise, the Monroe County Comprehensive Plan praises the use of BMPs for forest management activities. AR0012492 ("Modern forestry's best management practices (BMPs) . . . help reduce the occurrence of negative impacts such as soil erosion or habitat loss. Forest production viewed in broader terms helps maximize the benefit for all County residents." (quoting AR0014857)).

The Final Supplemental EA and 2024 Decision require turbidity and BMP monitoring throughout the lifespan of the Project, which will ensure the effectiveness of the Forest Plan standards, Project design features, and BMPs in protecting soil and water quality. AR0012474; AR0012491-93; *see also* AR0012493 ("Certified timber sale administrators and harvest inspectors oversee the implementation of silviculture activities to ensure proper implementation of Forest Plan guidance, BMPs, and project design."). Turbidity monitoring will measure turbidity upstream of Project activities and compare it to turbidity downstream of Project activities. AR0012493. Potential erosion risks will be mitigated before erosion occurs. *Id.* And the Forest Service will take corrective action where monitoring shows that BMPs are not being as effective as expected, consistent with Forest practice. *Id.* ("If turbidity is found to increase relative to pre-treatment levels during project activities, further investigation and remediation would occur to ensure proper BMP usage."); AR0012496. ("Hoosier National Forest staff would take action to restore any impacts that do occur from silvicultural activities.").

The Forest Service also considered the effects of prescribed burning on water quality. AR0012494. The Project includes low intensity prescribed fires, which research shows only removes the top layer of organic matter, causing minimal soil disturbance. *Id.* (citing AR0013541 (Rigg and Larson (2007))). Other research suggests that "low intensity, low severity prescribed

burns could be used to restore vegetation structure and composition in mixed pine-hardwood ecosystems <u>without negatively impacting water quality</u>." AR0012494 (emphasis added) (citing AR0012608 (Elliot and Vose (2005))). Forest Service monitoring also confirms that ash from prescribed fire does not leave the site. AR0012494. The Forest Service will monitor Project prescribed burns according to the Hoosier National Forest Prescribed Fire Monitoring Plan. *Id.*

In addition, the Forest Service considered the use of spot-herbicide on water quality. AR0012495. Herbicide will be applied directly to trunks and stumps with little to no herbicide contacting soil. AR0012463. Herbicides will not be used in floodplains, and buffers between water sources will reduce the potential of herbicides reaching streams to a "negligible level." AR0012495. The Forest Service reviewed literature confirming the limited impacts to water quality with proper herbicide application. AR0012496 ("Research has shown that herbicides used in forestry biodegrade relatively fast after application and that leaving untreated buffer zones around water sources insures [sic] that they will be protected.") (citing AR13004 (Kochenderfer (2012))).

Finally, the Forest Service considered the notable distance between Project silvicultural activities and the shores of Lake Monroe. AR0012496. "The nearest forestry action is approximately 10 stream miles from the shore of the lake." *Id*. Given the relatively small percentage of the total Lake Monroe watersheds that will be treated with silviculture activities (1.6%) and prescribed burn (4.9%), and that these treatments will occur gradually over ten or more years, on average silviculture treatments would impact "less than 0.16 percent of the combined Lake Monroe watersheds in any given year." AR0012496. Thus, any potential BMP ineffectiveness does not mean that sedimentation will reach Lake Monroe in significant amounts. AR0012492; AR0012496.

Accordingly, the Forest Service concluded that the Project would not "pose any significant short or long-term effects because site-specific design measures included in this project (see Appendix A [of Final Supplemental EA]), Best Management Practices (BMPs), and Forest Plan standards and guidelines will limit adverse effects to such an extent that they will not be significant[.]" AR0012528; *see also* AR0012496 ("Following the Forest Plan standards and guidelines, the proper design criteria, and the proper implementation of BMPs, the [Project] would not add additional impairments to Monroe Lake via erosion[.]"). In fact, the Project will likely *reduce* sedimentation into the South Fork Salt Creek watershed by replacing undersized culverts and repairing roads and trails that currently contribute to sedimentation. AR0012497-99 (describing the negative water quality impacts if the Project is not implemented). The Forest Service further concluded that there would be no cumulative effects to Lake Monroe as a result. AR0012501; AR0012529-30; *see also* AR0012499-501 (discussion of cumulative impacts to Lake Monroe from other sources).

