**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

---

|  |  |  |
|---|---|---|
| MONROE COUNTY BOARD OF COMMISSIONERS, et al., | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | Case No. 1:24-cv-01560-TWP-KMB |
| UNITED STATES FOREST SERVICE, et al., | ) ) | |
| *Defendants.* | ) ) | |

---

**REPLY IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

Matthew R. Arnold
William S. Eubanks II
Eubanks & Associates PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(843) 718-4513
matt@eubankslegal.com

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

Table of Authorities ................................................................................................. iii

Table of Acronyms ................................................................................................. vi

Introduction ............................................................................................................. 1

Argument ................................................................................................................. 3

I.    Defendants Cannot Unilaterally Alter the Scope of Plaintiffs' Case ........................... 3

II.   Plaintiffs Easily Satisfy the Article III Standing Requirements ................................. 6

    A.  Plaintiffs' Declarations Clearly Demonstrate Article III Standing ........................... 7

    B.  Although Unnecessary, Supplementing Plaintiffs' Declarations Leaves No Doubt About Their Standing to Pursue This Litigation ....................................................... 12

III.  Defendants Have No Persuasive Excuse for Their Continued Refusal to Examine Project Impacts on Lake Monroe ................................................................ 12

IV.   Defendants Fail to Make a Convincing Case for Their FONSI ................................. 19

    A.  Defendants Cannot Escape the Immense Scale of the Project and the Devastating Effects to Myriad Resources in the Project Area with Post Hoc Rationales Meant to Undervalue Its Scope ................................................................ 20

    B.  The Project is a Textbook Example of a "Highly Controversial" Federal Action That Requires an EIS Under NEPA ....................................................... 23

    C.  Defendants Have Not Alleviated the Concerns About the Project's Effect on Public Health and Local Environmental Requirements ....................................... 27

    D.  The Project's Cumulative Impacts Weigh in Favor of an EIS, and Defendants Have No Persuasive Response ....................................................... 30

    E.  Unique Aspects of the Project Area Remain at Risk from Project Implementation 31

V.    Plaintiffs Do Not Oppose Remedy Briefing, Provided Defendants Do Not Implement the Project During the Interim ....................................................... 32

Conclusion .............................................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bark v. U.S. Forest Serv.*,
  958 F.3d 865 (9th Cir. 2020) ................................................29

*Bonte v. U.S. Bank, N.A.*,
  624 F.3d 461 (7th Cir. 2010) ................................................25

*Bowsher v. Synar*,
  478 U.S. 714 (1986)................................................8

*Burlington N. Ry. Co. v. Surface Transp. Bd.*,
  403 F.3d 771 (D.C. Cir. 2005)................................................23

*Curry v. U.S. Forest Serv.*,
  988 F. Supp. 541 (W.D. Penn. 1997)................................................20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)................................................9, 19, 21

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)................................................28

*Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................8

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990)................................................7

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002)................................................20

*Greater Hells Canyon Council v. Wilkes*,
  No. 2:22-cv-00859, 2023 WL 6443823 (D. Or. Aug. 31, 2023) ................................................21, 22, 28

*Idaho Sporting Cong. v. Thomas*,
  137 F.3d 1146 (9th Cir. 1998) ................................................17

*Ind. Forest All., Inc. v. U.S. Forest Serv.*,
  325 F.3d 851 (7th Cir. 2003) ................................................17

*Islander E. Pipeline Co. v. Conn. Dep't of Envt. Prot.*,
  482 F.3d 79 (2d Cir. 2006)................................................16

*Kettle Range Conserv. Grp. v. U.S. Forest Serv.*,
  No. 2:21-cv-00161, 2023 WL 4112930 (E.D. Wash. June 21, 2023) ....................5, 23, 30, 31

*Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*,
  410 F. Supp. 3d 943 (S.D. Ind. 2019) (Pratt, J.) ....................................................25

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)....................................................................................27, 28, 31

*Metro. Wash. Chapter, Associated Builders & Contractors v. District of Columbia*,
  62 F.4th 567 (D.C. Cir. 2023)...............................................................................4, 6

*Monroe County Board of Commissioners v. U.S. Forest Serv.* (*Monroe I*),
  595 F. Supp. 3d 713 (S.D. Ind. 2022) ...............................................................*passim*

*Monroe County Board of Commissioners v. U.S. Forest Serv.* (*Monroe II*),
  4:23-cv-00012, 2023 WL 2683125 (S.D. Ind. Mar. 29, 2023)......................................*passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*,
  463 U.S. 29 (1983)......................................................................................23, 28

*Nat. Parks Conserv. Ass'n v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) .............................................................6, 10, 23, 24

*Nat'l Audubon Soc'y v. Dep't of Navy*,
  422 F.3d 174 (4th Cir. 2005) ...........................................................................14, 24

*Nat'l Wildlife Fed'n v. Lohr*,
  No. 19-cv-2416, 2024 WL 4443687 (D.D.C. Oct. 8, 2024) .........................................3

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
  625 F.3d 1092 (9th Cir. 2010) .........................................................................31

*Pennell v. City of San Jose*,
  485 U.S. 1 (1988)........................................................................................12

*Protect Our Parks, Inc. v. Buttigieg*,
  39 F.4th 389 (7th Cir. 2022) ...................................................................27, 28, 29

*Rumsfeld v. Forum for Acad. & Inst. Rights*,
  547 U.S. 47 (2006).....................................................................................8, 10

*Sierra Club v. EPA*,
  774 F.3d 383 (7th Cir. 2014) ..........................................................................8, 9

*Sierra Club v. U.S. Dep't of Transp.*,
    753 F.2d 120 (D.C. Cir. 1985) ...................................................................19

*Simmons v. U.S. Army Corps of Eng'rs*,
    120 F.3d 664 (7th Cir. 1997) ....................................................................14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ......................................................23, 24, 26

*Transactive Corp. v. U.S.*,
    91 F.3d 232 (D.C. Cir. 1996) ....................................................................22

*U.S. Magnesium, LLC v. EPA*,
    690 F.3d 1157 (10th Cir. 2012) .................................................................12

*W. Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013) ...................................................................15

*Xirum v. U.S. Immigr. & Customs Enf't*,
    No. 1:22-cv-00801, 2023 WL 2683112 (S.D. Ind. Mar. 29, 2023) .........................8

**Statutes**

5 U.S.C. § 706(2) .......................................................................................2, 3, 31

42 U.S.C. §§ 4321-4347 ....................................................................................1

42 U.S.C. § 4332(C) ........................................................................................14

**Regulations**

36 C.F.R. § 220.7 ............................................................................................5

40 C.F.R. 1508.27(b)(4).....................................................................................23

40 C.F.R. § 1508.27 ......................................................................................5, 19

40 C.F.R. § 1508.27(b)(3).................................................................................30

40 C.F.R. § 1508.27(b)(10), (b)(2) ......................................................................27

## TABLE OF ACRONYMS

| APA | Administrative Procedure Act |
|---|---|
| BMPs | Best Management Practices |
| CEQ | Council on Environmental Quality |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| NEPA | National Environmental Policy Act |
| NFS | National Forest System |
| SEA | Supplemental Environmental Assessment |
| SIR | Supplemental Information Report |

## INTRODUCTION

This case challenges the U.S. Forest Service's ("Service's") authorization of the Houston South Project ("Project")—the single largest logging and prescribed burning effort ever undertaken in Indiana's only national forest, the Hoosier National Forest. The agency's environmental analysis in support of the Project pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, is arbitrary and capricious on several fronts.

In formulating the scope of its analysis, the Service undervalues and/or completely ignores the Project's foreseeable effects on Lake Monroe, which serves as the sole source of drinking water for more than 145,000 residents near Bloomington, Indiana. The Service's continuing, steadfast refusal to examine and disclose to the public the Project's detrimental effects on Lake Monroe is particularly concerning because that waterbody is already considered impaired such that the addition of even small amounts of nutrients and/or sediment unleashed by the decade-plus logging and burning of thousands of acres across the Project area will create a cascading series of new, harmful disruptions to Lake Monroe's water quality. Since the Project's inception, Plaintiffs have consistently warned the Service that it has placed too much blind faith in the ability of its "Best Management Practices" ("BMPs")—e.g., erosion control strategies meant to reduce (but not eliminate) sediment transfer and nutrient loading—to ameliorate Project effects. But Defendants lack any credible evidence demonstrating the efficacy of its proposed BMPs, and Plaintiffs therefore routinely urged the Service to explain why it believes this Project will be different from the agency's ineffectual BMPs in similar circumstances.

