## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MONROE COUNTY BOARD OF COMMISSIONERS, INDIANA FOREST ALLIANCE INC, HOOSIER ENVIRONMENTAL COUNCIL, INC., FRIENDS OF LAKE MONROE, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:24-cv-01560-TWP-KMB |
| UNITED STATES FOREST SERVICE, MICHAEL CHAVEAS Forest Supervisor, Hoosier National Forest, CHRISTOPHER THORNTON District Ranger, Hoosier National Forest, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

This matter is before the Court on Cross-Motions for Summary Judgment filed by Plaintiffs Monroe County Board of Commissioners, Indiana Forest Alliance Inc., Hoosier Environmental Counsel, Inc., and Friends of Lake Monroe (collectively, "Plaintiffs") (<u>Filing No. 24</u>) and Defendants United States Forest Service ("Forest Service"), Michael Chaveas, and Christopher Thornton (collectively, "Defendants") (<u>Filing No. 26</u>). This is the third lawsuit Plaintiffs have brought challenging the Forest Service's Houston South Vegetation Management and Restoration Project. Plaintiffs contend that the Forest Service's decision to proceed with implementing the project without preparing an Environmental Impact Statement was arbitrary and capricious and, as such, violates the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–06. For the following reasons, Plaintiffs' motion is **granted in part** and **denied in part as premature**, and Defendants' cross-motion is **denied**.

# I.    BACKGROUND

These background facts are not intended to provide a comprehensive explanation of all the facts presented in this complex case or the administrative record; rather, it provides the background relevant to the issues before the Court.

## A.    NEPA and the APA

The controlling statute at issue here, NEPA, "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). It is a "procedural" or "'action-forcing'" statute that "does not mandate particular results" but instead requires agencies to study and describe the environmental consequences of their proposed actions. *Id*. at 348–51; *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.

NEPA requires all federal agencies to prepare certain reports if their proposed actions might have a significant effect on the environment. If a proposed action will have a significant effect, the agency must prepare a detailed environmental impact statement ("EIS") reviewing the environmental impacts of the proposed action and alternatives to it. 42 U.S.C. § 4332(2)(C). If it is uncertain whether the proposed action will have a significant effect, then the agency must prepare an environmental assessment ("EA"). An EA is a shorter, rough-cut, low-budget EIS, which is designed to determine whether a Finding of No Significant Impact ("FONSI") should be issued, or a "full-fledged" EIS is needed. *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 856 (7th Cir. 2003). In evaluating whether an EIS is necessary, Council on Environmental Quality

regulations[1] instruct that the term "significantly" in the statute requires consideration of both "context" and "intensity." 40 C.F.R. § 1508.27(a)–(b). Context requires the significance of an action be analyzed from different perspectives, including "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity relates to "the severity of the impact" and requires consideration of ten factors, including but not limited to, "the degree to which the proposed action affects public health and safety," "the degree to which the effects on the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id.* § 1508.27(b)(1)–(5).

The APA provides the standard of review for Plaintiffs' challenge of Defendants' decision. *See Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003). In a suit under the APA, a district court sits as a reviewing court, much like an appellate court. *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 443–44 (7th Cir. 1990). With very rare exception, the court does not take new evidence and considers only matters within the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard of review is narrow and requires that the court "consider 'whether the decision was based on a consideration of the relevant factors and whether there has been clear error in judgment.'" *Ind. Forest All.*, 325 F.3d at 858–59 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). The Court may not substitute its judgment regarding the environmental consequences of an action for that of the agency. *Id.* at 859. However, the Court

---

[1] At all relevant times, the Forest Service's compliance with NEPA was governed by regulations issued by the Council on Environmental Quality, 40 C.F.R. §§ 1500.1–1508.1, *rescinded by* 90 Fed. Reg. 10610 (Feb. 25, 2025), and regulations issued by the Forest Service, 36 C.F.R. §§ 220.1–.7, *rescinded by* 90 Fed. Reg. 29632 (July 3, 2025). For purposes of this Order, the Court will cite to the relevant regulations as they existed at the time.

must ensure "that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

**B.     The Houston South Vegetation Management and Restoration Project**

The Hoosier National Forest (the "Hoosier Forest") is comprised of approximately 200,000 acres of land in southern Indiana and is the only national forest in the state (Filing No. 27 at 12; Filing No. 24-1 at 14). As a national forest, the Forest Service oversees the management of the Hoosier Forest (Filing No. 27 at 12). The Forest Service governs each national forest using a management plan. The plan for the Hoosier Forest is the Hoosier National Forest Land and Resource Management Plan (the "Forest Plan"). *Id.*

The Hoosier Forest abuts Lake Monroe, a 10,750-acre reservoir created in 1964 (Filing No. 24-1 at 15). Lake Monroe is the largest lake in Indiana and serves as the sole source of drinking water for more than 145,000 people. *Id.* The Lake also attracts more than 1.5 million visitors each year and contributes significantly to the local economy. *Id.* Lake Monroe unfortunately suffers from significant water quality issues, including harmful algal blooms, caused in part by pollution from nearby agricultural and forest management activities. *Id.* Lake Monroe is particularly sensitive to pollution caused by soil erosion, as roughly seventy six percent of the Lake Monroe watershed is considered "highly erodible soil." *Id.* at 15–16. The degradation of Lake Monroe's water impairs its use for recreation and for drinking water. *Id.*

The proposed Houston South Vegetation Management and Restoration Project (the "Project") is a vegetation management project planned for the "Houston South" area of the Hoosier Forest. The Project involves 401 acres of clearcutting, logging on approximately 4,000 acres, herbicide use on approximately 2,000 acres, and prescribed burning of 13,500 acres to "move the landscape toward desired conditions." (Filing No. 24-1 at 19). The Project will also involve several miles of road construction (Filing No. 27 at 19).

