**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

MONROE COUNTY BOARD OF COMMISSIONERS, INDIANA FOREST ALLIANCE INC, HOOSIER ENVIRONMENTAL COUNCIL, INC., FRIENDS OF LAKE MONROE,

Plaintiffs,

v.

UNITED STATES FOREST SERVICE, MICHAEL CHAVEAS Forest Supervisor, Hoosier National Forest, CHRISTOPHER THORNTON District Ranger, Hoosier National Forest,

Defendants.

Case No. 1:24-cv-01560-TWP-KMB

**ORDER ON PLAINTIFFS' MOTION TO VACATE AND DIRECTING ENTRY OF FINAL JUDGMENT**

This matter is before the Court on Plaintiffs' Monroe County Board of Commissioners, Indiana Forest Alliance Inc., Hoosier Environmental Counsel, Inc., and Friends of Lake Monroe (collectively, "Plaintiffs") Motion for the Presumptive Relief of Vacatur Under the Administrative Procedure Act. (Filing No. 55). Plaintiffs brought this action against Defendants United States Forest Service ("Forest Service"), Michael Chaveas, and Christopher Thornton (collectively, "Defendants"), alleging that the Forest Service violated the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* ("NEPA"), by deciding to proceed with a vegetation management project without adequately studying the project's environmental impacts. In September 2025, the Court granted summary judgment in Plaintiffs' favor on their NEPA claim but directed the parties to file additional briefing on the appropriate remedy. Having reviewed the parties' supplemental

briefing, the Court **grants in part** and **denies in part** the Motion to Vacate and remands this matter with **partial vacatur**.

## I. BACKGROUND

This section is not intended to provide a comprehensive explanation of all the facts in this case; rather it provides only the brief background relevant to the issue remaining before the Court. The underlying facts and procedural history of this case are described in detail in the Order on Cross-Motions for Summary Judgment (Filing No. 48).

This is the third lawsuit Plaintiffs have filed challenging the Houston South Vegetation Management and Restoration Project (the "Project"), which is a vegetation management project in the Hoosier National Forest that entails clearcutting, logging, herbicide use, prescribed burns, and road construction. The Hoosier National Forest abuts Lake Monroe, which is a large reservoir that serves as the sole source of drinking water for more than 145,000 people.

If a proposed agency action, like the Project, will have a significant effect on the environment, NEPA requires the agency to prepare a detailed environmental impact statement ("EIS"). If it is uncertain whether the proposed action will have a significant effect, then the agency must prepare a shorter environmental assessment ("EA"). If the EA reveals that the project will have a significant impact, then the longer EIS must be prepared. Otherwise, the agency prepares a Finding of No Significant Impact and may proceed without an EIS. *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 856 (7th Cir. 2003).

In 2019, the Forest Service issued an EA for the Project, and in 2020, it issued a Finding of No Significant Impact and decision to proceed with the Project without an EIS. Throughout the Project approval process, Plaintiffs and others voiced concerns about the Project's impact on Lake Monroe and its water quality. *Id.* A few months later, Plaintiffs filed their first lawsuit, No. 4:20-cv-00106-TWP-DML (S.D. Ind.) ("*Monroe I*"). In *Monroe I*, Plaintiffs claimed that Defendants

violated NEPA by failing to consider the Project's impact on Lake Monroe. 595 F. Supp. 3d at 713, 719 (S.D. Ind. Mar. 20, 2022). The Court granted summary judgment for Plaintiffs:

> Given the number of comments and concerns that were raised . . . regarding Lake Monroe, [the Forest Service] should have at least provided a "convincing statement of reasons" that explained why the impact to Lake Monroe would not be significant. But considering Defendants failed to do this while also acknowledging the sedimentation risk of the project[,] . . . [it] should not move forward without first determining how the water quality of 120,000 people could be affected.

*Id.* at 723–24 (citation omitted).

On remand, the Forest Service issued a Supplemental Information Report to evaluate the environmental effects of the Project on Lake Monroe. A few months after that, Plaintiffs filed their second lawsuit, No. 4:23-cv-00012-TWP-KMB (S.D. Ind.) ("*Monroe II*"). In *Monroe II*, the Court found that it was improper for the Forest Service to attempt to repair its deficient EA with a Supplemental Information Report, rather than a NEPA document like an EA or EIS. The Forest Service then withdrew its Supplemental Information Report, and the parties stipulated to dismissal of *Monroe II*.