Plaintiffs argue that the Project "*will* adversely impact Lake Monroe" based on the opinions of Dr. Mitchell-Brucker. ECF No. 24-1 at 34. But those opinions are not *facts*, and the Forest Service is entitled to rely on its own experts. *Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, <u>an agency must have discretion to rely on the reasonable opinions of its own qualified experts</u> even if, as an original matter, a court might find contrary views more persuasive." (emphasis added)); *Sauk Prairie Conservation All. v. U.S. Dep't of the Interior*, 944 F.3d 664, 678 (7th Cir. 2019) (finding agency's "application of expertise" entitled to deference). The Court should reject Plaintiffs' attempt to start a so-called "battle of experts." *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 577 (9th Cir. 1998) ("We have generally rejected plaintiffs' attempt to 'engage in a battle of experts'" (citation omitted)); *see also Mississippi v.*

25

*EPA*, 744 F.3d 1334, 1348 (D.C. Cir. 2013) ("We repeat: it is not our job to referee battles among experts; ours is only to evaluate the rationality of [the agency's] decision."); *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) ("We are in no position to resolve this dispute because we would have to decide that the views of [Plaintiffs'] experts have more merit than those of the [government's] experts." (internal quotation and citations omitted)). Even assuming Dr. Mitchell-Brucker qualifies as an expert,

> the fact that [Plaintiffs] cite an expert who agrees with their position and alleges a lack of analysis is not dispositive. It merely reflects the crux of their complaint—they disagree with the Forest Service's decision. [The Court's] job is not to question the wisdom of the Forest Service's ultimate decision or its conclusion concerning the magnitude of … impacts. Rather, we must examine the administrative record, as a whole, to determine whether the Forest Service made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making.

*Colorado Env't Coal. v. Dombeck*, 185 F.3d 1162, 1176-77 (10th Cir. 1999) (internal citation omitted). The Forest Service considered Dr. Mitchell-Bruker's public comments and opinions. AR0011906; AR0011911; AR0013504-16. NEPA requires nothing more.

There is also no evidence in the Record to support Plaintiffs' definitive claim of impacts to Lake Monroe. Nor is there evidence that any such impacts would rise to the level of *significance* within the meaning of NEPA. AR0012528 (FONSI). Plaintiffs reference a study in Kentucky, but that project involved slopes that averaged 45%, which, as discussed in the Forest Service response to public comments, exceeds the slope the Forest Service has authorized for this Project. AR0011906-7 ("[The Kentucky study involved] complete clearcuts on very steep slopes that averaged 45% incline. It is not comparable to Houston South where clearcuts are proposed on lesser-sloped ground and in only a small portion of the project area); *see also*; AR0012059-60 (map showing Project clearcuts are not on steep slopes). Plaintiffs reference

"highly erodible soils" in the Project area, ECF No. 24-1 at 34, but soil types and ratings dictate what Project activities are authorized where as well as the BMPs employed. AR0003520-24.

Plaintiffs also appear to claim, without adequate support, that the Forest Service cannot rely on BMPs to comply with NEPA. But numerous courts have upheld the use of project design features, Forest Plan guidance, and BMPs as reasonable bases to conclude that forestry impacts will not be significant. *See e.g. Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1086 (10th Cir. 2014) ("We conclude the Forest Service made a reasoned evaluation of how the [Water Conservation Practices Handbook] and the BMPs would mitigate sedimentation . . . and reliance on these methods was not arbitrary or capricious."); *Ecology Center v. Castaneda*, 574 F.3d 652, 666 (9th Cir. 2009) ("So long as BMPs are supported by reasonable scientific assumptions, reasonably appropriate for the circumstances at hand, the Forest Service is not acting in an arbitrary and capricious fashion in relying on them.") (noting also that plaintiffs had not proven that poor water quality of which they complain was the result of the ineffectiveness of the BMPs proposed for use on the project); *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1013 (9th Cir. 2006) (holding Forest Service took "hard look" at impacts on water quality where EA described existing condition and potential impacts and included "precautions and methods that would be utilized to minimize impacts."); *Wildwest Inst. v. Bull*, 468 F. Supp. 2d 1234, 1252 (D. Mont. 2006) ("The incorporation of mitigation measures into a proposed action and analysis of the effects of that proposed action with the mitigation measures in place supports an agency's 'hard look' at environmental effects as required by NEPA." (citation omitted)), *aff'd* 547 F.3d 1162 (9th Cir 2008); *Lands Council v. Vaught*, 198 F. Supp. 2d 1211, 1232 (E.D. Wash. 2002) (denying plaintiffs motion for summary judgment where plaintiffs argued decision was arbitrary and capricious for relying on BMPs and monitoring).