Defendants' Cross-Motion for Summary Judgment and Response, ECF No. 27, makes clear that Defendants have no persuasive answers. They expend considerable space in their Response erecting roadblocks meant to prevent the Court from reaching the merits of Plaintiffs' claims. For example, after six years of litigation and two previous trips to this Court over this

same Project, Defendants suddenly claim for the first time that Plaintiffs somehow lack standing to challenge the Project. They also attempt to arbitrarily limit Plaintiffs' challenge based on a distorted understanding of the Court's prior rulings. Both legal maneuvers are red herrings.

After stripping away Defendants' baseless attempts to distract from the core issues, it becomes clear that Defendants' litigation position amounts to: "Just trust us." Self-serving statements like that, however, cannot serve as a substitute for the reasoned decisionmaking required by NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Court should declare Defendants' purported analysis (or excuses) unlawful and arbitrary, and, as instructed by the APA, set aside the Service's decision and its concomitant analysis of the Project for failing to examine the foreseeable Project effects to Lake Monroe that Plaintiffs have now extensively explained in three different decisionmaking processes over the course of six years. *See id.* § 706(2) (directing courts to "hold unlawful and set aside" "action, findings, and conclusions" that are "arbitrary, capricious, . . . or otherwise not in accordance with law").

Defendants' NEPA analysis, which culminated in a Supplemental Environmental Assessment ("SEA") and finding of no significant impact ("FONSI" or "DN/FONSI"), is arbitrary for still another reason. In deciding to forgo the more robust analysis required by an Environmental Impact Statement ("EIS") in favor of the shallow evaluation contained in the agency's SEA, the Service has run afoul of NEPA and its implementing regulations because the administrative record here demonstrates that this immense Project spanning decades implicates numerous factors delineating "significant" federal actions under NEPA and its implementing regulations. Although Defendants attempt to explain away the massive size of the Project and the inexorably significant effects of the Project on many unique resources located in the Project area, their excuses ultimately fail to make the legally required convincing case for the agency's

finding that the Project is not likely to have any significant negative effects on the environment. This, too, provides the Court with a well-founded basis to set aside the Service's misguided analysis of the Project that bypassed the EIS requirement which plainly applies here.

Because the Service has yet to validate its decision with the rational decisionmaking required by the APA and this Court's prior orders—despite three attempts to take seriously the effects of the largest logging and burning project in Indiana's history—Plaintiffs are entitled to the APA's default remedy of vacatur. *See* 5 U.S.C. § 706(2). While Plaintiffs believe that the Court may vacate the Service's decision and accompanying NEPA analyses based on Plaintiffs' explicit request to do so, *see* ECF No. 24-1 at 44-45, and Defendants' failure to respond to that request, *see* ECF No. 27 at 42, *see also Nat'l Wildlife Fed'n v. Lohr*, No. 19-cv-2416, 2024 WL 4443687, at *3 (D.D.C. Oct. 8, 2024) (explaining that where "Plaintiff explicitly requested vacatur, and Defendants chose not to respond to that request," the government may not later "challenge the remedy that it should have responded to earlier on"), Plaintiffs would not object to post-merits briefing on remedies in the event the Court determines that additional briefing would be beneficial to the Court in crafting a remedy for this matter.

## ARGUMENT

### I.    Defendants Cannot Unilaterally Alter the Scope of Plaintiffs' Case

Before turning to the merits of Plaintiffs' claims, Defendants' Response makes it necessary to set the record straight about the appropriate scope of review here. Defendants would have the Court believe the only issue to be decided in this case is "whether the [] Service complied with NEPA in its analysis of the Project's effects on Lake Monroe." ECF No. 27 at 14. Indeed, they repeatedly suggest that the Court already decided the EIS question during prior litigation. *See id.* at 7 ("[T]he Court did not order the Forest Service to complete an EIS."); *see also id.* at 16 (arguing that only injuries redressable "by a remand to the [] Service for further

analysis of the Project's effects on Lake Monroe"); AR0015647 (incorrectly interpreting the Court's decision in *Monroe I* as upholding "Service's decision to prepare an EA for this project").

Defendants' characterization is at best misleading, and at worst, disingenuous. True, Plaintiffs challenged the Service's failure to prepare an EIS in *Monroe County Board of Commissioners v. U.S. Forest Service* ("*Monroe I*"), 595 F. Supp. 3d 713, 722 (S.D. Ind. 2022) (Pratt, C.J.). However, "[h]aving found that Defendants violated NEPA by failing to fully evaluate the environmental effects to Lake Monroe," the Court never resolved the separate question of whether an EIS is required. *Id.* at 724. Instead, the Court expressly deferred resolving *that* issue (i.e., whether the combination of Project impacts is "significant" and thus warrants an EIS), explaining that "Defendants' EA . . . failed to adequately consider or discuss the legitimate concerns the Houston South Project could have on Lake Monroe." *Id.* at 723. In turn, the Court expressed concern that the Service could not provide a "convincing statement of reasons that explained why the impact to Lake Monroe would not be significant," in conjunction with other Project impacts, thus likely "render[ing] its finding of no significant impact unreasonable" due to the "agency's failure to address certain critical factors [i.e., the Project's impact to Lake Monroe] that are essential to the decision to prepare an [EIS]." *Id.* at 723-24. Hence, the Court left the EIS question open for future litigation once the Service revisited the Project's impacts to Lake Monroe—i.e., the posture in which the parties now find themselves.

The Court's decision to reserve judgment on the EIS issue is unsurprising as it merely follows "[t]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more . . . ." *Metro. Wash. Chapter, Associated Builders & Contractors v. District of Columbia*, 62 F.4th 567, 576 (D.C. Cir. 2023) (quoting *PDK Labs., Inc. v. U.S. Drug*

*Enf't Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)). Under NEPA and the Service's implementing regulations, the significance determination, i.e., whether to prepare a FONSI rather than an EIS, is the product of the agency examining a combination of factors, including whether the Project is "highly controversial" and the "degree to which the proposed action affects public health or safety," among others. 40 C.F.R. § 1508.27; *see also* 36 C.F.R. § 220.7 (Service regulations); *Kettle Range Conserv. Grp. v. U.S. Forest Serv.*, No. 2:21-cv-00161, 2023 WL 4112930 at *11 (E.D. Wash. June 21, 2023) ("Courts have found that the presence of any one of these factors, or a combination of multiple factors, may warrant a significant impact to the environment, necessitating an EIS." (citing *Ctr. for Biological Diversity v. Nat'l Hwy. Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008)). For example, the FONSI at issue in this case does not purport to limit it analysis to Lake Monroe or just one resource concern, indicating the agency's own recognition that its determination to prepare an EIS or a FONSI in this instance must account for all relevant Project impacts and considerations. *See* AR0012528-30 (citing, in the Project FONSI, the various "significance" criteria in relation to resources beyond Lake Monroe like endangered species, etc.).

In sum, because the Service originally overlooked an important aspect of the NEPA analysis—i.e., potential Project effects on Lake Monroe and the drinking water for over 145,000 individuals—it lacked the information necessary to make a non-arbitrary determination about the significance of the Project. The Court said as much in *Monroe I* when it explained that "an agency's failure to address certain critical factors that are essential to the decision to prepare an [EIS] or not can render its [FONSI] unreasonable." (citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982))). Given the lack of important information bearing on the "significance" question at that time, the Court correctly chose to remand the

decision for further analysis, making it "not necessary to decide" the EIS issue at that time since the agency might have reached a different conclusion on remand. *Metro. Wash. Chapter*, 62 F.4th at 576; *see also Nat. Parks Conserv. Ass'n v. Semonite* ("*NPCA*"), 916 F.3d 1075, 1088 (D.C. Cir. 2019) (deferring consideration of "the remaining questions raised by the Conservation Groups" under NEPA because the "agency was 'already committed to agency revision'" on remand (quoting *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1008 (D.C. Cir. 1997))).