In July 2019, the Forest Service completed a draft EA for the Project (Filing No. 24-1 at 20). The draft EA included a Finding of No Significant Impact, which concluded, in part, that the Project would not significantly affect public health and safety because mitigation practices would "minimize or eliminate the potential for adverse impacts caused by the proposed project." *Id.* Plaintiffs, and others, raised several issues in response, including concerns over recreational use of trails and impacts to Lake Monroe, as well as the Forest Service's reliance on mitigation practices due to a historical lack of success implementing those practices. *Id.* at 20–21.

In November 2019, the Forest Service issued its original final EA for the Project (Filing No. 27 at 16). Around the same time, the Forest Service issued its draft Decision Notice informing the public of its intention to issue a FONSI. *Id.* Several individuals and organizations, including Plaintiffs, submitted objections (Filing No. 24-1 at 22). These objections again included concerns regarding the Project's impact on Lake Monroe, its water quality, and its recreational trails. *Id.* On February 14, 2020, the Forest Service responded to the objections and issued its final decision and FONSI stating its intention to proceed with the Project, giving rise to litigation.

## C.    **The First Lawsuit**

In 2020, Plaintiffs brought their first lawsuit against Defendants alleging violations of NEPA, the National Forest Management Act, the APA, and the Endangered Species Act.[2] The parties filed cross-motions for summary judgment,[3] and on March 30, 2022, the Court granted in part and denied in part the cross-motions. *Monroe Cnty. Comm'rs v. U.S. Forest Serv.*, 595 F. Supp. 3d 713, 726 (S.D. Ind. 2022). The Court found in favor of the Forest Service on all claims except for Plaintiffs' NEPA claim. *Id.* at 723. The Court determined that the Forest Service had "failed to evaluate the potential impact of the Houston South Project on Lake Monroe." *Id.* The Court stated,

---

[2] *See* Cause No. 4:20-cv-00106 at Dkt. 1.
[3] *Id.* at Dkt. 33; Dkt. 35.

"[w]hile Defendants' EA does discuss the possibility of sedimentation to the South Fork Salt Creek and the use of best practices to reduce negative impacts, there is no mention of the present concerns regarding Lake Monroe's water or how the Houston South Project may exacerbate these problems." *Id.* at 723–24. Given that "Lake Monroe is the sole source of drinking water" for more than one hundred thousand people in southern Indiana, and "the number of comments and concerns that were raised during the scoping process regarding Lake Monroe," the Court expected that the Forest Service would have provided a "'convincing statement of reasons'" explaining why the impact to Lake Monroe would not be significant. *Id.* (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). The Court remanded the Forest Service's decision "for analysis consistent with federal law." *Id.* at 726.

**D.** **The Supplemental Information Report and Second Lawsuit**

On October 6, 2022, the Forest Service prepared a draft Supplemental Information Report to evaluate the environmental effects of the Project on Lake Monroe and to consider new information from the February 2022 Lake Monroe Watershed Management Plan (Filing No. 27 at 17–18). On December 5, 2022, after a public comment period, the Forest Service issued a final Supplemental Information Report (Filing No. 24-1 at 25).

On January 25, 2023, Plaintiffs initiated a second related action alleging the final Supplemental Information Report violated NEPA, APA, and this Court's 2022 summary judgment order.[4] (Filing No. 24-1 at 26–27). Because the Forest Service planned to implement the Project in April 2023, Plaintiffs filed a Motion for Preliminary Injunction seeking to enjoin implementation of the Project and to remand the claim once more to the Forest Service for further analysis consistent with federal law.[5]

---

[4] *See* Cause No. 4:23-cv-00012 at Dkt. 1.
[5] *Id.* at Dkt. 20.

On March 29, 2023, the Court granted Plaintiffs' Motion for Preliminary Injunction, finding that the Forest Service improperly prepared a Supplemental Information Report to repair its deficient EA rather than a NEPA document, like an EA or EIS. *Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.*, No. 23-cv-12, 2023 WL 2683125, at *6 (S.D. Ind. Mar. 29, 2023). A few weeks later, the Forest Service withdrew the Supplemental Information Report to "allow the [F]orest to further evaluate the original decision." (Filing No. 24-1 at 27 (alteration in original)). The parties then stipulated to the dismissal of the second lawsuit.

**E.      The Supplemental Environmental Assessment and This Lawsuit**

On October 20, 2023, the Forest Service announced the availability of its draft Supplemental EA ("SEA") (Filing No. 24-1 at 28). The draft SEA concluded that the implementation of Forest Plan guidance, project design, and Best Management Practices (collectively, "BMPs") would eliminate any significant impact to Lake Monroe (AR0012322).

In response to the draft SEA, Plaintiffs again submitted comments expressing concerns that the Forest Service had not supplied "new information about *why* it believed that BMPs would be 100% effective," and citing evidence of ineffectiveness of the Forest Service's BMPs in settings similar to the Project (Filing No. 24-1 at 29 (emphasis in original)). Plaintiffs also contested that the SEA failed to discuss prescribed fire's role in accelerating sediment and nutrient loading in adjacent water bodies. *Id.* Plaintiffs submitted further comments explaining their contention that the Project is "significant" under NEPA and therefore warrants an EIS. *Id.* at 30.

In August 2024, the Forest Service published the final SEA and a draft FONSI. *Id.* at 31. The FONSI considers each of the ten intensity factors under NEPA. The analysis is brief and largely relies on the SEA (AR0012524). Plaintiffs submitted objections to the draft FONSI, repeating their earlier criticisms of the Forest Service's decision to forgo EIS. *Id.* at 32. On August

14, 2024, the Forest Service signed a final FONSI and decided to implement the Project without preparing an EIS (AR0012535).

Plaintiffs filed their Complaint in this action on September 11, 2024, raising familiar claims under NEPA and the APA (Filing No. 1). The parties swiftly filed their cross-motions for summary judgment, which are now ripe for the Court's review.