In August 2024, the Forest Service published a Supplemental EA ("SEA") and Finding of No Significant Impact, and despite Plaintiffs' reiterated concerns, issued a final decision to implement the Project without an EIS (the "Decision"). The SEA concluded that the implementation of mitigation efforts including Forest Plan guidance, Best Management Practices ("BMPs"), and monitoring, would eliminate any significant impact on Lake Monroe. This lawsuit followed.

On summary judgment, Plaintiffs argued that Defendants "failed to take a 'hard look' at the foreseeable impacts of the Project on Lake Monroe" and instead simply assumed, without any support, that BMPs would be "completely effective in mitigating the impact to Lake Monroe." (Filing No. 48 at 15). Defendants argued that the SEA adequately considered the Project's potential

impact on Lake Monroe's water quality, and determined that given the parameters of the Project, including the Forest Plan, Project design features, BMPs, and monitoring, that the Project would not have any significant impact on Lake Monroe's water quality. *Id.* at 15–16.

In determining whether Defendants reasonably evaluated the Project's impact on Lake Monroe, the Court explained that the Forest Service chose not to consider the Project's unmitigated impact on Lake Monroe and instead based its finding on the conclusion that mitigation efforts would reduce all potential impacts to insignificant levels. "The dispositive question, then, [was] whether the Forest Service took a 'hard look' at whether [the mitigation efforts][1] would mitigate all potential significant impacts on Lake Monroe." *Id.* at 16.

The Court found that the Forest Service failed to reasonably explain its decision to proceed with the Project without an EIS. *Id.* at 26–27. The Court stated that the "Forest Service offer[ed] no support for its conclusion that its BMPs will reduce any negative effect of the Project on Lake Monroe to an insignificant level," and that the studies cited in the SEA offered only "platitudes" about the general effectiveness of mitigation measures like BMPs. *Id.* at 20. The Court added that "[t]he Forest Service's reliance on the tiered Forest Plan EIS similarly does not satisfy NEPA" because it "does not contain any site-specific analysis for the Project." *Id.* at 23. Stated differently, the Court held that by failing to reasonably explain how much the Project will affect Lake Monroe or how much mitigation efforts would reduce those impacts, the Forest Service failed to reasonably explain its finding that the Project would have no significant impacts.

The Court accordingly granted summary judgment in favor of Plaintiffs on their NEPA claim. *Id.* However, the Court denied as premature Plaintiffs' request for vacatur and ordered supplemental briefing on the proper remedy, which the parties' have since submitted.

[1] The Summary Judgment Order collectively referred to "Forest Plan guidance, project design, and Best Management Practices" as "BMPs." (Filing No. 48 at 7).

## II. DISCUSSION

In their supplemental briefing, Plaintiffs argue that the Court should vacate the Forest Service's decision, while Defendants argue that the Court should neither vacate nor remand its decision under the harmless error doctrine, or, in the alternative, order remand without vacatur.

### A. Harmless Error

The Court begins with Defendants' argument that neither vacatur nor remand should be ordered under the harmless error doctrine. 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Under this doctrine, remand and vacatur "may be unwarranted in cases where '[t]here is not the slightest uncertainty as to the outcome' of the agency's proceedings on remand." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 630 (2023) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 n.5 (1969)). The harmless error "exception" applies "only in narrow circumstances." *Id.*; *see, e.g.*, *People of the State of Ill. v. Interstate Com. Comm'n*, 722 F.2d 1341, 1346 (7th Cir. 1983) ("[I]f we are *sure* that the agency would if we remanded the case reinstate its decision . . . a reversal would be futile . . . ." (emphasis added)); *Ctr. for Biological Diversity v. EPA*, -- F.4th --, 2026 WL 2330260, at *15 (11th Cir. Aug. 12, 2026) ("The doctrine of harmless error applies . . . 'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of [the] decision reached.'" (alteration in original) (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979)).