Plaintiffs further argue that BMPs must be 100% effective, but again, this is not the standard. *Habitat Educ. Ctr., Inc.*, 673 F.3d at 528 ("We take care to distinguish between claimed deficiencies in an EIS that are 'mere flyspecks' and those that are 'significant enough to defeat the goals of informed decisionmaking and informed public comment.'" (citation omitted)). Nor has the Forest Service claimed BMPs are 100% effective. The Supplemental EA clearly states that "[w]ith adherence to Forest Plan guidance, the use of design features and BMPs, and proper monitoring, this project would have minimal to no effects on water quality . . . ." AR0012491 (emphasis added). In the rare instance in which a BMP is not fully effective, monitoring will ensure corrective action. AR0012493. And there is no evidence to suggest that this would result in sediment reaching Lake Monroe, 10 miles downstream from Project silviculture activities. AR0012492; AR0012496.

Plaintiffs rely on *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989 (9th Cir. 2004), arguing that the Forest Service should have quantified the Project's contribution to sediment in Lake Monroe. In that case, the Bureau of Land Management ("BLM") divided a timber harvest plan into four immediately adjacent projects with four separate EAs. 387 F.3d at 992. The Ninth Circuit determined that although the EAs discussed cumulative impacts, BLM did not analyze the "combined environmental impacts" of the four projects. *Id.* at 994. Each project was expected to pose an increased risk of a higher magnitude runoff impacting soils and endangered salmon habitat, but there was no discussion in the EAs of the combined risk where two projects were slated to occur at the same time in the same watershed. *Id.* at 996.

*Klamath-Siskiyou* is readily distinguishable for two reasons. First, Plaintiffs here do not allege that the Forest Service failed to consider the cumulative impacts of the Project in

conjunction with past, present, and reasonably foreseeable future agency projects. The only issue in this case is whether the Forest Service took a hard look at the impacts of the Project on Lake Monroe's already degraded water quality. ECF No. 24-1 at 3. Second, as discussed above, the Forest Service considered Lake Monroe's current water quality impairment, the impacts that forest management can have on water quality, the effectiveness of the Forest Plan standards, Project design features, and BMPs in protecting water quality, and the 10-mile stream distance between Project silviculture activities and Lake Monroe, and concluded that the Project would not contribute to Lake Monroe's impairment. In *Klamath-Siskiyou*, the Ninth Circuit faulted the agency for not quantifying the stated "moderate" impacts to water quality across projects to confirm the lack of significant effects. *Klamath-Siskiyou Wildlands Ctr.,* 387 F.3d at 994. But here, the Project is expected to have "minimal to no effects on water quality." AR0012491. There is nothing to quantify. If turbidity monitoring shows an increase in local stream sedimentation, the Forest Service will investigate and take corrective action, but even local sedimentation does not mean sedimentation will occur 10-miles downstream in Lake Monroe.

Plaintiffs also cite *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). Like in *Klamath-Siskiyou*, plaintiffs in *Blue Mountains Biodiversity Project* challenged the cumulative effects of a series of timber sales. 161 F.3d at 1210. In that case, the Forest Service proposed multiple salvage harvesting sales following severe wildfires that "killed all trees, shrubs, and ground cover in several thousand acres." *Id.* The Ninth Circuit found the Forest Service's reliance on BMPs inadequate in that case because they were based on "past observations of logging on <u>unburned</u> areas" and there was no evidence of their effectiveness for salvage logging in "a severely burned area." *Id.* at 1214. Unlike in *Blue Mountains*, the Forest

29

Service here is proposing adherence to Forest Plan standards, Project design features, and BMPs that are designed for the exact type of Project at issue, with demonstrated effectiveness.