This is confirmed by the Court's more recent order in *Monroe County Board of Commissioners v. U.S. Forest Service* ("*Monroe II*"), where the Court rejected the Service's attempt at avoiding the "significance" determination by relying on a non-NEPA document, "rather than an EA *or EIS* as required under the NEPA and its implementing regulations." *Monroe II*, 4:23-cv-00012, 2023 WL 2683125 at *5-6 (S.D. Ind. Mar. 29, 2023) (Pratt, C.J.) (emphasis added). It would make little sense for the Court to have discussed the requisite supplemental analysis required in terms of an "EA *or EIS*" if it had already shut the door on the latter being potentially required for this Project if the combination of Project effects are significant and thus warrant preparation of an EIS. *See id.* (emphasis added).

In short, the propriety of the Service's FONSI, which embodies the agency's important decision to forgo an EIS, remains very much at issue in this case. To the extent Defendants contend otherwise, that argument must be rejected as inconsistent with this Court's prior orders, NEPA, and its implementing regulations that all help frame the significance determination that the Service must make before proceeding with this immense Project.

## II.    **Plaintiffs Easily Satisfy the Article III Standing Requirements**

Building on their flawed understanding of the case and in a further effort to prevent the Court from reaching the merits of Plaintiffs' claims, Defendants suddenly allege that Plaintiffs— a coalition of Indiana-based conservation organizations comprising individuals who regularly

utilize areas of the Hoosier National Forest ("the Forest") that will be permanently destroyed or impaired by the Project—lack Article III standing to challenge the decades-long destruction and impairment of the Forest areas they routinely use and enjoy. *See* ECF No. 27 at 15-17. Defendants' position is especially surprising because the Service has never previously raised any concerns about Plaintiffs' standing in either of the prior cases concerning this same Project. *See Monroe I*, 595 F. Supp. 3d 713; *Monroe II*, 2023 WL 2683125 (S.D. Ind. Mar. 29, 2023).[1]

Nevertheless, Defendants now feel that the declarations offered in support of Plaintiffs' Motion for Summary Judgment ("Motion"), ECF No. 24—which largely mirror declarations offered in prior litigation and also submitted to the Service in public comments on the Project— do not satisfy two of the three elements for Article III standing. *See* ECF No. 27 at 16. Without actually addressing the specifics of Plaintiffs' declarations, Defendants assert that the detailed declaration of Dr. Sherry Mitchell-Bruker (submitted on behalf of Plaintiff Friends of Lake Monroe), ECF No. 24-2, and the similarly detailed declaration of Mr. Jeff Stant (submitted on behalf of Plaintiff Indiana Forest Alliance), ECF No. 24-3, do not allege injuries sufficient to satisfy Article III. They are wrong for the reasons discussed below.

### A.  Plaintiffs' Declarations Clearly Demonstrate Article III Standing

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The Supreme Court has interpreted this provision to mean that any party seeking to challenge a federal action must show: (1) "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural

---

[1] Having assured itself of jurisdiction over both prior cases, the Court did not question Plaintiffs' standing in either matter, which further reinforces the self-evident and undeniable nature of Plaintiffs' standing here. *See, e.g., FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (citation omitted)).

or hypothetical"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Importantly, "the standing question" requires the Court to "assume that on the merits the plaintiffs would be successful in their claims." *Sierra Club v. EPA*, 774 F.3d 383, 389 (7th Cir. 2014) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003)); *see also Xirum v. U.S. Immigr. & Customs Enf't*, No. 1:22-cv-00801, 2023 WL 2683112 at *8 (S.D. Ind. Mar. 29, 2023) (Pratt, C.J.) (same). The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" such that the Court need "not determine whether the other plaintiffs have standing." *Rumsfeld v. Forum for Acad. & Inst. Rights*, 547 U.S. 47, 52 n.2 (2006); *see also Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (same).

### 1.    *Declaration of Mr. Jeff Stant (Indiana Forest Alliance)*

Defendants do not dispute that Mr. Stant's declaration satisfies the first and second elements of the standing inquiry. *See* ECF No. 27 at 16 (acknowledging alleged injuries to Mr. Stant's recreational interests). Nor could they do so credibly. As Mr. Stant's declaration makes clear, he and other members of his organization routinely visit areas of the Forest that will be permanently destroyed by the Project to pursue recreational and scientific interests. ECF No. 24-3 ¶¶ 23, 24, 30. The injuries alleged by Mr. Stant are the archetypal environmental injury in cases like this one, and routinely deemed by reviewing courts to be sufficient to satisfy Article III. *See, e.g.*, *Friends of the Earth*, 528 U.S. at 183.

The *only* issue Defendants raise with respect to Mr. Stant's injuries concerns their redressability by this Court. While acknowledging the injuries to Mr. Stant's recreational interests, Defendants argue that those injuries are insufficient to satisfy Article III because they "would not be redressed by a remand to the [] Service for further analysis of the Project's effects

on Lake Monroe." ECF No. 27 at 16. In other words, Defendants' view of redressability rests on

the flawed assumption that the only issue under review is the Service's examination of impacts

to Lake Monroe (rather than the Hoosier National Forest or resources located there), and that the

only remedy available to the Court is remand "for further analysis of the Project's effects on

Lake Monroe." *Id.* at 16.

They are wrong on both counts. As explained above, not only have Plaintiffs challenged

the Service's impact analysis with respect to Lake Monroe, they have also challenged the

Service's FONSI, which embodies the agency's bottom-line finding that the "Project would not

have significant effects on the environment" and does not require an EIS. *See* ECF No. 24-1 at iii

(Plaintiffs' Local Rule 7-1(E) Statement of Issues); *see also supra* at 3-6 (dispelling Defendants'

myopic view of the scope of litigation). The FONSI purports to consider Project effects beyond

just those on Lake Monroe. *See, e.g.*, AR0012528-30 (concluding in the FONSI that the Project

"would not have any significant effects on unique characteristics of the geographic area,"

cultural resources, wildlife, and other resources not related to Lake Monroe). Given the Court's

prior choice to reserve judgment on the FONSI/EIS question, Defendants' cramped view of this

litigation and the elements of standing necessary to pursue it would completely immunize those

elements of the FONSI (i.e., Project effects unrelated to Lake Monroe) from judicial scrutiny.

Such an outcome runs directly contrary to the APA's presumption of reviewability. *Dep't of*

*Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-17 (2020) ("The APA establishes a

'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'"

(quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (alteration in original)).

For purposes of the standing inquiry, moreover, the Court must assume that Plaintiffs will

be successful in challenging the Service's significance determination and its failure to prepare an

EIS. *See, e.g.*, *Sierra Club*, 774 F.3d 389. That is, the Court must presume that Defendants failed to make a convincing case for their decision to forgo an EIS because they either overlooked or downplayed certain Project effects or failed to explain why those impacts do not implicate any of the intensity factors that define the significance threshold. *Id.* In such circumstances, the APA empowers the Court to vacate the Service's DN/FONSI and remand with instructions to the Service to prepare an EIS, a remedy that would at least partially cure the injuries to Mr. Stant. *See*, *e.g.*, *NPCA*, 916 F.3d at 1089 (D.C. Cir. 2019) (vacating permit "and direct[ing] the [agency] to prepare an [EIS]"); *see also* ECF No. 24-3 (Stant Decl.) ¶ 30 (explaining that further consideration of the environmental "consequences of the Project . . . may well force the agency to choose a different course of action that allows [Mr. Stant] and others to continue to study, document, and enjoy the iconic wildlife and ecosystems that exist in the Project area").

For all these reasons, Mr. Stant's declaration clearly establishes standing. If necessary, that declaration alone is sufficient to confer jurisdiction on all other plaintiffs under Article III's cases-and-controversies requirement. *E.g.*, *Rumsfeld*, 547 U.S. at 52 (explaining that standing for one plaintiff is sufficient to confer standing on the remaining plaintiffs).