## II.   LEGAL STANDARD

Summary judgment is proper where "there is no genuine issue as to any material fact and that moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In a case involving cross-motions for summary judgment, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

The APA sets out the standards for reviewing federal agency action. The standard of review under the APA is a narrow one, and the plaintiff bears the burden of proof. *See Marsh*, 490 U.S. at 378; *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995). The reviewing court is limited to answering two questions: (1) whether the agency made its decision after considering relevant factors, and (2) whether the agency committed a clear error of judgment. *See Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952–53 (7th Cir. 2003). Under the APA, a court may set aside an agency action or conclusion when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); *see also Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1021 (7th Cir. 2018). An agency's determination is arbitrary and capricious if it relied on factors Congress did not intend it to consider, offers explanations for its

8

actions that "run counter to the evidence before the agency," "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," or entirely failed to consider relevant factors. *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016); *Marita*, 46 F.3d at 619.

## III.    DISCUSSION

The parties' cross-motions focus on three primary issues: Plaintiffs' standing; Defendants' alleged NEPA violation; and the appropriate remedy. However, Defendants also raise evidentiary objections in their cross-motion. The Court will briefly address the objections before addressing each substantive issue in turn.

### A.    Defendants' Evidentiary Objections

Defendants raise two evidentiary objections in their summary judgment brief (Filing No. 27 at 22–23). Defendants object to Plaintiffs citing evidence outside the administrative record and to the declarations of Sherry Mitchell-Bruker and Jeff Stant to the extent they purport to offer expert testimony. Defendants therefore ask the Court to "reject Plaintiffs' attempt to impermissibly expand the Administrative Record" and "disregard any information in Plaintiffs' declarations that goes beyond standing." *Id.* at 23. The Court is not considering evidence outside the Administrative Record or Plaintiffs' averments beyond standing, as they are not material to the Court's decision. Defendants' objections are therefore **overruled as moot**.

### B.    Standing

Plaintiffs submit declarations from two individuals regarding standing: Jeff Stant ("Mr. Stant"), who is the Executive Director and a member of the Indiana Forest Alliance ("IFA") (Filing No. 24-3); and Dr. Sherry Mitchell-Bruker ("Dr. Mitchell-Bruker"), who is the President of Friends of Lake Monroe (Filing No. 24-2). Defendants contend that neither declaration satisfies Article III's standing requirements.

Article III of the United States Constitution limits federal courts to resolving "cases" and "controversies." U.S. Const. art. III, § 2. To establish the "irreducible constitutional minimum" of standing to challenge the Forest Service's decision, Plaintiffs must allege they suffered (1) an injury in fact, (2) that is fairly traceable to the defendants, and (3) that is likely to be redressed by a favorable judicial decision. *Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 639 (7th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). To satisfy this burden at the summary judgment stage, Plaintiffs must "'set forth' by affidavit or other evidence 'specific facts,'" rather than "'general factual allegations of injury.'" *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801–02 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(e)).

Defendants argue that Mr. Stant's declaration fails to establish standing because it asserts only a threatened injury to his recreational use of the Hoosier Forest, which "would not be redressed by a remand to the Forest Service for further analysis of the Project's effects on Lake Monroe." (Filing No. 27 at 25). As to Dr. Mitchell-Bruker, Defendants argue that her declaration asserts only a general interest in protecting Lake Monroe's water quality, rather than the necessary concrete and particularized harm. Defendants also argue that Dr. Mitchell-Bruker's declaration fails to identify a "nexus" between the Project and any concrete and particularized harm, and that her alleged harm stems from the already impaired condition of Lake Monroe's water quality. *Id.* at 25–26. The Court will address the sufficiency of Mr. Stant's declaration first.

Mr. Stant's declaration states, in part, that the Project's proposed burns "will irreversibly harm [his] and other IFA members' recreational interests in the Project area." (Filing No. 24-3 ¶ 24). Mr. Stant and many other IFA members "regularly hike in Indiana's forests, including in the Hoosier National Forest generally and in the proposed burn zones specifically. [Mr. Stant and his wife] own a cabin roughly 1.5 miles from the Houston South Project area, and [they] regularly

traverse through the Project area when traveling to and from [the] cabin." *Id.* Specifically, Mr. Stant "routinely hike[s] in the Project area, including on trails that bisect both the Combs-Lincoln Back and Squirrel Town areas, both of which will be burned during Project implementation," as well as off-trail areas in or near the Project area. *Id.* Likewise, "many other IFA members also live near the Project area and/or hike regularly through the Project area on the Hickory Ridge Trail System and/or the Knobstone and Fork Ridge trails." *Id.* ¶ 25. IFA members regularly use the Project area for "hiking, picnicking, horseback riding, birdwatching, mushrooming, backpacking, camping, meditating, mountain biking, and other outdoor activities." *Id.*

Plaintiffs contend that Mr. Stant's declaration is sufficient because it "makes clear [that] he and other members of his organization routinely visit areas of the Forest that will be permanently destroyed by the Project to pursue recreational and scientific interests," which is the "archetypal environmental injury in cases like this one." (Filing No. 30 at 14). As to redressability, Plaintiffs argue that they are challenging not only the Forest Service's EA analysis of the Project's effects on Lake Monroe, but also the Forest Service's FONSI and decision not to perform an EIS. *Id.* at 15. Plaintiffs contend that "the Court must assume that Plaintiffs will be successful in challenging the [Forest] Service's significance determination and its failure to prepare an EIS." *Id.* at 15–16. On reply, Defendants argue that Mr. Stant's declaration does not contain enough specificity about his injuries resulting from the project, and that remand would not directly redress his alleged injury. (Filing No. 31 at 12).