Defendants' first argument regarding harmless error reads more like a motion to reconsider than remedy briefing. They argue that contrary to the Court's finding on summary judgment, the Forest Service's conclusion of no significant impact is well-supported by the Administrative Record and therefore would not change on remand; essentially, the Forest Service did not act arbitrarily or capriciously. Defendants point to two purported errors in the Court's Summary Judgment Order: improperly suggesting that the Forest Service must first address the Project's

unmitigated impact before addressing its impact with mitigation measures; and focusing solely on the Forest Service's evaluation of BMPs, rather than the Forest Plan, BMPs, and monitoring together (Filing No. 54 at 2, 7). Defendants misread the Summary Judgment Order. The Court did not suggest that the Forest Service must address the Project's unmitigated impact on the Project; rather, the Court explained that without evaluating *either* the Project's unmitigated impact *or* the effectiveness of the mitigation measures, there is no reasoned way the Forest Service could conclude that the mitigation measures would reduce any and all impact to insignificant levels (Filing No. 48 at 16). The Court also considered all the mitigation measures, not just the BMPs. *Id.* at 7 (referring to "Forest Plan guidance, project design, and Best Management Practices" collectively as "BMPs"); *id.* at 23 (specifically discussing Forest Service's reliance on Forest Plan EIS). The Court therefore declines to find harmless error on the basis that, notwithstanding the Summary Judgment Order, the Forest Service did not act arbitrarily or capriciously.

Cases discussing the harmless error standard illustrate why the error in this case was not harmless. In *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*, 896 F.3d 520 (D.C. Cir. 2018) ("*Oglala I*"), a company applied to the Nuclear Regulatory Commission (the "Commission") for a license to construct a uranium mining project in the Black Hills of South Dakota, and the Oglala Sioux Tribe intervened. *Id.* at 522. The Commission prepared an EIS and then issued the license. On administrative appeal, the Commission found that the EIS did not satisfy NEPA's "hard look" requirement because it "failed to adequately address the environmental effects of the [mining] project on Native American cultural, religious, and historical resources." *Id.* at 525. But the Commission did not suspend the license because the Tribe did not show irreparable harm. *Id.* at 525–26. The issue before the D.C. Circuit was whether the Commission properly required a showing of irreparable harm, but the doctrine of harmless error was discussed because the

Commission likened its irreparable-harm-requirement to harmless error review. The appellate court found that the Commission's error was "*nothing* like the harmless error review undertaken by this court. [While] it is true that '[courts] have applied the prejudicial error rule in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply *precisely* with NEPA procedures[,]' . . . . the error here was neither a failure of precision nor a technicality. Rather, . . . it was a 'significant deficiency' in the Staff's NEPA review." *Id.* at 534. (emphasis in original) (citations omitted) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006)).

And more recently, the Southern District of Illinois rejected the Forest Service's harmless error argument where it had approved a project several weeks before receiving a biological opinion, which the Forest Service was required to consider before moving forward with the project. *Friends of Bell Smith Springs & Reg'l Ass'n of Concerned Environmentalists v. U.S. Forest Serv.*, No. 25-CV-1377, 2026 WL 2568342, at *10–11 (S.D. Ill. Aug. 31, 2026) (vacating agency action and remanding). The district court held that the Forest Service's error was not harmless even though the biological opinion ultimately approved the project.

By contrast, courts have found harmless error where: the agency purchased property before the expiration of a comment period where no additional comments were received between the purchase and the end of the comment period, *Ind. Forest All. v. McDonald*, No. 16-cv-3297, 2017 WL 131739, at *9 (S.D. Ind. Jan. 13, 2017); the agency "placed notices in local papers, received comments from those notices, and met with various interested parties," but failed to "precisely satisfy formal scoping requirements," *Oglala Sioux Tribe v. NRC*, 45 F.4th 291, 300 (D.C. Cir. 2022); the agency released its EA after deciding to proceed with a program, but had considered the EA before making its decision, *Int'l Broth. Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206,

217 (D.C. Cir. 2013) (describing mis-timed release as a "technical error"); the agency applied an incorrectly low risk threshold but the studied risks fell below the higher threshold, *Ctr. for Biological Diversity*, 2026 WL 2330260, at *14–15; and the agency mischaracterized the plaintiffs' rights in a single, "isolated" sentence, but demonstrated a proper understanding of the plaintiffs' rights elsewhere, *Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. U.S. Dep't of Interior*, No. 21-cv-573, 2026 WL 2206073, *6 (D. Utah July 30, 2026).