The present case is more analogous to the Seventh Circuit's decision in *Highway J Citizens Group v. Mineta*, 349 F.3d 938 (7th Cir. 2003). In that case, the plaintiffs alleged that the Department of Transportation failed to take a hard look at the environmental effects of two bridge projects on drinking water. 349 F.3d at 942. Specifically, plaintiffs alleged that the bridge pilings would introduce a pre-existing underground contamination plume from a nearby landfill into the drinking water supply. *Id.* at 954. The Seventh Circuit framed the issue as whether there was a "nexus" between the project and the "*preexisting* contamination in the general vicinity, which, apart from the Project, NEPA and its regulations do not affect[;]" *i.e.*, whether the project will "exacerbate this preexisting condition." *Id.* While the EA for that project did not contain a specific discussion of the effects of the pilings themselves, the record contained defendants' expert opinion that the vertical movement of contaminated groundwater from the pilings was "insignificant" as compared to the "natural vertical movement." *Id.* at 956. The project would not "significantly affect" the pre-existing condition. *Id.* The Court held this satisfied NEPA's "hard look" requirement. *Id.*

So too here. The Forest Service considered the impacts of the Project on soil and water quality in the EA, AR0003519-26; AR0012471-78, and then looked at the specific impacts, if any, of the Project on Lake Monroe's water quality in the Supplemental EA. AR0012491-501. The Forest Service reasonably concluded Project impacts on the environment would not be significant. AR0012528. The Court should not substitute its judgment for that of the agency. *Nat'l Wildlife Fed'n*, 75 F.4th at 749.

At bottom, Plaintiffs advocate a mere difference of opinion on how the Forest should be managed, but such a disagreement does not render the 2024 Decision arbitrary, capricious, or a violation of law. *Ind. Forest All., Inc.*, 2001 WL 912751, at *1 (denying plaintiffs' motion for summary judgment where challenges to decision "show not violations of law but only reasonable differences of opinion about how the Forest should be managed."). Forest management is within Federal Defendants' expertise—and legal mandate, 16 U.S.C. § 583—and their determination that Forest Plan standards, design features, and BMPs will ensure that the Project does not have a significant effect on Lake Monroe water quality is entitled to deference. *Protect Our Parks,* 39 F.4th at 399 (holding agency conclusion "implicates substantial agency expertise and is entitled to deference" (citation omitted)).

### III.    The Forest Service Complied with NEPA by Completing a Supplemental EA.

The Forest Service reasonably concluded that the Project will not have significant environmental effects, and it complied with NEPA by completing a Supplemental EA and issuing a FONSI. NEPA allows an agency to prepare an EA instead of an EIS where environmental impacts are either insignificant or the significance is unknown. 42 U.S.C. § 4336(b)(2); 36 C.F.R. § 220.7. "An EA has been described as a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." *Ind. Forest All. Inc.*, 325 F.3d at 856 (internal quotation and citation omitted). As the Seventh Circuit has recognized, "[p]reparing an EIS is expensive and time-consuming" and can take on average "four and a half years to complete." *Protect Our Parks, Inc.*, 39 F.4th at 397.

In evaluating significance, Forest Service regulations require the agency to consider both "context" and "intensity." 36 C.F.R. § 220.7(b)(3)(iii) (citing 40 C.F.R. § 1508.27).[4] Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a) (2019). Intensity "requires agencies to consider, among other factors, 'the degree to which the proposed action affects public health and safety'; 'the degree to which the effects on the quality of the human environment are likely to be highly controversial'; and 'the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.'" *Highway J Citizens Grp.*, 349 F.3d at 953 (quoting 40 C.F.R. § 1508.27(b)(2),(4),(5) (2019)).

Plaintiffs attempt to downplay the standard of review by claiming they must merely raise "substantial questions" as to whether the Project may have significant environmental effects to warrant an EIS. ECF No. 24-1 at 42 (quoting *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011)). But Plaintiffs must do more than raise a "substantial question;" they must *prove* the decision to complete an EA instead of an EIS was arbitrary and capricious. *Dep't of Transp.*, 541 U.S. at 763 ("An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A))); *Marsh*, 490 U.S. at 375-76. "[I]nformation merely favorable to [plaintiff's] position in the NEPA documents does not

_____

[4] Forest Service regulations incorporate the Council on Environmental Quality ("CEQ") regulations for the definition of "significantly." 36 C.F.R. § 220.7(b)(3)(iii). Although the CEQ regulations were replaced in 2020 and updated in April 2022 (40 C.F.R. § 1501.3(b)(3)), these revised regulations only apply to any NEPA process begun after May 20, 2022. Therefore, significance is evaluated based on the CEQ regulations in effect at the time the NEPA process commenced, which are found at 40 C.F.R. § 1508.27 (2019). AR0012528.

necessarily raise a substantial question about the significance of the project's environmental effects." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005). And, as the Seventh Circuit has made clear, an agency's decision to complete an EA instead of an EIS is entitled to deference. *Protect Our Parks*, 39 F.4th at 399.