### 2. *Declaration of Dr. Sherry Mitchell-Bruker (Friends of Lake Monroe)*

To the extent the Court finds it necessary to expand its standing inquiry, it will find that Dr. Mitchell-Bruker's declaration also easily satisfies the elements of Article III. *See* ECF No. 24-2. Like Mr. Stant's, Dr. Mitchell-Bruker's declaration clearly describes and attests to injuries to Dr. Mitchell-Bruker's longstanding interests in Lake Monroe that are typical in these types of environmental challenges. For example, her declaration establishes that she frequently visits Lake Monroe (at least once per month) to pursue recreational interests like kayaking, and that her enjoyment of those recreational pursuits would be impaired by sediment- and/or nutrient-loading

caused by the Project because it would likely make Lake Monroe's water quality too dangerous for her enjoyment. *Id.* ¶ 8.

Dr. Mitchell-Bruker's declaration also makes out a cognizable scientific interest in Lake Monroe, as the organization she leads and whose behalf she submits her declaration, Friends of Lake Monroe, is responsible for originating and administering the Lake Monroe Watershed Management Plan, which endeavors to identify and minimize potential sources of pollution like that generated by the Project. *See* ECF No. 24-2 ¶ 19 (alleging that "Project activities threaten to irreparably harm my and other [Friends of Lake Monroe's] members' interest in improving the water quality of Lake Monroe by introducing nutrient-laden sediment that will likely remain on the lakebed for decades, contributing to algal blooms which further degrade Lake Monroe's water quality").

Defendants claim that Dr. Mitchell-Bruker's well-pled injuries are too general to support Article III standing. ECF No. 27 at 16. Not so. Unlike the case upon which they rely, Dr. Mitchell-Bruker has not asserted a generic interest in the protection of the environment, *cf.* Summers, 555 U.S. at 494, but instead she claims a specific interest in protecting her recreational and scientific interests in this particular waterbody; for purposes of Article III, that is all that is required. *See id.* ("[I]f that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." (citing *Sierra Club v. Morton*, 405 U.S. 727, 734-36 (1972)).

For these reasons, and those discussed in the declarations, Plaintiffs have amply satisfied their burden to establish standing under Article III to challenge the Service's decision that will result in long-term, adverse effects to various areas and resources of the Forest and Lake Monroe that are routinely used and enjoyed by Mr. Stant, Dr. Mitchell-Bruker, and many other members of Indiana Forest Alliance and Friends of Lake Monroe.

### B. Although Unnecessary, Supplementing Plaintiffs' Declarations Leaves No Doubt About Their Standing to Pursue This Litigation

Although Plaintiffs maintain that they have plainly satisfied the requirements of Article III standing for the reasons above, out of an abundance of caution, they provide the attached supplemental declarations to remove any potential roadblocks to the Court reaching the merits of this case, as the Court has done twice before. Not only do courts permit supplementation in these circumstances, binding and persuasive precedent arguably requires Plaintiffs to supplement its declarations in response to Defendants' standing arguments raised for the first time in their Response. *See U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012) (considering declaration "attached to [Petitioner's] reply brief" to "determin[e] whether [it] has standing"); *see also Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) ("We strongly suggest that in future cases parties litigating in this Court under circumstances similar to those here," i.e., where the record lacks "specificity for purposes of determining [] standing," "take pains to supplement the record in any manner necessary to enable us to address with as much precision as possible any question of standing that may be raised.").

Accordingly, in light of Plaintiffs' extensive declarations accompanying their Motion, *see* ECF Nos. 24-2, 24-3, and their supplemental declarations further articulating their satisfaction of the requisite elements of Article III standing, *see* Exs. C, D, there is no question that this Court, as in the prior two cases, has jurisdiction to resolve the merits of Plaintiffs' NEPA claims.

### III. Defendants Have No Persuasive Excuse for Their Continued Refusal to Examine Project Impacts on Lake Monroe

Throughout the Project planning process and across each phase of this litigation, Plaintiffs have consistently explained the reasons that the Service should have but failed to evaluate the Project's plainly foreseeable impacts on Lake Monroe. ECF No. 24-1 at 25-33; *see also infra* at 13 (collecting record citations of same). Not only is that waterbody an important

driver of recreational opportunities for Monroe County residents, AR0011571, more importantly, it also serves as the largest source of drinking water for over 145,000 Indiana residents. AR0010814 (outlining why "[i]t is difficult to overstate the paramount importance of Lake Monroe to Indiana's residents, and especially the residents of Monroe County"). What's more, Lake Monroe already suffers from severely degraded baseline conditions such that the addition of even small amounts of sediment and pollutants can (and almost certainly will) trigger events like algal blooms that significantly impair Lake Monroe and its water quality even further. AR0011569 (explaining why small amounts of sediment entering Lake Monroe today will be "contributing to algal blooms for decades into the future").

Given these real-world risks to their environmental, public health, and safety interests, Plaintiffs have repeatedly urged the Service to examine and disclose to the public the Project's likely effects on Lake Monroe. In doing so, Plaintiffs (as well as other members of the public) have consistently encouraged the Service to eschew Pollyannish speculation about the efficacy of its BMPs and instead grapple with the fact that this particular branch of the Service has been unable to either implement its BMPs effectively, or to consistently document any such implementation. AR0000416; AR0002077; AR0011518; AR0010816; AR0010866; AR0001553-34; AR0001550. As a result, serious questions remain about the actual breadth and severity of the Project's impacts. ECF No. 24-1; AR0001547.

Despite the risks to Lake Monroe and its many users and consumers, and notwithstanding explicit direction from the Court to rigorously study the Lake Monroe issue, the NEPA documents under review here carry on Defendants' tradition of ducking Plaintiffs' pointed criticisms of the Hoosier National Forest's demonstrated inability to implement and/or document the effectiveness of its BMPs during prior forest management actions that were much smaller,

and posed far less significant effects to various Forest and water resources, than the Project currently before the Court. ECF No. 24-1 at 25-33; *see also* AR0011517-20 (explaining the same in comments to the Service). Rather than candidly confront that criticism, however, the Service essentially took the position that it need not answer to the public about its prior track record, and that the public should instead simply take it on faith that BMP implementation, monitoring, and documentation will be different for this Project than previous go-rounds—despite the substantially larger size of the Project and the enormous scope of effects that will result from it. ECF No. 24-1 at 21-23; AR0011516-24.

Defendants' litigation position mirrors its pre-decisional "just trust us" approach. *See* ECF No. 27 at 29-30 (alleging without support or citation that the Service has "demonstrated [the] effectiveness" of its BMP implementation). However, basic principles of administrative law and prevailing NEPA precedent hold that those kinds of self-serving statements are a legally insufficient substitute for the reasoned decisionmaking required of all federal agencies. The whole purpose of NEPA and the "hard look" doctrine is to assure the public that the agency has indeed considered the "reasonably foreseeable environmental effects of the proposed agency action"—"*to the fullest extent possible*." 42 U.S.C. § 4332(C) (emphasis added). At minimum, satisfying that standard requires the agency to demonstrate, based on reasoned decisionmaking, that it has "weigh[ed] the pros *and cons*" of the Project. *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 670 (7th Cir. 1997) (emphasis added). Here, "reasoned decisionmaking" must at minimum encompass objectively confronting evidence that directly undermines the agency's overconfidence in its ability to comply (or demonstrate compliance) with the very BMPs the Service invokes here to excuse itself of having to conduct any further analysis of the Project's impact on Lake Monroe. ECF No. 24-1 at 30; *see also Nat'l Audubon Soc'y v. Dep't of Navy*,

422 F.3d 174, 194 (4th Cir. 2005) ("An agency's hard look should include neither researching in a cursory manner nor sweeping negative evidence under the rug.").