The Court finds that Mr. Stant's declaration establishes standing. Mr. Stant details his and other IFA members' regular use and enjoyment of the Hoosier Forest and the Project area, so his alleged injury is sufficiently concrete and particularized. *See, e.g.*, *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 789 F. App'x 599, 600 (Mem.) (9th Cir. 2020) ("One of [plaintiff's] two declarants

. . . averred that she visited campsites a mile away and half a mile away from the permit sites in the [project area]. This was not an averment which stated only that one of the organization's members uses unspecified portions of an immense tract of territory, but a statement that she uses the affected area." (cleaned up)); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1156 (10th Cir. 2013) ("A plaintiff who has repeatedly visited a particular site, has imminent plans to do so again, and whose interests are harmed by a defendant's conduct has suffered injury in fact that is concrete and particularized."); *Hoosier Env't Council v. Nat. Prairie Ind. Farmland Holding, LLC*, 564 F. Supp. 3d 683, 700 (N.D. Ind. 2021) (stating that defendant "reads too much into [*Lujan v. National Wildlife Federation*] by arguing that the injury must occur to the contested property, not to a site adjacent to it," and explaining that a plaintiff may establish standing where an agency action affects water several miles downstream). *Contrast Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 961–62 (7th Cir. 2005) (finding that plaintiff did not assert sufficient interest in project area because "[h]e lives far from the project areas," "does not claim that the [projects] prevent him from using areas of the national parks," "[does] not indicate that he has visited [the project area]," and gives "no indications of planned future visits to either project area").

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, the United States Supreme Court held that the plaintiff environmental group's claims that the defendant agency's conduct was "directly affect[ing] those affiants' recreational, aesthetic, and economic interests" were "dispositively more than the mere 'general averments' and 'conclusory allegations' found inadequate in *Lujan v. National Wildlife Federation*." 528 U.S. 167, 183–84 (2000) (citing 497 U.S. 871, 888 (1990)). The Supreme Court continued that "the affiants' conditional statements—that they would use the nearby [river] for recreation if [the defendant] were not discharging pollutants into it" could not be "equated with the speculative '"some day" intentions'

to visit endangered species halfway around the world that [the Court] held insufficient to show injury in fact in *Defenders of Wildlife*." *Id.* at 184 (citing 504 U.S. 555 (1992)). Mr. Stant's claims that he regularly uses the Project area are certainly enough to establish a concrete and particularized injury.

The Court also finds that Mr. Stant satisfies the redressability element of standing. "*Lujan v. Defenders of Wildlife*, 504 U.S. at 571–72 112 S. Ct. 2130, makes clear that assertion of a procedural right, unconnected to a plaintiff's concrete harm, is not enough to convey standing." *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 952 (7th Cir. 2000). "However, *Lujan* also says that '[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'" *Id.* (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. at 573 n. 7)); *see Gutierrez v. Saenz*, 145 S. Ct. 2258, 2269 (2025) (Barrett, J., concurring) (referring to the Supreme Court's "somewhat relaxed redressability inquiry in administrative-law procedural injury cases"); *Texas Indep. Producers & Royalty Owners Ass'n v. Env't Protection Agency*, 410 F.3d 964, 979 (7th Cir. 2005) ("[T]he [plaintiff's] claimed injury here is a procedural injury—the lack of statutorily required consultation. Therefore, the standing requirements are more relaxed.").

The possibility that the Forest Service may ultimately proceed with the Project (with or without an EIS) does not preclude redressability. The United States Supreme Court explained years ago that:

> Agencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground. If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason. Thus respondents' "injury in fact" is "fairly traceable" to the [agency's] decision . . . , even though the [agency] might reach the same result

exercising its discretionary powers lawfully. For similar reasons, the courts in this case can "redress" respondents' "injury in fact."

*Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) (citations omitted); *see also Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.D.C. 2021) (citing *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472 (D.C. Cir. 2014)).

The possibility that the Forest Service will reconsider its decision is enough to establish IFA's standing. The Court therefore need not, and does not, address the sufficiency of Dr. Mitchell-Buker's declaration. "As long as there is 'at least one individual plaintiff who has demonstrated standing to assert these rights as his own,' a court 'need not consider whether the other . . . plaintiffs have standing to maintain the suit.'" *Bond v. Utreras*, 585 F.3d 1061, 1070 (7th Cir. 2009) (omission in original) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977)); *see Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Highway J Citizens Grp.*, 349 F.3d at 952. Plaintiffs' motion for summary judgment is **granted**, and Defendants' cross-motion is **denied**, as to standing.

## C.    <u>Violation of NEPA</u>

The Court now turns to the merits of Plaintiffs' NEPA claims. Plaintiffs assert that Defendants violated NEPA by once again failing to adequately consider the environmental impacts of the Project on Lake Monroe and its watershed, and by deciding not to prepare an EIS. The Court will address each argument in turn.

### 1.    <u>Failure to Consider Effects on Lake Monroe</u>

The Forest Service currently owns roughly twenty percent of the Lake Monroe watershed (Filing No. 27 at 15). This includes portions of the South Fork Salt Creek watershed, which contributes thirty percent of Lake Monroe's water and is located within the Project area (Filing No. 24-1 at 17). Plaintiffs contend that despite having now had three attempts to do so, Defendants

have failed to take a "hard look" at the foreseeable impacts of the Project on Lake Monroe (Filing No. 24-1 at 33). More specifically, Plaintiffs argue that Defendants acknowledge that the Project will have some negative impact on the Lake Monroe watershed but fail to analyze how significant those impacts will be and instead unreasonably conclude that the use of BMPs will render any impacts insignificant. *Id.* at 35. However, according to Plaintiffs, Defendants provide no support for their belief that BMPs will be completely effective in mitigating the impact to Lake Monroe and rely on "circular" reasoning. *Id.* at 35–37 ("Put differently, the Service therefore claims in the SEA that the 'Project would not have insufficient erosion control methods because Forest Service personnel and contractors would use [sufficient control measures].'" (alteration in original) (quoting AR0012501)).