Here, the Forest Service's error was not one of precisely complying with NEPA procedures, or an error that was minor and cured elsewhere in the agency's analysis. Nor was this an error in the weighing of an action's studied consequences against its benefits. *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 186 (2025); *People of the State of Ill.*, 722 F.2d at 1348–49. Rather, the Forest Service's error was a failure to reasonably evaluate the Project's impact on Lake Monroe. And because the Forest Service never adequately evaluated the Project's impact on Lake Monroe, Defendants cannot say with certainty that upon remand, the Forest Service will again find that the Project will have *no* significant environmental impact. In other words, Defendants cannot show that the error was harmless. *See Oglala I*, 896 F.3d at 534 ("If even 'significant' deficiencies in NEPA reviews are forgiven because they are merely procedural, there will be nothing left to the protections that Congress intended the Act to provide."); *Winter v. Nat Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures.").

Defendants lastly argue that the Forest Service's error was harmless because it will make the same decision upon remand in light of recent regulatory changes. In January 2026, the Council on Environmental Quality published a final rule rescinding its NEPA implementing regulations,

including those mandating the analysis of an action's cumulative impacts. *See* Removal of Nat'l Env't Policy Act Implementing Regulations, 91 Fed. Reg. 618 (Jan. 8, 2026). Defendants contend that Plaintiffs' claims focus on the Project's cumulative impacts, and now that NEPA no longer requires the Forest Service to consider such impacts, "there could be no future analysis under NEPA that would lead to a different result." (Filing No. 54 at 8).[2] Plaintiffs respond that their claims alleged the Forest Service's failure to consider the Project's cumulative, indirect, *and* direct effects on Lake Monroe, so the Forest Service's error is still not harmless.

The Court recognizes that the Project's potential cumulative impacts on the already degraded Lake Monroe has always been Plaintiffs' primary concern. *E.g.*, *Monroe I*, 595 F. Supp. 3d at 722; (Filing No. 48 at 25; Filing No. 55 at 11). But Plaintiffs alleged, and the Court found, that the Forest Service failed to adequately evaluate any type of impact on Lake Monroe, whether cumulative, indirect, or direct. Because the Forest Service never reasonably evaluated the Project's impact on Lake Monroe, the Court cannot say with any certainty that the Forest Service will reach the same conclusion upon remand. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (stating remand is not needed only "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record").The harmless error doctrine therefore does not apply.

**B. <u>Remand with or without Vacatur</u>**

**1. <u>Standard for Vacatur</u>**

The Court begins with a discussion of the applicable standard for ordering vacatur, which the parties dispute on two fronts. The parties first disagree as to whether vacatur is a presumptive

---

[2] The parties dispute whether the rescinded regulations would apply to the Forest Service upon remand (Filing No. 54 at 8 (implying that the rescinded regulations would not apply); Filing No. 57 at 11 (arguing that the Forest Service remains bound by all regulations in place when the Project was first proposed)). The Court need not resolve this issue because even if the regulations did not apply on remand, the agency's error was not harmless.

remedy. Plaintiffs contend that it is, citing the language of the APA and cases[3] noting that vacatur is the usual remedy when a court finds a violation of the APA. (Filing No. 55 at 9); 5 U.S.C. § 706(20(A) ("The reviewing court shall . . . set aside agency action, findings, and conclusions . . . ."); *Johnson v. U.S. Off. of Personnel Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015) (referring to vacatur as "the presumptive remedy for a violation of the Administrative Procedure Act"). Defendants respond that no binding precedent requires the Court to vacate the Decision, and that vacatur is only one available remedy under the APA (Filing No. 56 at 2–3).

Despite their dispute, the Court finds that both parties are correct. "Vacatur is the presumptive remedy for a violation of the Administrative Procedure Act, [but] courts have discretion to craft other remedies." *Johnson*, 783 F.3d at 663 (7th Cir. 2015) (citation modified). Defendants contend that the United States Supreme Court did away with this presumption in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025) (*see* Filing No. 56 at 4). The *Seven County* court did not expressly reject vacatur as the presumptive remedy under the APA, although it did remind that "review of an agency's [analysis] is not the same thing as review of the agency's final decision," and caution lower courts to think twice before vacating a decision. So although this Court agrees with Plaintiffs that vacatur is the ordinary remedy for APA violations, the Court remains mindful of *Seven County*'s guidance in crafting an appropriate remedy here.