Here, in compliance with NEPA and the Court's orders, the Forest Service completed a Supplemental EA and determined an EIS was unnecessary after analyzing the context and intensity of the Project's impacts. AR0012448-534; AR0012528-30 (analysis of context and intensity factors). Accordingly, the Forest Service met it obligations under NEPA. *See Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1211 (11th Cir. 2012) ("The requirements of NEPA are purely procedural and do not mandate any specific outcome; agencies may make a decision that preferences other factors over environmental concerns as long as they have first adequately identified and analyzed the environmental impacts."). Despite the clear record showing that the Forest Service analyzed each of the regulatory factors, Plaintiffs impermissibly attack the Forest Service's substantive *conclusions*, not procedure. *See Protect Our Parks, Inc.*, 39 F.4th at 398-99 ("Protect Our Parks also attempts to recast its substantive objections as procedural ones by arguing that the Park Service and the Department of Transportation did not adequately consider three of the ten factors set forth in the NEPA regulations in effect while the review was underway.") (holding the agencies "studied the project through the lens of the required regulatory factors before reaching their decision that no environmental impact statement was required."). Plaintiffs' arguments fail as a result.

A.    **The Forest Service Considered the Context of the Project.**

The Forest Service considered the context of the Project in concluding that it would not have significant environmental effects. "Context" requires the agency to consider significance

"in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a) (2019). Importantly, as Plaintiffs concede, "in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id.*; ECF No. 24-1 at 42. Put another way, "[c]ontext simply delimits the scope of the agency's action, including the interests affected." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020) (citation omitted); *see also Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) ("Context refers to the setting in which the proposed action takes place").

The Forest Service appropriately considered the context of the Project and concluded that it was "limited in context (scope and duration)." AR0012528. As a "site-specific project," the "scope is confined to addressing the environmental effects of the project, and the context of the action is local and specific to the general area surrounding the project area." *Id.* After delineating the context, the Forest Service concluded that the Project would not pose any significant short or long-term effects. *Id.* Accordingly, the Forest Service considered the context and appropriately concluded, as is typical in site-specific projects, that the affected area was the locale and its surroundings and analyzed the environmental impacts to this area.

Plaintiffs argue that the Forest Service failed to consider the context because the Project, according to Plaintiffs, is "large[]." ECF No. 24-1 at 43. But courts across the country have resoundingly rejected Plaintiffs' argument that size alone is determinative of significance. *See, e.g., Klamath Forest All. v. U.S. Forest Serv.*, No. 23-CV-03601-RFL, 2024 WL 4017202, at *10 (N.D. Cal. Aug. 23, 2024) ("With regard to Plaintiffs' first point, the large size of the Projects, alone, does not necessarily raise a substantial question as to significant environmental impacts, so the Forest Service's alleged failure to address scale across all nine affected National Forests

does not make the FONSIs arbitrary."); *W. Watersheds Project v. Perdue*, No. CV-21-00020-TUC-SHR, 2023 WL 6377287, at *12 (D. Ariz. Sept. 29, 2023) ("While this is a large Project—spanning across two states and multiple national forests—Plaintiffs do not point to, and the Court is unaware of, any authority holding large projects necessarily have a significant environmental impact."); *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262 (10th Cir. 2019) ("there is no categorical rule that sizable federal undertakings *always* have a significant effect on the quality of the human environment"). Ultimately, it is not the size of the project—or whether the general Project area is significant to the local community—but the significance of the *environmental effects* that is relevant. Here, the environmental effects were analyzed and found to be insignificant. Accordingly, the Forest Service adequately considered the context of the Project.

**B.    The Forest Service Considered the Intensity of the Project.**

The Forest Service also considered each of the ten intensity factors and concluded that the Project would not have a significant environmental impact. AR0012528-30. Nevertheless, Plaintiffs once again attack the Forest Service's *conclusions*, arguing that the even one factor can require an EIS. However, the case law is clear that the agency must merely consider the intensity factors—which are not elements—and then analyze the *degree* of the impact for the agency's decision to be entitled to deference. *Protect Our Parks*, 39 F.4th at 398 ("Again, the administrative record amply shows that the agencies 'consider[ed] the proper factors,'" ensuring that their decision is entitled to deference." (alteration in original) (citation omitted)); *WildEarth Guardians*, 920 F.3d at 1262 (stating the "simple existence of an effect does not trigger" an EIS—"the 'relevant analysis is the *degree* to which the proposed action affects' a listed factor") (citation omitted); *Env'tl Prot. Info. Ctr.*, 451 F.3d at 1012  (9th Cir. 2006) ("Although [plaintiff] seems to urge that *any* impact to a listed species requires an EIS, USFS correctly argues that the