In an effort to distort what the Service actually accomplished on remand, Defendants' Response makes a number of misleading and/or false assertions which necessitate correction. The first is their assertion that the Project's effects fall within the ambit of the EIS prepared in 2006 to support the Hoosier National Forest Land and Resource Management Plan (the "Forest Plan"). ECF No. 27 at 19. Not only is that nearly 20-year-old document stale and thus a deficient basis for any alleged "tiering," *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1049-53 (9th Cir. 2013), it fails to respond whatsoever to the issues raised by Plaintiffs during the NEPA process: That is, *since* the Forest Plan's promulgation, this particular Forest has been unable to consistently document and substantiate the assumed efficacy of its BMPs to reduce (let alone eliminate) erosion and sedimentation, and it is now setting this Project up to follow suit because the Service has neither disclosed "the baseline metrics by which future water samples will be measured" nor "positioned its few monitoring stations so as to [detect] any sedimentation caused by the Project." ECF No. 24-1 at 29, 28 (citing AR0011523-24); *see also* AR0001550 ("Claims of no significant impact to municipal water supply tiered to the 2006 Forest Plan EIS which [also] relies on BMPs to fully mitigate, [and] did not address comments related to past history of BMP implementation.").

In any case, both the original Project EA and subsequent SIR also tiered to the Forest Plan EIS's purported analysis. AR0003416 (original EA); AR0008945 (SIR). However, for both documents, tiering proved legally and practically insufficient to rescue those documents from invalidation in either *Monroe I* or *Monroe II* because neither addressed Plaintiffs' "*present* concerns regarding Lake Monroe's water or how the [Project] may exacerbate these problems"

if, as reasonably predicted, the Service fails to successfully implement its BMPs and/or detect any downstream impact due to faulty monitoring. *Monroe I*, 595 F. Supp. 3d at 724 (emphasis added). Defendants have not offered any reason for a different outcome in this case.

Second, Defendants are clearly wrong to claim that there is "no evidence in the Record" of foreseeable Project "impacts to Lake Monroe." ECF No. 27 at 26. In fact, elsewhere in Defendants' Response, they concede the Project will have at least *some* impact on the Lake's water quality. *See id.* at 28 (agreeing the record "clearly states . . . this project would have minimal to no effects on water quality" (emphasis in ECF No. 27) (quoting AR0012491)); *see also* AR0011583. Elsewhere in that very same document, however, Defendants justified their decision not to conduct a "cumulative effect" analysis for the Project on the theory that "[a]ny direct or indirect impacts of the [Project] would be mitigated[.]" AR0012332; *see also* AR0003566. Both cannot be true. *See, e.g., Islander E. Pipeline Co. v. Conn. Dep't of Envt. Prot.*, 482 F.3d 79, 100 (2d Cir. 2006) (Under the APA, "it is the agency's task to conduct a thorough examination of the record, to explain why it has rejected or ignored contradictory evidence, and to come to a decision supported by substantial evidence in the record.").

The Service has no doubt undervalued the magnitude of the inevitable impact of the Project by blindly relying on the efficacy of its BMPs. Even if those BMPs were implemented correctly, the record shows that "receiving streams in forested areas (with topography nearly identical to the Project area) logged with and without BMPs both eventually showed statistically significant increases in nutrient loading." ECF No. 24-1 at 31 (emphases added) (citing AR0011431). Defendants strive to distinguish this record evidence by a literal matter of degrees, arguing that findings offered by Plaintiffs are "not comparable" due to a ~5-degree difference in the average grade between the Project and study areas. ECF No. 27 at 26. They offer nothing—

no studies, data, or evidence of any kind (besides pure conjecture)—to rebut Plaintiffs' evidence,

nor any explanation (let alone a reasoned one) as to why such a modest difference in the relative

angle of the terrain between the Project and study areas, both of which contain steep slopes,

completely nullifies the findings' applicability to the Project. *Cf. Ind. Forest All.*, *Inc. v. U.S.*

*Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003) (Where "there is a substantial dispute about the

size, nature or effect of an action in the relevant community," NEPA "places the burden on the

agency to come forward with a 'well-reasoned explanation' demonstrating why opinions

disputing an EA's conclusions 'do not suffice to create a public controversy based on potential

environmental consequences.'" (quoting *LaFlamme v. FERC*, 852 F.2d 389, 401 (9th Cir.1988));

*see also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) (explaining that "a

'mere listing' of good management practices" cannot validate a claim of minimal effects

"[w]ithout analytical data to support the proposed mitigation measures").

Third, Defendants are wrong to suggest that they have a successful track record when it

comes to demonstrating the efficacy of these same BMPs in this Forest. ECF No. 27 at 22

(claiming "BMP effectiveness of every project *monitored* in the Hoosier National Forest 2020

and 2021 Biennial Monitoring Report was 'excellent'" (emphasis added)). The record is clear:

this National Forest has demonstrated a chronic inability to properly monitor any such alleged

implementation of BMPs. AR0000416 (voicing concerns, in 2018, that "Hoosier National Forest

has not demonstrated competence" in areas of BMP monitoring and providing annual reports to

the public"); AR0011518; AR0010816 (listing examples of failed BMP implementation by "this

national forest"); AR0001553-34 (citing numerous instances of "Inadequate Performance" by

this Forest in implementing and/or monitoring BMPs); AR0001550. This means the list of

projects actually "*monitored* in the Hoosier National Forest 2020 and 2021 Biennial Monitoring

Report," ECF No. 27 at 22 (emphasis added), is quite small. Even for those though, the record shows there were no "written" "operations [or] maintenance plan[s]," meaning the Service's "excellent" rating is a self-awarded designation based on the staff's impression of its own compliance. AR0011906. If anything, what that Biennial Monitoring Report *really* shows is "that for much smaller actions than the Project, the Hoosier National Forest is in many instances achieving no to marginal implementation of BMPs." AR0011518. That also shows why it is disingenuous for Defendants to suggest this Forest is contributing to the alleged nationwide BMP efficacy rate of 96.4% on federal lands, ECF No. 27 at 22; if anything, sadly, this Forest is likely contributing to the remaining 3.6% on the other side of that statistic, ECF No. 24-1 at 30 n.6

Fourth, Defendants' promise to "investigate and take corrective action" if/when "turbidity monitoring shows an increase," ECF No. 27 at 29, does nothing to *prevent* all Project impacts on the Lake Monroe watershed given the inherent limitations of a retroactive response to changes in turbidity by the Service. ECF No. 24-1 at 28; AR0011523. In any case, their generic promise to keep an eye on things rings hollow given the Service's unwillingness to clarify the baseline or background turbidity levels by which any such increase will be measured, and their decision to position only "four water quality monitoring sites" across the massive Project area, and in places where they will be unable "to monitor the runoff from [the] prescribed burns to be carried out on more than two thousand acres of [the Forest] in the northwest corner of the Project area." AR0011524 (spotlighting the vague aspects of the Service's "corrective action" standard which confer an inordinate amount of discretion on the agency to avoid any further examination of Project effects on the watershed during its decades-long implementation).

In the end, the Service has now thrice disregarded overwhelming evidence of the plainly foreseeable impacts to Lake Monroe that will result from this Project's wide-scale logging and

burning on steep slopes (that drain into the Lake) for the next decade and beyond, and thereby refused to examine or disclose the Project's effects on the Lake as required by NEPA and its implementing regulations. The Service has once again hidden behind the unsupported efficacy of the agency's ineffectual BMPs, despite extensive record evidence demonstrating that those measures have not been implemented consistently or effectively by the Hoosier National Forest, and in any event cannot completely avoid sedimentation and other adverse effects to Lake Monroe even if they could be effectively and consistently implemented. The agency's conclusions to contrary—i.e., that this time the agency will succeed in its implementation of its BMPs for this large-scale Project and that these BMPs can entirely avoid *any* nutrient-laden sediment from reaching Lake Monroe where all water drains—is arbitrary and capricious.