Defendants respond that the SEA "acknowledged Lake Monroe's current water quality, analyzed the Project's potential impacts on that water quality, and determined that given the parameters of the Project, including Forest Plan standards, Project design features, and BMPs, that the Project would not have a direct, indirect, or cumulative impact on Lake Monroe's water quality." (Filing No. 27 at 27). Defendants also assert that the SEA appropriately tiered the Forest Plan EIS, which determined that "[g]uidance included for vegetation management and other Forest management would mitigate any potential soil movement and sedimentation to the background level," and that "the actions permitted by the alternatives [in the EIS] would not impair the water quality of the lakes." (Filing No. 27 at 28 (quoting AR0015923–24)). Defendants further contend that the Forest Service considered and acknowledged the risks of sedimentation and considered the effects of prescribed burns and the use of spot-herbicide on water quality, but it ultimately concluded that its BMPs will reduce the risk such that the Project will have "minimal to no effects on water quality in any water body and particularly to Lake Monroe itself.'" (Filing No. 27 at 30

15

(quoting AR0012491)). Defendants identify a variety of "literature" regarding the effectiveness of BMPs, which were cited in the SEA.

Plaintiffs' reply criticizes the Forest Service's reliance on BMPs as a "legally insufficient substitute for the reasoned decisionmaking required of all federal agencies," and as an excuse from "having to conduct any further analysis of the Project's impact on Lake Monroe." (Filing No. 30 at 20). Plaintiffs argue that the SEA still fails to address concerns that the Project will exacerbate Lake Monroe's present water quality problems, that the BMP "literature" cited in SEA is inapplicable and/or cited misleadingly, and that the tiered Forest Plan EIS is outdated and fails to address concerns that the Forest Service has been unable to substantiate the efficacy of its BMPs *since* the EIS was promulgated. *Id.* at 23–24.

In the portion of the SEA discussing the Project's effects on Lake Monroe (AR0012491–507), the Forest Service does not determine whether the Project, without consideration to BMPs, would have any significant impact, and it instead expressly bases its conclusion that there will be no significant impact on the assumption that its BMPs would effectively mitigate any and all potential significant impacts (AR0012491–92; AR0012496; AR012501; AR 0012528).

The dispositive question, then, is whether the Forest Service took a "hard look" at whether BMPs would mitigate all potential significant impacts on Lake Monroe. After reviewing the administrative record, the Court finds that the Forest Service did not. While the Court uses a deferential standard when evaluating an agency's decision, the Court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Ind. Forest All.*, 325 F.3d at 858–59 (citing *Marsh*, 490 U.S. at 378); *Wild Sheep*, 681 F.2d at 1182–83 (stating court must be "mindful that it is not the province of [the] Court to substitute its judgment for that of the Service. Yet it must also be remembered that the spirit of

NEPA would die aborning if the facile, ex parte decision that a project was minor or did not significantly affect the environment were too well shielded from impartial review." (citation modified)). But an agency's failure to address certain critical factors that are essential to the decision to prepare an EIS or not can render its finding of no significant impact unreasonable. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982).

The SEA describes the BMPs that the Forest Service intends to implement and monitor, but the Forest Service offers no support for its conclusion that its BMPs will reduce any negative effect of the Project on Lake Monroe to an insignificant level. The Forest Service summarizes some studies related to BMP effectiveness (AR0012492), but even a brief review of those studies shows that the Forest Service's reliance on them is entirely misplaced.

The first study, *Lake Monroe Diagnostic & Feasibility Study* (Jones et al. 1997) ("Jones"), is almost thirty years old, and rather than describing the BMPs intended for the Project, it describes a wide range of agricultural, forestry, urbanized land, and shoreline erosion best management practices that Jones argues should be implemented by individuals and government agencies alike to reduce negative impacts on Lake Monroe's water quality (AR0012674). Importantly, Jones cautions that "[t]he degree to which BMPs should be used depends upon many factors including soils, topography, and the individual farm or land management operation. It is not practical to select a specific set of BMPs without knowledge of these factors." (AR0012824). Despite this caveat, the Forest Service cites Jones to support its finding that a blanket application of BMPs will eliminate all significant impacts in the Project area, without further discussion.

The next study, *Effects of Forest Harvesting Best Management Practices on Surface Water Quality in the Virginia Coastal Plain* (Wynn et al. 2000) ("Wynn"), as its title suggests, studies BMP effectiveness in the Virginia coastal plain (AR0014386). The age and location of Wynn is

17

particularly notable because, as Wynn states, "each state [must] identify specific sources of [nonpoint source] discharge and to develop [BMPs] to control them," and "BMP guidelines are continually updated based on the results of . . . monitoring." (AR0014387). Wynn therefore has no applicability to the Project area.

Third is *Forestry Best Management Practices for Timber Harvesting and Site Preparation in the Eastern United States* (Aust & Blinn 2004) ("Aust & Blinn"), which gives a general overview of BMPs in the "eastern states." Aust & Blinn does not refer to Indiana except for one paragraph citing a 1992 study, which does not appear to relate to BMPs (AR0004431). Aust & Blinn concludes that "[o]verall, the research literature indicates that forestry best management practices are effective for minimizing impacts to water quality and site productivity," but "Forest managers need additional information regarding the site specificity of BMPs in order to help them make appropriate site specific recommendations." (AR0004449–50). This study again highlights the need for site-specific BMPs and provides no support for the Forest Service's finding that its blanket application of BMPs will eliminate any significant impacts on Lake Monroe.