[3] As Defendants point out, and Plaintiffs acknowledge, Plaintiffs misquote and/or miscite at least three cases in their Motion to Vacate (Filing No. 55 at 4, 8, 10), and include one quotation with no attributed source, *id.* at 11 ("strong presumption in favor of vacatur"). The Court's review of Plaintiffs' Motion revealed yet another citation error, *id.* at 55 (attributing quote to order in *Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*, published at 177 F. Supp. 3d 146 (D.D.C. 2016), instead of the order published at 189 F. Supp. 3d 1 (D.D.C. 2016)). This Court has stated that "[c]onfirming a case is good law is a basic, routine matter and something to be expected from a practicing attorney." *Mid Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC*, No. 24-cv-326, 2025 WL 574234, at *2 (S.D. Ind. Feb. 21, 2025). Sadly, failures to meet these basic obligations have received heightened attention in recent months, thanks to the widespread use of generative artificial intelligence. Failures similar to Plaintiffs' have warranted sanctions in several cases. *E.g.*, *Platt v. Volunteers of Am. Ohio & Ind.*, No. 25-cv-1866, 2026 WL 670057, at *1 (S.D. Ind. Mar. 10, 2026) (citing cases). Here, there is no allegation of generative AI use, or a request for sanctions. The Court merely reminds counsel that they must take care to ensure accuracy in their citation to authority, and ensure compliance with their professional obligations.

Second, the parties dispute the applicable burden of proof for vacatur. Defendants contend that because vacatur would "'ha[ve] the effect of an injunction" in that it would "end[] the Project, at least until the Forest Service issues a new decision," Plaintiffs must satisfy the test for a permanent injunction before the Court can grant vacatur (Filing No. 54 at 5–6). Defendants rely on *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139 (2010), for this proposition. But the vacatur and the injunctions in *Monsanto* were distinct remedies that were analyzed separately. In *Monsanto*, following an EA and Finding of No Significant Impact, the defendant-agency deregulated a certain variety of alfalfa. The district court found that the agency violated NEPA by not completing an EIS, and it "sought to remedy [that] violation in three ways: "vacatur of the agency's deregulation decision and two injunctions. *Id.* at 156. Neither party challenged the vacatur remedy on appeal, so the Supreme Court "assume[d] without deciding that the District Court acted lawfully in vacating the deregulation decision" and "address[ed] only the latter two aspects of the District Court's judgment." *Id.* As such, *Monsanto* is inapposite.

Defendants cite one other district court case merging the vacatur and injunction standards, but that case is not persuasive because that court held the agency did not act arbitrarily or capriciously, so its denial of a specific APA remedy is dicta. *ForestKeeper v. La Price*, 270 F. Supp. 3d 1182, 1226 (E.D. Cal. 2017). Further, in applying the injunction standard to the plaintiff's request for vacatur, that court relied on *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which addressed only a motion to vacate a preliminary injunction, not a request to vacate an agency decision. *Id.* This Court therefore declines to hold Plaintiffs to the permanent injunction standard to show that vacatur is appropriate here.

**2. <u>Whether Vacatur is Appropriate</u>**

With the applicable standard resolved, the Court turns to whether remand with or without vacatur is appropriate. The parties' arguments for and against vacatur are organized consistent with

the framework set out in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993). In *Allied-Signal*, the D.C. Circuit stated that the decision whether to vacate an agency decision depends on: "the seriousness of the . . . deficiencies"; and "the disruptive consequences of an interim change that may itself be changed." *Id.* at 150–51. Several courts have applied this framework, but the Seventh Circuit is not one of them, so the Court uses the *Allied-Signal* framework only as a tool to organize its discussion.