regulation's 'intensity' factor focuses on the '*degree* to which an action may adversely affect' a threatened species or critical habitat" (citation omitted)); *Coliseum Square Ass'n Inc. v. U.S. Dep't of Housing*, 465 F.3d 215, 240 (5th Cir. 2006) ("[T]he factors listed in the regulations 'do not appear to be categorical rules that determine by themselves whether an impact is significant.'" (citation omitted)).

1.    Beneficial and Adverse Impacts

The benefits of the project do not require preparation of an EIS. 40 C.F.R. § 1508.27(b)(1) (2019) requires an agency to consider, "[i]mpacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." As this Court has recognized, "40 C.F.R. § 1508.27(b)(1) is relevant only in situations where the agency must balance significant adverse impacts against significant beneficial impacts." *Ind. Forest All., Inc.*, 2001 WL 912751, at *14. Where the agency determines the adverse effects will not be significant, 40 C.F.R. § 1508.27(b)(1) "does not come into play because the agency [has] no need to consider whether 'on balance,' there would be significant beneficial effects." *Id.* To hold otherwise "would require the Forest Service to prepare an EIS for every project that it contends would have a significant beneficial impact on the environment. This is not what NEPA requires." *Id.*

Similarly here, because the Forest Service concluded that the Project will not have significant adverse effects, it need not balance the adverse and beneficial effects. AR0012529 (noting Forest Service's conclusion of significant adverse effects was "not biased by the beneficial effects of the action."). Nothing more is required. *See Cascade Forest Conservancy v. U.S. Forest Serv.*, 577 F. Supp. 3d 1163, 1186 (W.D. Wash. 2021), *aff'd*, No. 22-35087, 2022 WL 10964667 (9th Cir. Oct. 19, 2022) ("This sentence merely explains the Forest Service's

36

conclusion that adverse impacts do not rise to the level of significance without weighing them against potential beneficial impacts. This was the proper analysis."). Despite Plaintiffs' claim, the Forest Service did not state that the Project had no benefits. *Compare* ECF No. 24-1 at 45 *with* AR0012529. Indeed, the Supplemental EA is replete with the benefits of the Project, including the desire to encourage the growth of native hardwood oaks and hickories to support a variety of wildlife and to promote forest health. AR0012457-59.

Plaintiffs also argue that the Project must have no significant beneficial impacts, because if it did, the Forest Service would have to prepare an EIS. ECF No. 24-1 at 45. But this is simply an incorrect statement of law. *See Ind. Forest All., Inc.*, 2001 WL 912751, at *14 ("[T]he conclusion that a project will have purely beneficial impacts does not require preparation of an EIS." (alteration in original) (quoting *Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194, 1211 (D.S.D. 2000))). Indeed, when the Indiana Forest Alliance, one of the Plaintiffs in this action, made this argument in the past, the Court held that "Plaintiffs' construction of 40 C.F.R. § 1508.27(b)(1) is unreasonable." *Id.* Accordingly, the Forest Service was not required to prepare an EIS to analyze beneficial effects of the Project since it found there were no significant adverse effects.

2.   Highly Controversial

The environmental effects of the Project are not highly controversial. 40 C.F.R. § 1508.27(b)(4) (2019) requires an agency to consider the "degree to which the effects on the quality of the human environment are likely to be highly controversial." Importantly, "'highly controversial' in NEPA context does not encompass all public opposition to a proposed action, but instead only applies to a substantial dispute as to the size, nature, or effect of an action." *Ind. Forest All., Inc.*, 325 F.3d at 857 (citation omitted). "Thus, controversy does not refer simply to

the existence of public opposition to a use." *Id.* at 858; *see also id*. at 857 ("[I]f controversy were equated with opposition, the EIS outcome would be governed by a 'heckler's veto.'" (citation omitted)).