## IV.    **Defendants Fail to Make a Convincing Case for Their FONSI**

Plaintiffs' opening brief and prior comments on the Project outline the many compelling reasons, individually and collectively, for finding that the Service acted arbitrarily in concluding that the decades-long, landscape-scale Project is not "significant" under NEPA and the Service's implementing regulations such that an EIS is not required to evaluate and disclose to the public the full scope of Project impacts. *See* ECF No. 24-1 at 33-44. In response, Defendants try to completely immunize the Service's FONSI—which baldly discounts each of the significance criteria without any explanation of the agency's reasoning, *see* AR0012528-30—by claiming that such documents may be overturned only upon a showing that the agency entirely overlooked a particular significance factor. *See* ECF No. 27 at 31-33. In other words, Defendants take the position that an agency's decision to prepare a FONSI rather than an EIS will pass muster under NEPA and the APA so long as the agency simply claims to have considered each significance factor, even if the agency has not provided any coherent explanation for its conclusion. *See id.*

Defendants' position goes too far, of course. The duty to comply with NEPA ultimately rests with the agency. *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985). But in discharging that duty, the Service is bound by the normal strictures of the APA, which "require[] agencies to engage in 'reasoned decisionmaking,' . . ., and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious'" on the basis of rationales provided by the agency when it acted. *Regents of the Univ. of Cal.*, 591 U.S. at 16 (citations omitted). For this reason, the D.C. Circuit has persuasively explained that the relevant inquiry for a reviewing court in this circumstance is "whether the [agency] is 'able to make a convincing case for its finding' of no significant impact" based on the significance criteria outlined at 40 C.F.R. § 1508.27. *NPCA*, 916 F.3d at 1082 (citation omitted); *see also Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("[S]tating that a factor was considered . . . is not a substitute for considering it."). "Implicating any one of the factors may be sufficient to require development of an EIS. *Id.* (citing *Grand Canyon Trust v. FAA*, 290 F.3d 339, 347 (D.C. Cir. 2002)).

### A.   Defendants Cannot Escape the Immense Scale of the Project and the Devastating Effects to Myriad Resources in the Project Area with Post Hoc Rationales Meant to Undervalue Its Scope

Comparing this Project to similar forest management projects in the Hoosier National Forest specifically, and other forests nationally, Plaintiffs' opening brief points out that the Service's decision to eschew an EIS in favor of an EA for an undertaking of this magnitude sticks out like a sore thumb. *See* ECF No. 24-1 at 34-36; AR0011541 (raising same issue in Plaintiffs' comments). Indeed, the decision to prepare an EA and FONSI rather than an EIS is particularly notable for this Project because it is indisputably "the largest and most expensive logging project *ever* undertaken in the Hoosier National Forest," ECF No. 24-1 at 35, and because the Service, including this specific Forest, has deemed it necessary to prepare EISs for projects that are much smaller in scope and effect than this one, *id.* at 35-36 (collecting cases and

20

highlighting the German Ridge Restoration Project in this Forest, which affected *less than 20% of the acreage* proposed to be treated by the Project). And, among the many highly significant effects to unique resources located in and near the Project area, *this* Project has an exceptionally unique feature usually not present near logging or burning projects in national forests—the sole drinking water supply for 145,000 people hanging in the balance. If anything, this Forest's, and the Service's broader, practice in complying with NEPA strongly suggests that this Project of unprecedented size and scope in the Forest warrants an EIS, just as the Forest (and the Service, nationally) has consistently determined for much smaller, less impactful projects. AR0011453 (collecting examples); *see also Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 553 (W.D. Penn. 1997) (invalidating EA and FONSI for a 5,000-acre logging project "based on the number of 'intensity' factors implicated by the [logging project], as well as the magnitude of the project").

Defendants claim to have considered the relative size and scope of the Project in the appropriate context, but they fail to offer any record evidence of that consideration, and argue that the size of a given project, standing alone, is not "determinative of significance." *See* ECF No. 27 at 34. There are at least two things wrong with Defendants' arguments. First, despite Defendants' suggestion that the Service did in fact consider the immense scale of the Project relative to prior forest management actions for which it prepared an EIS, Defendants have not offered any evidence of such consideration in the record. ECF No. 27 at 33-35. In fact, the FONSI makes no mention of the Project's relative enormity at all—let alone explains how its size and considerably more impactful scope of effects compares to the German Ridge Project or other EIS-based projects that Plaintiffs highlighted in their NEPA comments. *See* AR0012528 (claiming in the FONSI that the "Project is limited in context"). To the extent Defendants now try to fill in that analytical gap during litigation, their new justifications are nothing more than

impermissible post hoc reasoning upon which the Court may not rely. *E.g., Regents of the Univ. of Cal.*, 591 U.S. at 23-24 ("An agency must defend its actions based on the reasons it gave when it acted," and may not "rely upon reasons absent from its original decision.").

Second, by narrowly focusing on whether a given project's size can be dispositive of significance, Defendants miss the forest for the trees. Plaintiffs do not dispute that a project's size is not necessarily determinative of significance; size, however, can serve as a highly relevant indicator of potential significance. *See Greater Hells Canyon Council v. Wilkes*, No. 2:22-cv-00859, 2023 WL 6443823 at *10 (D. Or. Aug. 31, 2023) ("Because context provides the backdrop for the significance analysis, there is no categorical rule that large federal projects are always significant, but on average large projects are more likely to be significant." (citing *Tomac v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006)). As the magnitude of a given project increases, the easier it becomes for that project to cross the significance threshold (thereby compelling an EIS) based on the presence of "less intense" impacts. *Id.* at *10 ("In other words, the larger the scope and setting of a project, and the greater the context, the less intense the project must be to be significant."); *see also* ECF No. 24-1 at 36 ("[I]n this locale, this Project is without precedent in terms of magnitude, scope, and cost." (citing AR0015698)).

The magnitude of a given project also merits special consideration when the Service treats that project different from comparable actions; to the extent the Service reaches different conclusions about similarly situated projects, it must thoroughly explain its decision to change course from one project to the next to survive the APA's prohibition against arbitrary agency action. *See Transactive Corp. v. U.S.*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

*v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (citations omitted)). None of the Service's NEPA documents for this Project nor anything in Defendants' Response provides any rationale for the Service's conspicuously divergent treatment of similar types of forest restoration projects undertaken within this same National Forest; for example, the Service prepared *two different* EISs to evaluate the impacts of the German Ridge Restoration Project, which affected a mere 2,602 Forest acres (compared to the Project's recurring impact to 13,500 Forest acres, AR0012368-72. ECF No. 24-1 at 35-36; AR0011453.

Defendants' failure to provide a rational explanation in response to Plaintiffs' comments pointing out these major discrepancies in treatment of similar actions is a classic example of the arbitrary decisionmaking prohibited by the APA. *See, e.g., Burlington N. Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld."); *see also Kettle Range*, 2023 WL 4112930 at *6 ("Agencies are required to respond to *all responsible opposing views* at appropriate points in the draft and final EIS, and they must respond explicitly and directly to conflicting views." (first citing 40 C.F.R. § 1502.9; then citing *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1172-73 (9th Cir. 2006)).

### B.    The Project is a Textbook Example of a "Highly Controversial" Federal Action That Requires an EIS Under NEPA

Plaintiffs' opening brief also persuasively details why this Project squarely satisfies the definition of a "highly controversial" federal action under NEPA's implementing regulations. 40 C.F.R. 1508.27(b)(4); *see also* ECF No. 24-1 at 37-39. The controversy test, Plaintiffs explained, focuses not on mere disagreement with a proposed action, but instead asks whether subject-matter experts have identified a "substantial dispute . . . as to the size, nature, or *effect*" of that

action. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1042-43 (D.C. Cir. 2021); *see also NPCA*, 916 F.3d at 1085 (finding a "substantial dispute" where there has been "repeated criticism from . . . consultants and organizations with on-point expertise"). Where such disagreement exists, an agency may avoid preparing an EIS only if it coherently resolves that disagreement through reasoned explanation that renders the criticism irrelevant. *Standing Rock*, 985 F.3d 1043 ("[A]n EIS is perhaps especially warranted where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain.").