The SEA next cites *Comprehensive Indiana Forestry Best Management Practices Monitoring Results, 1996–2016* (McCoy & Sobecki 2016) ("McCoy & Sobecki"). On its face, McCoy & Sobecki is a relatively recent Indiana-based study that shows a 96.5% effectiveness rate for BMPs on federal lands (AR0006133). However, a closer review of the study reveals that this single metric carries little to no weight for the Project. McCoy & Sobecki states that all monitored sites under federal ownership had an 86.8% BMP application rate and 96.5% BMP effectiveness rate. However, "it is *impossible* to make any direct correlation between landowner types due to the different site-selection methods used." (AR0006149 (emphasis added)). Importantly, only six federal sites (totaling 355 acres) were monitored for the McCoy & Sobecki study, which is just

18

0.08% of federal lands, and just 0.46% of the acreage being monitored (AR0006134). McCoy & Sobecki therefore found that data for these limited federal sites "do not provide a clear picture of the status of BMPs on timber harvest of those ownerships statewide." (AR0006149). McCoy & Sobecki further notes that log landings on federal lands "have had fewer harvests" than State Forest sites (AR0006160), which will no longer be true if the Project is implemented.

McCoy & Sobecki therefore does not, as the SEA might suggest, provide that all Forest Service BMPs are 96.5% effective at remediating all negative environmental impacts. The study, at most, shows that data from 355 acres of "federal lands" somewhere in Indiana were, on average, 95.6% effective in preventing negative environmental impacts from relatively few harvests. The SEA does not mention the much lower federal BMP application rate of 86.8%; the lack of identifiable correlation between application and effectiveness (other than the general observation that effectiveness rates were generally higher than application rates); the lack of an observable trend for BMP application and effectiveness year-over-year; and the explicit absence of any correlation between landowner type and BMP effectiveness. The SEA offers no basis for extrapolating the BMP effectiveness rate for the 355 acres studied in McCoy & Sobecki to the more than ten thousand acres being disturbed by the Project, and McCoy & Sobecki teaches that no such extrapolation can reasonably be made.

In sum, the studies cited in the SEA stand only for the general proposition that "best management practices" (whatever those are in a given region and in given year) help reduce the negative effects of forest management. The two plans cited in the SEA (*Lake Monroe Watershed Management Plan* (Sullivan 2022) and *Monroe County Comprehensive Plan* (2012)) likewise offer only generalized assurances that plan guidance will help reduce negative impacts (AR0012492).

However, platitudes are not enough to satisfy NEPA. The Forest Service's selective and incomplete citations to BMP literature show that the Forest Service took more of a cursory glance at the effectiveness of its BMPs rather than a hard look. The SEA offers no support for the Forest Service's conclusion that *its* BMPs applied in the *Project area* will prevent any significant impact on *the Lake Monroe watershed*. *Contrast Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1086–87 (10th Cir. 2014) (finding that Forest Service took requisite "hard look" where final EIS relief on studies in areas with more erodible soil types and steeper topography than project area, and where agency relied on a 2001 sedimentation study involving BMPs in the project area); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 665–66 (9th Cir. 2009) ("[W]e [previously] found that disclosure of mitigation measures was inadequate because the Forest Service relied on BMPs developed for significantly different circumstances from those existing in the disputed project areas. . . . Unlike in [that case], the BMPs here were developed for the precise circumstances at hand."); *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006) (finding that agency took a "hard look" where EA contained detailed analysis of environmental impact with BMPs for the project at issue); *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 959 F. Supp. 2d 982, 1011 (W.D. Ky. 2013) (finding that agency took a "hard look" where EIS included "careful considerations of potential mitigation measures and proposals for ensuring that the Project's final design will protect water resources in the Project area," and that the agency's conclusions "do not derive from stale information"); *Surfrider Found. v. Dalton*, 989 F. Supp. 1309, 1320 –21 (S.D. Cal. 1998) (finding that agency reasonably decided that visual impact on beach would not be significant, with mitigation, where EA included "[c]omputer-generated before-and-after pictures of beach views," along with a written analysis of how project would affect appearance of area).

The Ninth Circuit's decision in *Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172 (9th Cir. 1982) ("*Wild Sheep*") is persuasive here. In *Wild Sheep*, an environmental group claimed that the Forest Service violated NEPA by declining to prepare an EIS for its proposal to reopen a mine access road. *Id.* at 1174. The plaintiff argued that the road reopening would significantly impact a protected sheep population. *Id.* at 1175. The Forest Service prepared an EA and concluded that it could "adequately mitigate[] the potential harm to the sheep," so the "action would have no significant effect on the quality of the human environment and therefore no EIS was required." *Id.* at 1176. On summary judgment, the district court upheld the Forest Service's decision, but the Ninth Circuit disagreed and reversed.

The Ninth Circuit found that the Forest Service "failed to take the requisite 'hard look' at the environmental consequences of its action and that its conclusion that reopening [the road] would have no significant effect on the human environment was reasonable." *Id.* at 1178. In part, the Ninth Circuit noted that the EA failed to estimate the expected amount of truck traffic on the reopened road, precluding any "intelligent[]" evaluation of the effect of the road opening. *Id.* The Ninth Circuit also found that "[o]ther significant questions raised by respondents to the initial draft of the EA were similarly ignored or, at best, shunted aside with mere conclusory statements." *Id.* at 1179. The court explained that the EA "relied heavily" on studies that were "totally dissimilar to the potential intrusion at issue here" and provided "no foundation for the inference that a valid comparison may be drawn" between the studies and proposed action. *Id.* The court was "therefore left to speculate" about the effects of the proposed action on the sheep population, even though "the very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for such speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action." *Id.*

The agency's reliance on mitigation in *Wild Sheep* fared no better. In its EA, the Forest Service made assumptions about the sheep's anticipated response to road traffic but "provided no basis for its assumption." *Id.* at 1181. "Evaluation of the reasonableness of this assumption [was] doubly difficult because of the Service's failure to provide data regarding the quantity of traffic expected to flow through the area. The absence of this crucial information renders a decision regarding the sheep's reaction to the traffic on [the road] necessarily uninformed." *Id.*