Plaintiffs argue that vacatur is appropriate considering Lake Monroe's highly erodible soils, diminished water quality, and use as drinking water by thousands of residents, as well as the Forest Service's repeated failure to produce an adequate environmental analysis. (Filing No. 55 at 15). Plaintiffs contend that vacatur would not cause any disruptive consequences to the Forest Service. *Id.* at 15–16.[4] Defendants, on the other hand, argue that the Forest Service has complied with each of this Court's orders, and that vacatur would disrupt critical work intended to improve the water quality in the Project area (Filing No. 54 at 8–11).

The seriousness of the Forest Service's error and its repeated failure to resolve that error favor the ordinary remedy of vacatur. A few months after the Court issued its summary judgment order in *Monroe I*, instead of conducting additional NEPA analysis, the Forest Service prepared a Supplemental Information Report, which is "not as detailed or thorough as an Impact Statement," is not necessarily "subject . . . to public comment," and have only been upheld to determine "whether new information or changed circumstances require[] the preparation of a supplemental EA or EIS." *Monroe II*, 2023 WL 2683125, at *5. A few months after the parties stipulated to the dismissal of *Monroe II*, the Forest Service issued its SEA, which perfunctorily concluded that because mitigation efforts generally mitigate environmental impacts, the Forest Service's

[4] The Court agrees with Defendants that Plaintiffs' new information on turbidity monitoring and arguments regarding old growth forests are not relevant to the instant issue, so the Court does not consider those arguments.

mitigation efforts (the Forest Plan, BMPs, and monitoring) would reduce all impacts of the Project on Lake Monroe to insignificant levels. The Forest Service, despite having had two attempts to do so, has not offered any information that would bear on *this Project's* impact on *Lake Monroe* (Filing No. 48 at 23–26). Additionally, Defendants' statement in supplemental briefing that they do not know "what more could be required under NEPA" convinces the Court that remand without vacatur would not lead to any meaningful analysis (Filing No. 54 at 11); *see WildEarth Guardians v. Bernhardt*, 423 F. Supp. 3d 1083, 1105 (D. Colo. 2019) ("Because remand without vacatur or injunction would incentivize agencies to rubber stamp a new approval, rather than take a true and informed hard look, I must enjoin further action until the agency review is completed.").

Plaintiffs argue that this case is analogous in several ways to *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021). The Court agrees. In *Standing Rock*, the plaintiff had raised an initial, successful challenge to the Corps of Engineers' decision to issue an easement for an oil pipeline without first preparing an EIS, resulting in remand to the agency. The Corps completed its remand analysis, again determined that no EIS was needed, and the plaintiffs again sued. The district court again agreed with the plaintiff but, unlike the first challenge, found that vacatur of the easement, among other remedies, was warranted. *Id.* at 1042. The Corps and pipeline company appealed the district court's vacatur. The circuit court found no abuse of discretion in the district court's findings "that the Corps was unlikely to resolve the controversies on remand because the court had previously remanded without vacatur for just that purpose and the Corps had nonetheless failed to resolve them," and that the significant economic harm of shutting down the pipeline did not justify remand without vacatur. *Id.* at 522. Defendants argue this case is distinguishable from *Standing Rock* by noting that the project being challenged

and potential risks of those projects are different (Filing No. 56 at 4).[5] The distinctions in the specific projects and environmental risks are immaterial. The type of error and inability to cure the errors are material, and the Court is persuaded by the reasoning in *Standing Rock* that vacatur is an appropriate remedy in this case.

As to the disruption caused by vacatur, Defendants argue that vacatur would prevent the Forest Service from performing two "critical restoration activities" that are designed to improve water quality in the Project area (the "Critical Restoration Activities"): (1) the "replacement of two undersized culverts and one undersized concrete structure in the Project area"; and (2) the "reconstruction of 4.9 miles of existing road and decommissioning of 2.7 miles of existing road" (Filing No. 54 at 8–10).

On reply, Plaintiffs argue Defendants are merely speculating that vacatur would disrupt the Critical Restoration Activities because, as Defendants acknowledge, the disruption would occur only "*if* funding becomes available." (Filing No. 10 & n.1 (emphasis added); Filing No. 57 at 9). The Court agrees that because there is no funding for the Critical Restoration Activities, the disruption of those activities is speculative. Nevertheless, Plaintiffs do not oppose a partial vacatur that would allow the Critical Restoration Activities to proceed, alleviating Defendants' concerns (Filing No. 57 at 10). *See Monsanto*, 561 U.S. at 165–66 (referring to "partial or complete vacatur"); *Johnson*, 783 F.3d at 663 ("[P]artial vacatur is sometimes an appropriate remedy."); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79 (D.D.C. 2010) (ordering partial vacatur).