In their attempt to demonstrate a substantial dispute, Plaintiffs cite only the opinion of Dr. Mitchell-Bruker. ECF No. 24-1 at 45-47. But as discussed above, the Forest Service is entitled to rely on its own experts, *Marsh*, 490 U.S. at 378, and Plaintiffs' reference to a competing "expert" does not render the impacts highly controversial under this factor. *Highway J Citizens Grp.*, 349 F.3d at 957 ("The mere fact that there is still disagreement or that Citizens' expert disagrees with the defendants' experts does not render the defendants out of compliance under this factor.").

Further, Dr. Mitchell-Bruker only opined that she believed that general Forest Service BMPs were insufficient. AR0011561; AR0011570. She did not address or consider the Forest Plan standards or design features the Forest Service developed specifically for the Project. AR0012508-11. Even if the Forest Service were only relying on BMPs though, Dr. Mitchell-Bruker has acknowledged the "effectiveness" of BMPs, AR0011566, and the Project exceeds the BMPs her organization—Plaintiff Friends of Lake Monroe—advocate for in the Lake Monroe Watershed Management. AR0012493.

Regardless, even assuming Plaintiffs have demonstrated a substantial dispute, which they have not, NEPA only requires the agency to address that dispute. *See Ind. Forest All., Inc.*, 325 F.3d at 858. The Forest Service considered the opinions of Dr. Mitchell-Bruker, AR0011906; AR0013504-16, and the opinions of Dr. Mitchell-Bruker do not warrant an EIS.

3.    Local Law or Requirements

 The Project will not violate local law or other requirements. 40 C.F.R. § 1508.27(b)(10) (2019) provides that an agency must consider "[w]hether the action threatens a violation of

Federal, State, or local law or requirements imposed for the protection of the environment."

Accordingly, the Forest Service considered the relevant laws and concluded that the Project did

not violate them. AR0012530-31; AR0012466; AR0012501-02; AR0003570.

Plaintiffs argue that the Project works against the goals of the Lake Monroe Watershed

Management Plan. ECF No. 24-1 at 47-48. But the Lake Monroe Watershed Management Plan is

not a "law or requirement" pursuant to 40 C.F.R. § 1508.27(b)(10) (2019). The Lake Monroe

Watershed Management Plan is a report prepared by Friends of Lake Monroe, a Plaintiff in this

case. AR0013761; AR0013772. The Plan is *voluntary* and not binding on any landowners in the

watershed, much less the federal government. AR0013932 ("Since implementation is voluntary,

program success rests upon attracting enough interested landowners."). Regardless, the Forest

Service considered the Lake Monroe Watershed Management Plan and concluded that the Project

was consistent with it. AR0012501; AR0012493 (noting exceedance of Lake Monroe Watershed

Management Plan's recommended BMPs).[5] Further, county zoning explicitly exempts federal

projects as well as agricultural uses and rural forestry harvesting from erosion control measures.

AR0014630.

4.    Public Health

The Forest Service considered public health and safety. 40 C.F.R. § 1508.27(b)(2) (2019)

requires an agency to consider the "degree to which the proposed action affects public health or

safety." The Forest Service considered these aspects and concluded that the Project "will not

---

[5] Plaintiffs appear to suggest the Project will violate the Clean Water Act by "depositing additional sediment in the most impaired part of the Watershed." ECF No. 24-1 at 48. But Lake Monroe is not impaired for sediment. AR0013793 ("Both the upper and lower basins of Lake Monroe are impaired for taste and odor, algal blooms, and mercury in fish.").

significantly affect public health and safety" and that "there is no indication that the general public will experience any adverse health and safety effects from the project." AR0012529.

Plaintiffs argue that in their view, and contrary to the Forest Service's analysis and conclusions, the Project will result in sedimentation and will therefore affect public health. But in making this argument, Plaintiffs attack the substance of the Forest Service's conclusion, not whether impacts on public health and safety were considered (they were). *Protect Our Parks, Inc. v. Buttigieg* is directly on point. In that case, the plaintiffs argued that an EIS was required because the project "require[d] the City to cut down about 800 trees and felling those trees may adversely affect certain migratory birds, and in part for historic preservation and other reasons noted earlier." *Protect Our Parks*, 39 F.4th at 398. In rejecting the plaintiffs' arguments, the Seventh Circuit noted, "those are arguments about the agencies' response to the procedural steps they took, not arguments about their failure to adhere to the required process." *Id.*

Similarly here, the Forest Service analyzed the effects on Lake Monroe at length in the Supplemental EA and concluded that there was no risk to health or safety. AR0012491-97. While Plaintiffs may disagree with the outcome, that is beyond the scope of NEPA review.