The controversy test fits these facts like a glove, as Plaintiffs' opening brief explains. Just like the EA and FONSI at issue in *NPCA*, this Project's NEPA documents over the last six years have been met with repeated and detailed criticism from the Plaintiff organizations, which are "highly specialized" "organizations with on-point expertise" that "serve as stewards of the exact resources at issue." *NPCA*, 916 F.3d at 108-86. For example, among those experts who voiced concern about the Forest's inability to validate its overly optimistic reliance on BMPs is Dr. Mitchell-Bruker (on behalf of Plaintiff Friends of Lake Monroe), who is both a former Service official with on-point hydrological experience in monitoring and documenting the efficacy of the very same BMPs employed here by the Service, as well as "an author and originator of the Lake Monroe Watershed Management Plan." ECF No. 24-1 at 38. Defendants do not dispute her unparalleled credibility or expertise on Lake Monroe watershed issues, or confront her detailed criticisms in any meaningful way; instead, the Service simply ignored it, sweeping Dr. Mitchell-Bruker's criticisms under the rug. *Id.*; *see also supra* at 16-18 (discussing the Service's deficient (or nonexistent) responses to questions about its dogmatic view of the BMPs' efficacy).

The bottom-line here is Defendants' stubborn failure to resolve—let alone squarely address—Dr. Mitchell-Bruker's detailed, expert criticisms in the record without preparing an EIS

is arbitrary and capricious because it fails to make a "convincing case" (or any case for that

matter) for *why* the Service concluded that the Project is "not highly controversial." AR0012529;

*see also Standing Rock*, 985 F.3d at 1050; *cf. Nat'l Audubon Soc'y,* 422 F.3d 174, 192, 194 (4th

Cir. 2005) (Agency's "cursory review of relevant scientific studies, however further illustrates its

failure to take a hard look at the environmental impacts of an [action]," which "should include

neither researching in a cursory manner nor sweeping negative evidence under the rug.").

    Defendants have no persuasive response. In fact, they do not address the relevant

controversy test whatsoever. *See* ECF No. 27 at 37-38. Instead, they try to downplay the obvious

controversy by pointing out that Dr. Mitchell-Bruker has previously "acknowledged the

'effectiveness' of BMPs" in the abstract. *Id.* at 38. But Dr. Mitchell-Bruker's general observation

that BMPs *can be* effective in *reducing* (but not necessarily eliminating) the transport of nutrient-

laden sediment when fully implemented and properly monitored—especially on slopes that are

not nearly as steep as those at issue in the Project area or are located farther from the receiving

waterbody—has zero bearing on her observation in comments on the Project and the specific

BMPs proposed here that *this* branch of the Service has thus far been unable to demonstrate

effective implementation or monitoring of BMPs identical to those proposed for the Project, let

alone do so with any consistency, or her observation that logging and burning on these steep

slopes (even with BMPs) will result on nutrient-laden sediment reaching Lake Monroe. *See* ECF

No. 24-1 at 38-39 (collecting Record citations to Dr. Mitchell-Bruker's comments criticizing the

Service's overzealous and unfounded reliance on BMPs to delimit the agency's NEPA analysis).

    By focusing on Dr. Mitchell-Bruker's prior endorsement of well-implemented,

effectively executed BMPs in the abstract, Defendants also arbitrarily overlook another

concerning dispute: Given the design flaws evident in *this specific Project*, coupled with "the

sediment- and nutrient-loading potential" of Project implementation, Dr. Mitchell-Bruker, who originated the Lake Monroe Watershed Management Plan and contributed to it as an editor and author, has explained on numerous occasions the reasons she believes *this particular Project* threatens to "seriously undermine the Lake Monroe Watershed Management Plan," a document meant to steward the Lake's overall ecological health. ECF No. 24-1 at 38. Defendants do not even acknowledge this dispute. *See* ECF No. 27 at 37-38. Their failure to do so is telling and indeed dispositive. *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 952 n.5 (S.D. Ind. 2019) (Pratt, J.) ("The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession."); *see also Bonte v. U.S. Bank*, *N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

Contrary to Defendants' suggestion, this case does not ask the Court to choose between experts. Instead, under the relevant test, the Court need only find that there exists a credible dispute over the Project's effect (there is), and that the Service has not convincingly resolved that dispute (it has not). *See* AR0011553-62; AR0011564-70; *see also* Ex. C (Mitchell-Bruker Decl.) ¶ 10. Identifying the existence of an ongoing dispute among subject-matter experts does not require the Court to wade into that controversy. As the D.C. Circuit has explained, the *existence* of a facial dispute simply indicates that there is more work to be done to understand the true nature or magnitude of the Project's impacts such that a more probing examination via an EIS is required to satisfy NEPA. *Standing Rock*, 985 F.3d at 1043 ("Indeed, an EIS is perhaps especially warranted where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain.").

In short, Plaintiffs have identified a substantial, unresolved controversy over the foreseeable effect of the Project based on Record comments from an indisputable subject-matter expert with highly relevant, on-point experience in the very issues under consideration in this NEPA analysis. Defendants' failure to resolve that controversy (or even to squarely address her specific criticisms) leaves the Project in a position where an "EIS is perhaps especially warranted," i.e., "where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain." *Standing Rock*, 985 F.3d at 1043. Defendants' failure to prepare an EIS under these circumstances is arbitrary and capricious. *See id.*

## C. Defendants Have Not Alleviated the Concerns About the Project's Effect on Public Health and Local Environmental Requirements

In their opening brief, Plaintiffs explained that the Project likely implicates two additional significance criteria related to the protection of public health and adherence to local environmental protection measures by running afoul of the Lake Monroe Watershed Management Plan. *See* ECF No. 24-1 at 39; *see also* 40 C.F.R. § 1508.27(b)(10), (b)(2). For residents that visit the Lake, the threat to public health is tangible, as there are often toxic algal blooms caused by eutrophication and upstream nutrient-loading that necessitate swimming bans. If the Service is going to accelerate that eutrophication by implementing the Project and adding yet more nutrient-laden sediment to this already impaired watershed, the public has a right to know what kind of downstream effects await them. Defendants' continuing refusal to quantify and/or disclose that information is arbitrary and capricious, and a violation of NEPA.

Defendants' only response is to suggest that the Seventh Circuit, in *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389 (7th Cir. 2022), immunized from judicial oversight almost all aspects of the agency's significance determination under NEPA. ECF No. 27 at 40. In their view, the procedural nature of NEPA means that an agency's unadorned and unexplained claim to have

considered a particular significance factor is sufficient to withstand judicial scrutiny under the Act. *See* ECF No. 27 at 40 (citing *Protect Our Parks*, 39 F.4th at 398).

But the decision in *Protect Our Parks* cannot bear the weight Defendants assign to it. First, although they insist that *Protect Our Parks* places the "outcome" of the agency's decisions "beyond the scope of NEPA review," ECF No. 27 at 40, Defendants' interpretation of that Seventh Circuit decision would place it at odds with binding Supreme Court authority which holds that "courts should *not* automatically defer to the agency's express reliance on an interest" in the NEPA review "without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the [] information" presented by commenters. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). "A contrary approach"—like the one advanced here by Defendants' cramped reading of *Protect Our Parks*—"would be contrary to the demand that courts ensure [] agency decisions are founded on a *reasoned evaluation* 'of the relevant factors.'" *Id.* (emphasis added) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Put differently, even if the "outcome" of the agency's decision were "beyond the scope of NEPA review," ECF No. 27 at 40, it is not beyond the scope of the APA, which demands that an agency "show its work" to substantiate the outcome of its administrative decisionmaking process, i.e., to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions.").

Regardless, the federal action at issue in *Protect Our Parks* is the construction of the "Obama Presidential Center in historic Jackson Park" on Chicago's South Shore; the Center will occupy a mere "19.3 acres, or about 3.5% of Jackson Park." 39 F.4th at 392-93. Obviously, the disturbance of less than 20 acres adjacent to a well-developed and densely populated urban area is a far cry from the kind of landscape-scale, consumptive actions authorized by the Project in secluded, rugged areas of steep terrain located in Indiana's only National Forest. To put this in context, the project reviewed in *Protect Our Parks* amounts to just 0.01% of the 13,500 acres slated to be burned (multiple times) during Project implementation, without even accounting for the acreage that will be logged or applied with toxic herbicides. Assuming context is key, as explained above, the Project would need far fewer and/or "less intense" impacts to cross the significance threshold as compared to the Obama Center. *See Greater Hells Canyon*, 2023 WL 6443823 at *10 ("[T]he larger the scope and setting of a project, and the greater the context, the less intense the project must be to be significant.").[2]

At bottom, there remain serious questions about what kind of effect the Project will have downstream on public health and how severe those impacts will be. The Service's unwillingness to fill in this information, and its subsequent attempt to hide behind an inflated understanding of its own authority, are both legally indefensible. The Court should set aside the DN/FONSI.