The SEA in this case has notable similarities to the EA in *Wild Sheep*. The SEA in this case fails to measure the potential effects of the Project on Lake Monroe, and instead relies on distinguishable and outdated studies in concluding that BMPs will mitigate all potential significant impacts. This type of superficial discussion is not sufficient under NEPA and leaves this Court to speculate about the Project's impact. *See Blue Mountains Biodiversity Project*, 161 F.3d at 1214 ("The EA identifies a series of [BMPs] designed, in part, to reduce the erosion from the logging and roadbuilding activities of the . . . project. The Forest Service's reliance on these BMPs, however, is based on 'past observations of logging on *unburned* areas' with similar soil types where BMPs have prevented 'large increases' in erosion. We find nothing in the EA to support the Forest Service's conclusion that the proposed BMPs will be adequate in a severely burned area where increased levels of erosion have already occurred." (emphasis in original)); *Nat'l Audubon Society v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997) ("We emphasize the requirement that mitigation measures be supported by substantial evidence in order to avoid creating a temptation for federal agencies to rely on mitigation proposals as a way to avoid preparation of an EIS. . . . In this case, we have no assurance of [the mitigation measure's] efficacy. The Forest Service conducted no study of its likely effects, proposed no monitoring to determine how effective the proposed mitigation would be, and did not consider alternatives in the event [the mitigation measure] fails. . . . Absent

substantial evidence to support the efficacy of [the mitigation measure], we, like the district court, are left with the firm conviction that the Forest Service could not have adequately considered the significance of its proposed action's impact on the environment."); *Cascadia Wildlands v. Adcock*, 779 F. Supp. 3d 1213, 1230 (D. Ore. 2025) ("While the [agency] did consider mitigation techniques in the [EIS], it did not detail their extent or expected level of success. . . . [T]he [agency] must provide analytical data supporting mitigation measures; otherwise, such measures constitute a mere listing and fail to satisfy NEPA. . . . The [agency] could not use mitigation alone to cure its failure to adequately consider noxious weeds and therefore failed to take a 'hard look' at the impacts of noxious weeds and invasive species." (citation modified)); *W. Watersheds Project v. U.S. Forest Serv.*, No. 17-CV-434, 2017 WL 5571574, at *13 n.25 (D. Idaho Nov. 20, 2017) ("[T]he Forest Service argues that BMPs are more effective on open landscapes . . . . [T]he present record contains no supporting science for the BMPs on more open landscapes.").

The Forest Service's reliance on the tiered Forest Plan EIS similarly does not satisfy NEPA. The SEA cites only the two paragraphs of the 2006 Forest Plan EIS discussing alternatives and effects on municipal watersheds:

> Any of the alternatives would have little to no effect on these reservoirs and their watersheds. Guidance included for vegetation management and other Forest management would mitigate any potential soil movement and sedimentation to the background level. That is, the activities of any of the alternatives would not affect the water quality disproportionately compared to the percentage of the watershed in [Forest Service] ownership. . . . .

> In combination with the practices (past and ongoing, as well as reasonably foreseeable future ones) on other lands, the actions permitted by the alternatives would not impair the water quality of the lakes.

(AR0015923–24).

This portion of the Forest Plan EIS, like the SEA, does not contain any site-specific analysis for the Project. *See Cascadia Wildlands*, 779 F. Supp. 3d at 1228 ("The Ninth Circuit has stated

that tiering is insufficient when both the programmatic EIS and the project EA contain merely general statements about an issue rather than site-specific information. Here, tiering was insufficient because neither the . . . FEIS nor the . . . EA contained adequately site-specific information or analysis." (citation modified) (citing *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004)); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1119 (9th Cir. 2018) ("Ultimately, when reviewing for NEPA compliance, we look to whether the agency performed the NEPA analysis on the subject action."); *Wilderness Society v. U.S. Dep't of Interior*, No. 22-cv-1871, 2024 WL 1241906, at *19 (D.D.C. Mar. 22, 2024) ("When the EA concludes the proposed lease sales are not 'expected to result in impacts not already considered in [the agency's resource management plans] or programmatic EIS,' then, it is hard to discern what the [agency] is referencing, as it is once again tiering its assessment to a review that it did not perform in the first instance. The [agency] cannot hang its hat where it never placed a peg.").

The EIS and SEA both simply point to mitigation guidelines and assume that compliance with those guidelines will reduce all negative impacts on local municipal watersheds to "background levels."[6] Tiering to the EIS, which in turn tiers to Forest Plan guidelines, is not enough to satisfy NEPA's "hard look" requirement. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002) ("[T]he EIS . . . is inadequate because it, too, impermissibly attempts to tier to the Guidelines. The revised EA is therefore inadequate to the extent that it attempts to tier to the EIS. The same is true of the revised EA's attempt to tier to the Guidelines."); *Nez Perce Tribe v.*

---

[6] Plaintiffs argue that the EIS's definition of "background levels" raises additional questions about the effectiveness of BMPs, and their point is well taken. The EIS defines "background levels" as proportionate "compared to the percentage of the watershed in [Forest Service] ownership." (AR0015923). The SEA does not explain how or why a negative effect to more than a quarter of the Lake Monroe watershed, albeit one that is proportionate to negative effects on the remaining part of the watershed, is not a "significant impact."

*Nat'l Oceanic & Atmospheric Admin. Fisheries*, No. CV04-299, 2005 WL 8165494, at *7 (D. Idaho Sept. 21, 2005) ("While the [EIS] generally contains many references to the effectiveness of [mitigation practices] . . . the discussion justifying the proposed infringement . . . is noticeably brief and conclusory. The [Forest Service's] conclusions cite support from the conclusion of the [Fishing Service's] opinion which was based upon the . . . biological assessment. The biological assessment, however, also does not evaluate the effectiveness of the measures employed to mitigate any impact from the [action] but, instead, identifies the same proposed actions in Appendix B without any further discussion. An endless circle of reliance without revealing any analysis.").