Considering the seriousness of the potential impact on Lake Monroe, the seriousness of the Forest Service's error, the agency's prior inability to remedy that error, and the remediable

[5] Defendants also seem to imply that *Standing Rock* is distinguishable because the pipeline project entailed a substantially greater impact than the Project, (Filing No. 56 at 4 (stating pipeline would "'move more than half a million gallons of crude oil . . . each day' *underneath* Lake Oahe" (emphasis in original)), that argument is misplaced. The error in both *Standing Rock* and this case is the failure to adequately evaluate what impact the project will have.

disruption that vacatur would cause, the Court finds that a partial vacatur is appropriate here. The Court will therefore remand this action with vacatur, except that the vacatur will not apply to the Critical Restoration Activities. This remedy will allow the Forest Service to proceed with its work to improve the Project area's water quality, but still require it to take the necessary hard look at the potential environmental impacts of the Project's other work.

**C. Scope of Vacatur**

One dispute remains as to what the Court may vacate. The parties agree that the Court may vacate the Decision and Finding of No Significant Impact, but Defendants argue that the Court lacks authority to vacate the EA or SEA (Filing No. 54 at 11). Defendants cite one case in support of their position, *Friends of the Everglades, Inc. v. Secretary of Department of Homeland Security*, No. 25-cv-12873, 2025 WL 2598567 (11th Cir. Sep. 4, 2025). There, the Eleventh Circuit noted that the failure to prepare an EIS "is not *itself* a final agency action for purposes of APA review" and "is merely an 'input' into an agency decision." *Id.* at *5 (citing *Seven Cnty.*, 145 S. Ct. at 1511). However, *Friends of the Everglades* does not hold that only reviewable agency actions are subject to vacatur. Indeed, recent dicta from the Supreme Court directly rebuts this proposition. *Nat'l Insts. Health v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2662 n.1 (Barrett, J., concurring) (2025) ("If a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward."). To be sure, district courts routinely vacate EAs and EISs. *See, e.g.*, *Cascadia Wildlands v. U.S. Bureau Land Mgmt.*, No. 24-cv-01641, 2026 WL 1998555, at *4 (D. Ore. July 9, 2026) (denying motion to reconsider vacatur of decision records, Finding of No Significant Impact, and EA); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau Land Mgmt.*, Nos. 23-cv-00519, 23-cv-01163, 2026 WL 1507899, at *1 (D. Ore. Mar. 31, 2026) (recommending partial vacatur of decision, Finding of No Significant Impact, and EA as to logging portions of project); *Powder River Basin Res. Council v. U.S. Dep't Interior*, No. 22-cv-

2696, 2026 WL 555013, at *10 (D.D.C. Feb. 27, 2026) (vacating decision and EIS); *Ctr. Biological Diversity v. U.S. Forest Serv.*, 811 F. Supp. 3d 1206, 1231 (D. Mont. 2025) (vacating decision and EA). The Court may vacate the EA and SEA.

## III. CONCLUSION

For the reasons explained above, Plaintiffs' Motion to Vacate is **GRANTED in part and DENIED in part** (Filing No. 55) in that the Court orders a **PARTIAL VACATUR**. The Project Decision, Finding of No Significant Impact, EA, and SEA are **VACATED**, **except** as they relate to the Critical Restoration Activities, and this matter is **REMANDED** to the Forest Service for further proceedings consistent with NEPA, the APA, and this Court's prior orders.

**SO ORDERED**.

Date: September 8, 2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Matthew Ryan Arnold
Eubanks & Associates, PLLC
matt@eubankslegal.com

William S. Eubanks II
EUBANKS & ASSOCIATES, LLC
bill@eubankslegal.com

W. Russell Sipes
Sipes Law Firm PC
wrs@sipeslawfirm.com

Reade Wilson
DOJ-Enrd
reade.wilson@usdoj.gov