5.    Cumulative Impacts

The Project will not have significant cumulative impacts on Lake Monroe. 40 C.F.R. § 1508.27(b)(7) (2019) requires an agency to consider the cumulative effect of the agency action in conjunction with other actions. The Forest Service extensively analyzed the potential for cumulative impacts on Lake Monroe and concluded the Project would not result in significant cumulative effects. AR0012529-30; AR0012499-501.

Plaintiffs argue that the Forest Service is "just plain wrong." ECF No. 24-1 at 49. But a disagreement about the conclusion reached is outside the scope of NEPA. Again, *Protect Our*

*Parks*, is instructive. In that case, after the plaintiffs similarly argued that the agency failed to consider cumulative impacts, the Seventh Circuit held:

> Finally, Protect Our Parks accuses the agencies of failing to consider the "cumulatively significant impact" of the project. *See* 40 C.F.R. § 1508.27(b)(7) (2019). But the EA did so—it just reached a conclusion with which the plaintiffs disagree, when it determined that the cumulative effects would be "negligible, minor, or otherwise relatively small[.]" The Park Service and the Department of Transportation thoroughly studied the project through the lens of the required regulatory factors before reaching their decision that no environmental impact statement was required. Their conclusion thus "implicates substantial agency expertise and is entitled to deference."

39 F.4th at 399 (alteration in original) (citation omitted). Similarly here, although Plaintiffs disagree with the outcome, the Supplemental EA and Administrative Record demonstrate that the Forest Service reasonably considered cumulative impacts before reaching its conclusion.

### 6.    Unique Characteristics

The Forest Service considered the unique characteristics of the geographic area. 40 C.F.R. § 1508.27(b)(3) (2019) requires an agency to consider "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." The Forest Service concluded that the Project "would not have any significant effects on unique characteristics of the geographic area." AR0012529; AR0003564; AR0012487-91.

Plaintiffs simply argue that the area is "unique," ECF No. 24-1 at 51-52, but this alone is not enough to warrant an EIS. *Cascade Forest Conservancy*, 577 F. Supp. 3d at 1187 ("That the area is unique, however, does not mean the impact on it will necessarily be 'significant.'" (citation omitted)). Again, while Plaintiffs may disagree with the conclusion, a substantive disagreement is beyond the scope of NEPA review.

The Forest Service considered all the requisite regulatory factors and reasonably concluded that the Project would not have a significant environmental effect on Lake Monroe and that an EIS would not be required. This determination is entitled to deference, and Plaintiffs have not shown it was arbitrary, capricious, or a violation of law. *Marsh*, 490 U.S. at 375-76; *Protect Our Parks,* 39 F.4th at 399; *Env'tl Law and Policy Ctr.*, 470 F.3d at 685.

## IV.    Federal Defendants Request Supplemental Briefing on Remedy.

Federal Defendants are entitled to summary judgment; however, should the Court find some legal violation, Federal Defendants request supplemental briefing on remedy. In deciding whether to vacate an agency action under the APA, courts balance the seriousness of the deficiencies and the disruptive consequences of vacating an agency decision. *See, e.g., Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Because these considerations are difficult to apply in the abstract, the Court should order separate briefing on remedy if it finds a legal violation. This procedure would allow the parties to brief the seriousness of the deficiencies, the disruptive consequences, and, as applicable, harmless error, in the context of any specific violations the Court finds.

## CONCLUSION

The Forest Service complied with NEPA by taking a "hard look" at the potential impacts of the Project on Lake Monroe, and reasonably determined that those impacts would not be significant and that an EIS would not be required. This determination is entitled to deference, and Plaintiffs have not met their burden of proving the 2024 Decision was arbitrary, capricious, or a violation of law. The Court should grant summary judgment in favor of Federal Defendants.

Dated: January 7, 2025            Respectfully submitted,


TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Reade E. Wilson*
READE E. WILSON, Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0299
Fax: (202) 305-0275
Email: reade.wilson@usdoj.gov

RACHANA N. FISCHER, Assistant U.S. Attorney
United States Attorney's Office
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204
Telephone: (317) 226-6333
Direct Dial: (317) 229-2414
Fax: (317) 226-5027
E-mail: Rachana.Fischer@usdoj.gov

*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 7, 2025, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Reade E. Wilson*
READE E. WILSON
Trial Attorney