---

[2] Further placing the project in *Protect Our Parks* in proper context compared to this immense Project with serious adverse environmental consequences affecting 1,000 times as many acres, the Obama Center was designed to provide significant benefits to the public and the environment through "a museum, a public library, spaces for educational and cultural events, [and] green space." *Protect Our Parks*, 39 F.4th at 393. Thus, that small project, whose aim was greatly enhancing cultural, historic, and environmental benefits for residents and visitors alike, was hardly "significant" as that term is defined under NEPA

### D.    The Project's Cumulative Impacts Weigh in Favor of an EIS, and Defendants Have No Persuasive Response

The record in this case clearly shows "the Service could have reasonably quantified and studied the Project's cumulative impact on Lake Monroe," but what is less clear is why its "refused to do so based on an arbitrary (and, frankly, overconfident) assessment of [the Service's] ability to completely negate Project effects to Lake Monroe." *See* ECF No. 24-1 at 41-43 (attempting to explain Defendants' position, which hinges entirely on unexplained "Project mitigation (i.e., erosion control measures)" being able to "prevent the Project from contributing even an "individually insignificant" or "incremental impact" to the Lake's future water quality (quoting 40 C.F.R. §§ 1508.7, 1508.27(b)(7)). Of course, Defendants contradict this position by conceding that the Project will have at least *some* impact on the Lake's water quality. *See supra* at 16. "Preventing or adequately mitigating [] potential loss[es]" from piecemeal actions "is the fundamental purpose of NEPA's requirement that agencies analyze cumulative impacts"; however, Defendants' gainsaying to escape measuring the Project's cumulative impacts leaves the Court without an objective "basis in the record to assess whether the [Service] has taken the necessary steps to consider this" factor in the significance analysis required by NEPA. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 873 (9th Cir. 2020). That oversight renders the Service's decision arbitrary and capricious, and supplies yet further indicia of the Project's significance.

Defendants have no explanation for their inconsistent statements within the very same NEPA document. Their only response is to again claim that *Protect Our Parks* shields their very obvious mistake from any judicial oversight because it would interfere with the agency's exercise of "substantial agency expertise." ECF No. 27 at 41 (quoting *Protect Our Parks*, 39 F.4th at 399). But same as before, Defendants seem to mix up substantive and procedural parts of their decision; as pointed out by Plaintiffs, there exists a facial contradiction in the agency's so-

called analysis which requires zero expertise to spot and implicates none of the agency's

purported specialty. ECF No. 24-1 at 41. The *procedural* shortcomings in the Service's

decision—i.e., the agency's failure to follow the Administrative Procedure Act's bedrock

requirement, reasoned decisionmaking—is well within the Court's purview, and it should set

aside the facially contradictory decisions challenged here as arbitrary and capricious.

### E.    Unique Aspects of the Project Area Remain at Risk from Project Implementation

The Project deserves an EIS for still another reason—because it threatens to permanently

impair "[u]nique characteristics of the geographic area," including "ecologically critical areas."

40 C.F.R. § 1508.27(b)(3). As Plaintiffs explained, the areas subject to the Project's sweeping

prescriptions for logging more than 59% of the forest that are a century or more old and burning

across more than *13,500 acres* of the Hoosier National Forest threatens to eliminate "some of the

oldest, most mature forests in the eastern United States," which are regionally unique due to

decades of intensive logging practices that have eradicated similar forest types across the eastern

United States. ECF No. 24-1 at 43-44; *see also Kettle Range*, 2023 WL 4112930 at *9

(invalidating EA and finding project significant because its context "create[d] uncertain risks to

old-growth forests and the wildlife dependent on them").

Just as they did in response to Plaintiffs' arguments concerning public health, Defendants

respond to Plaintiffs' arguments by alleging that "substantive disagreement[s]" with the agency's

FONSI are "beyond the scope of NEPA review." ECF No. 27 at 41. Here, too, Defendants

attempt to shield their decision from any judicial scrutiny by claiming that the Court must blindly

defer to the agency's ultimate conclusion that this factor is not implicated by the Project, even

where record evidence sharply disputes the agency's conclusion. *Id.*; *see also* AR0012529. But

again, this misunderstands how deference operates. Agency decisions are not automatically

entitled to deference in the absence of reasoned decisionmaking, *Marsh*, 490 U.S. at 378; without explanation about *how* the agency reached that conclusion, there is nothing to which the Court can defer. *See Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) ("We cannot defer to a void.").

Accordingly, the fact that the Project area not only drains into the drinking water supply for over 145,000 Hoosiers—which is extremely unique for national forest logging and burning projects for that reason alone—Defendants have also failed to explain why the highly significant effects to some of the last remaining mature and old-growth forests in the eastern United States do not rise to the level of "significance" that at least warrants further study and examination in an EIS. *E.g., Kettle* Range, 2023 WL 4112930 at *12 ("The record indicates the effects on balance are likely to be 'significant'—and at the very least, those effects and risks are unknown, mandating an EIS.").[3]

In sum, individually and certainly in combination, the context and intensity of the effects of this very large and impactful Project squarely establish its "significance" for purposes of NEPA, and thereby warrant preparation of an EIS in the same manner as all comparable Service logging and/or burning projects identified in the record of similar or far less size and effect.

## V.    Plaintiffs Do Not Oppose Remedy Briefing, Provided Defendants Do Not Implement the Project During the Interim

Assuming the Court agrees that Plaintiffs are correct that the Service's NEPA analysis remains deficient under NEPA and the APA, Plaintiffs are presumptively entitled to the APA's default remedy of vacatur of the DN/FONSI and SEA because this case "is not one of the

---

[3] In addition, because of the unique nature of the Project area's mature hardwood forest that rarely exists in this region, the Project will necessarily destroy or impair a large swath of highly suitable, well-preserved habitat for endangered and threatened bat species that live in the Project area—a further indication of the Project's significance. *See* 40 C.F.R. § 1508.27(b)(9).

'limited circumstances' in which equity demands 'remand without vacatur.'" *See* ECF No. 24-1 at 44 (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)); *see also* 5 U.S.C. § 706 (A "reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

In their Response, Defendants "request supplemental briefing on remedy," reasoning that the considerations underlying the remedy analysis are too "difficult to apply in the abstract." ECF No. 27 at 42. Given that federal agencies ordinarily respond to requests for vacatur in cases like this one challenging a discrete agency action under NEPA, *supra* at 3, Plaintiffs do not understand why the Forest Service views it as particularly difficult to weigh in on the proper remedy in this case. Nonetheless, while Plaintiffs find it difficult to imagine how Defendants can demonstrate that anything other than vacatur is appropriate under the circumstances of this case, Plaintiffs would not oppose limited, additional briefing on the question of the appropriate remedy should the Court deem such briefing beneficial to its crafting of the proper remedy in this case, provided that such briefing *does not delay resolution* of this case beyond the Service's proposed Project start in April 2025. This is because Defendants cannot—and must not be allowed—to use the prospect of supplemental remedy briefing (in lieu of advising the Court on remedy in summary judgment briefing, as the government ordinarily does) as a backdoor mechanism for moving forward with unlawful Project implementation in the event the Court determines that the agency has violated NEPA in the ways described above.

## **CONCLUSION**

The Court should grant summary judgment in favor of Plaintiffs for the reasons discussed above and vacate the SEA and DN/FONSI.

Respectfully submitted,

/s/ *Matthew R. Arnold*
Matthew R. Arnold
DC Bar No. 1618616
(843) 718-4513
matt@eubankslegal.com

William S. Eubanks II
DC Bar No. 987036
(970) 703-6060
bill@eubankslegal.com

EUBANKS & ASSOCIATES PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

*Counsel for Plaintiff*