Site-specific analysis for the Project is particularly crucial in light of the highly erodible soils in the Project area and the already impaired water quality in the Lake Monroe watershed. The Forest Service attempts to discount the concerns about highly erodible soils by noting that "soil types and ratings dictate what Project activities are authorized where as well as the BMPs employed." (Filing No. 27 at 36). This argument misses the mark. The Plaintiffs' concern is that the SEA failed to analyze the effectiveness of chosen BMPs in light of the specific conditions in the Project area—*i.e.*, highly erodible soils—and the Court agrees. The Forest Service also attempts to sidestep the issue of Lake Monroe's existing impairments by asserting that the Monroe County Board of Commissioners is to blame (Filing No. 27 at 26). This argument is again inapposite. NEPA is not concerned why Lake Monroe's water quality is already impaired; it is concerned with whether the Forest Service analyzed the impact of the Project in light of the impaired water quality. *Blue Mountains Biodiversity Project*, 161 F.3d at 1213 ("Despite its lack of data, the Forest Service asserts throughout the EA that the expected level of increased erosion and sediment delivery will be small in comparison to that caused by the fire. Whether the increased

erosion from logging and roadbuilding is smaller or larger than that produced by the fire is irrelevant. The proper evaluation should identify the impact of the increased sediment from the logging and roadbuilding . . . in light of the documented increases that already have resulted from the fire."). Given the number of comments and concerns raised during the scoping process, the Forest Service should have at least provided a "convincing statement of reasons" that explained why the impact to Lake Monroe would not be significant. *Id.* at 1212. Because the SEA fails to explain the significance of the Project's impact on Lake Monroe, or how BMPs would be effective enough to completely mitigate any possible significant impacts, there is no way to know how the water quality of 145,000 Hoosiers could be affected. The Project should not move forward until that determination is made.

In reaching this decision, the Court is mindful of the United States Supreme Court's recent reminder that "NEPA is a procedural cross-check, not a substantive roadblock." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1507 (2025). Nevertheless, after reviewing the administrative record, the Court cannot say that the Forest Service prepared an "adequate report," or that its decision to proceed with the Project without further study was "fully informed," "well-considered," or "reasonably explained." *Id.* at 1514. Despite the substantial deference owed to the Forest Service's choices, the Court finds that it failed to satisfy NEPA's procedural requirements.

Because Defendants violated NEPA by failing to fully evaluate the environmental effects to Lake Monroe, Plaintiffs' summary judgment motion is **granted** as to Defendants' violation of NEPA, and the corresponding portion of Defendants' cross-motion is **denied**.

### 2.  Decision to Forgo EIS

Defendants' failure to fully evaluate the environmental impacts of the Project on Lake Monroe is dispositive of Plaintiff's NEPA claim. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477

F.3d 225, 234 (5th Cir. 2007) ("[T]he EA fails to tell us why the proposed agency action will not have a significant impact on the human environment. . . . [T]he [agency therefore] acted arbitrarily in relying only on the information in the current EA to support the issuance of its mitigated FONSI." (citation modified) (omissions omitted)). The Court need not, and therefore does not, consider Plaintiffs' additional argument that the Project is in fact "significant" (Filing No. 24-1 44–52).[7]

### D.    Remedy

Plaintiff contends that due to the serious and repeated deficiencies in Defendants' analyses, the Court should vacate the Forest Service's decision, FONSI, and EA (Filing No. 24-1 at 52–53). Defendants believe that remand without vacatur is the appropriate remedy (Filing No. 31 at 27–28). The parties agree that supplemental briefing on the appropriate remedy is warranted (Filing No. 30 at 38; Filing No. 31 at 27–28). Plaintiffs request, however, that the Court enjoin the Project in the meantime. Plaintiffs' request is reasonable given the Court's above findings. The Court will therefore enjoin the Project pending a ruling on the appropriate remedy and direct the parties to meet with the Magistrate Judge regarding briefing on the remedy issue. Plaintiffs' motion for summary judgment as to vacatur is therefore **denied as premature**, without prejudice to refile a motion for summary judgment on the sole issue of the appropriate remedy.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Summary Judgment (Filing No. 24) and **DENIES** Defendants' Motion for Summary Judgment (Filing No. 26). Summary judgment is **granted in favor of Plaintiffs** as to standing and

---

[7] As in the Court's 2022 summary judgment decision in the first lawsuit, 595 F. Supp. 3d 713 (S.D. Ind. 2022), the Court does not reach the question of whether the Forest Service properly decided to prepare an EA instead of an EIS, since the Forest Service's failure to prepare an adequate EA is dispositive of Plaintiffs' NEPA claim. Neither this decision nor the Court's prior orders in related litigation should be construed as implicitly holding that an EIS was not or is not required, since the Court never reached that issue.

Defendants' violation of NEPA, and **denied as premature, without prejudice to refile**, as to the remedy of vacatur. Defendants are **ORDERED** to halt all activities related to the Project pending a decision from the Court as to the appropriate remedy. The parties are **DIRECTED** to meet with the Magistrate Judge regarding a briefing schedule on the remaining remedy issue.

Final Judgment will issue in a separate Order once all issues are resolved.

**SO ORDERED**.

Date:    9/18/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Matthew Ryan Arnold
Eubanks & Associates, PLLC
matt@eubankslegal.com

William S. Eubanks II
EUBANKS & ASSOCIATES, LLC
bill@eubankslegal.com

W. Russell Sipes
Sipes Law Firm PC
wrs@sipeslawfirm.com

Reade Wilson
DOJ-Enrd
reade.wilson@usdoj.gov